**Opinions Holding That An Unsecured Or Undersecured Claim
For Postpetition Attorneys' Fees *Cannot* Be Allowed**

KeyCite Yellow Flag - Negative Treatment
Disagreed With by In re Pioneer Carriers, LLC, Bankr.S.D.Tex.,
February 8, 2018

2017 WL 5714111
United States District Court,
E.D. North Carolina,
Western Division.

SUMMITBRIDGE NATIONAL
INVESTMENTS III, LLC, Appellant,
v.
Ollie William FAISON, Appellee.

No. 5:17-CV-384-BO
|
Signed 11/22/2017
|
Filed 11/27/2017

ON APPEAL FROM THE UNITED STATES
BANKRUPTCY COURT FOR THE EASTERN
DISTRICT OF NORTH CAROLINA RALEIGH
DIVISION

**Attorneys and Law Firms**

Daniel C. Bruton, Bell, Davis & Pitt, P.A., Winston-
Salem, NC, for Appellant.

John A. Northen, Northen Blue, LLP, Chapel Hill, NC,
for Appellee.

ORDER

TERRENCE W. BOYLE, UNITED STATES
DISTRICT JUDGE

**\*1** This cause comes before the Court on SummitBridge
National Investment's appeal of an order of the United
States Bankruptcy Court for the Eastern District of North
Carolina entered July 13, 2017. [DE 1-1]. The appeal
has been fully briefed and is ripe for review. For the
reasons that follow, the decision of the bankruptcy court
is affirmed.

BACKGROUND

Ollie William Faison, the debtor and appellee in this
matter, filed a petition for relief under Chapter 11 of the
Bankruptcy Code on January 3, 2014. Branch Banking
& Trust Company (BB&T) filed a proof of claim for
the total prepetition amount of $1,627,239.82 under three
promissory notes cross-collateralized by two deeds of trust
encumbering roughly 372 acres of farmland in Orange
County, North Carolina. Each promissory note provided
for reasonable attorneys' fees should the note be placed
with an attorney for collection. Faison was not in default
on the loans which formed the basis of BB&T's claims
at the time the Chapter 11 petition was filed. In January
2015, BB&T sold and assigned its interests in the subject
promissory notes and deeds to appellant SummitBridge.

Faison's fifth amended plan of reorganization under
Chapter 11 was confirmed by order of the bankruptcy
court on November 16, 2015. The reorganization plan
provided that Class 4 consisted of claims five, six, and
seven held by SummitBridge and secured by the subject
Orange County property. The reorganization plan treated
the Class 4 claim as an allowed secured claim in the
aggregate amount of $1,715,000.00, inclusive of principal,
prepetition interest, and post-petition interest, appraisal
fees, late fees, and attorneys' fees. [DE 8-3]. The plan
provided that Faison would convey the SummitBridge
collateral to the holder of the Class 4 claim or its designee,
subject only to ad valorem taxes for the calendar years
2016 and 2017 and the existing deed of trust securing
such indebtedness, in full satisfaction of the secured claim.
The plan further provided that such treatment would not
impair the right of the holder of the Class 4 claim to seek
allowance of unsecured attorneys' fees and expenses in
addition to the Class 4 allowed secured claim, nor the right
of the debtor to oppose or object to the allowance of such
an unsecured claim. Id.

Faison tendered to SummitBridge on December 1, 2016,
a deed sufficient to convey the SummitBridge collateral
to the designee of SummitBridge in satisfaction of
the Class 4 allowed secured claim. SummitBridge then
timely filed Claim 16 in the amount of $302,596.19
seeking allowance of a non-priority unsecured claim
for post-petition attorneys' fees equal to 15% of the
outstanding indebtedness. [DE 9-4]. Faison objected to
SummitBridge's claim for post-petition attorneys' fees,
and a hearing was conducted before the bankruptcy court
on March 1, 2017.

In its order currently under review, the bankruptcy court concluded that 11 U.S.C. §§ 506(b) and 502(a) and (b) do not permit the recovery of post-petition attorneys' fees sought as unsecured claims. In so holding, the bankruptcy court relied, *inter alia,* on its prior decisions which have held that consideration of a claim for post-petition attorneys' fees is governed by Section 506, which provides an exception to the general rule under Section 502 that claims must be determined on the petition date, and that Section 506 by its express terms applies only to oversecured creditors. *See In re Davis, 570 B.R. 522, 526 (Bankr. E.D.N.C. 2017)* (citing *In re Constr. Supervision Servs., Inc.,* Case No. 12-00569-8-SWH, 2015 WL 4873062, at *4 (Bankr. E.D.N.C. Aug. 13, 2015) and *Ins. Co. of N. Am. v. Sullivan,* 333 B.R. 55, 61 (D. Md. 2005)).

## JURISDICTION AND STANDARD OF REVIEW

**\*2** Jurisdiction over this appeal is proper pursuant to 28 U.S.C. § 158(a), which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals ... from final judgments, orders, and decrees ... of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." A bankruptcy court's findings of fact shall not be set aside unless clearly erroneous. *In re White,* 487 F.3d 199, 204 (4th Cir. 2007). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948). Legal conclusions made by the bankruptcy court are reviewed de novo. *In re White,* 487 F.3d at 204. Mixed questions of law and fact are also reviewed de novo. *In re Litton,* 330 F.3d 636, 642 (4th Cir. 2003). As this appeal involves a pure question of law, the Court reviews the bankruptcy court's conclusions de novo.

## DISCUSSION

Claims are defined by the Bankruptcy Code as the right to payment. 11 U.S.C. § 101(5)(a). Section 502 of the Bankruptcy Code, which addresses whether a claim may be allowed, sets out that a claim or interest, proof of which is properly filed, is deemed allowed unless the debtor or other interest party objects. 11 U.S.C. § 502(a). If an objection is filed, the court must determine the amount of the claim as of the date of the filing of the bankruptcy petition, and shall allow the claim in that amount except where certain circumstances are present, including where the claim is unenforceable against the debtor or the claim is for unmatured interest or an unmatured debt. *Id. § 502(b).* Section 506 of the Bankruptcy Code addresses the determination of the secured status of a creditor whose claim has been allowed. *Id. § 506.* Section 506(b) provides that reasonable fees, costs, or charges provided for under an agreement or applicable state statute may be recovered where the value of the collateral exceeds the amount of the allowed claim, resulting in an oversecured creditor. *Id. § 506(b).* In other words, § 506(b) preserves the right of a secured creditor to recover post-petition interest, attorneys' fees, and costs to the extent the value of the collateral exceeds the amount of the claim determined under § 502. *See generally United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988); *Unsecured Creditors' Comm. 82-00261c-11A v. Walter E. Heller & Co. Se.,* 768 F.2d 580, 585 (4th Cir. 1985); *In re Record Enterprises, Ltd.,* 189 B.R. 769, 770 (D. Neb. 1986) (fees under § 506(b) interpreted to include attorneys' fees).

SummitBridge contends that its unsecured claim for post-petition attorneys' fees should be allowed under Section 502(b), which defines which claims are allowed and is wholly silent as to the allowance or disallowance of a claim for post-petition attorneys' fees. In support of its argument, SummitBridge relies heavily on an expansive reading of *Travelers Casualty and Surety Company of America v. Pacific Gas and Electric Company,* wherein the Supreme Court decided "whether the Bankruptcy Code disallows contract-based claims for attorney's fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." 549 U.S. 443, 449 (2007). In concluding that the Bankruptcy Code does not disallow such claims, the Supreme Court abrogated the *Fobian* rule, a rule adopted only in the Ninth Circuit which held that attorneys' fees for work on issues peculiar to federal bankruptcy law are not recoverable in bankruptcy. *Id.* at 451 (citing *In re Fobian,* 951 F.2d 1149, 1153 (9th Cir. 1991)). In holding that the *Fobian* rule was not supported by the Bankruptcy Code, the Supreme Court noted that "the Code says *nothing* about unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law," and that, in the absence of a clear and express exception, claims enforceable under applicable

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

state law and presumed to be allowed in bankruptcy. *Id.* at 452-53 (emphasis in original). SummitBridge contends that application of *Travelers* in this context results in a conclusion that, because Section 502 is silent as to a claim for unsecured post-petition attorneys' fees, such a claim is presumed to be allowed.

**\*3** The bankruptcy court in this case recognized that a "a number of courts adopt some version of the position advanced by SummitBridge, and hold generally that post-petition attorneys' fees are allowable as an unsecured claim, irrespective of whether the creditor is oversecured." [DE 1-1 at 11] (citing *In re 804 Congress, L.L.C.,* 756 F.3d 368 (5th Cir. 2014), *on remand,* 529 B.R. 213 (Bankr. W.D. Tx. 2015); *In re SNTL Corp.,* 571 F.3d 826, 842 (9th Cir. 2009); *In re Welzel,* 275 F.3d 1308 (11th Cir. 2001)); *see also Ogle v. Fid. & Deposit Co. of Maryland,* 586 F.3d 143, 148 (2d Cir. 2009) (§ 506(b) "does not implicate unsecured claims for post-petition attorneys' fees, and it therefore interposes no bar to recovery."). These courts generally have reasoned that claims for post-petition attorneys' fees are contingent, unliquidated claims which are not precluded by Section 502 and are thus allowable. *See, e.g., In re SNTL Corp.,* 571 F.3d at 840-45.

The bankruptcy court also recognized that a number of other courts

> adhere to the view held by this court, that § 506(b) provides the *only* means within the Bankruptcy Code in which a secured creditor is entitled to post-petition attorneys' fees." *Construction Supervision Servs.,* 2014 WL 4873062 at *4, citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd.,* 484 U.S. 365 (1988). "If attorneys' fees were allowable on the unsecured portion of a debt, there would be no need for [§ 506(b) ]. If Congress had intended for the holders of both secured claims and unsecured claims to recover attorneys' fees, it could have easily said so. But it did not." *In re Saunders,* 130 B.R. 208, 210 (Bankr. W.D. Va. 1991), *quoted in In re Miller,* 344 B.R. 769 (Bankr. W.D. Va. 2006) (adopting same position that undersecured or unsecured creditors cannot be allowed an unsecured claim for post-petition contractual attorneys' fees); *see also, e.g., In re Electric Machinery Enterprises, Inc.,* 371 B.R. 549, 550-51 (Bankr. M.D. Fla. 2007).

[DE 1-1 at 11].

Having considered the arguments of the parties and, in the absence of binding circuit precedent, the persuasive authority from within and outside this circuit, the Court concludes that the bankruptcy court did not err in declining to deviate from its prior holdings. The Court agrees with the bankruptcy court that the Bankruptcy Code does not permit SummitBridge, a secured creditor, to advance an unsecured claim for post-petition attorneys' fees on the premise that these fees are somehow independent of its secured claim, and thereby avoid the application of § 506(b).

As has been recognized, the Supreme Court in *Travelers* did not address the issue now before this Court; rather, the *Travelers* court declined to express an opinion as to whether, after the demise of the *Fobian* rule, there might be another basis for disallowing an unsecured claim for attorneys' fees. *Travelers,* 549 U.S. at 443. Consistent with *Travelers,* a provision of the Bankruptcy Code, including § 506(b), may provide the basis to render a claim unenforceable; Section 502(b) itself provides that a claim shall not be allowed if it is unenforceable against the debtor and the property of the debtor under an agreement or *applicable law.* 11 U.S.C. § 502(b)(1); *see also* Jennifer M. Taylor & Christopher J. Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post-Petition Attorneys' Fees Against the Bankruptcy Estate,* 81 AM. BANKR. L.J. 123, 147 (2007).

The Bankruptcy Code expressly awards post-petition fees under several circumstances, none of which include an award of post-petition attorney's fees to an unsecured creditor. *In re Seda France, Inc.,* No. 10-12948-CAG, 2011 WL3022563, at *3 (Bankr. W.D. Tex. July 22, 2011) (listing circumstances and citing Taylor & Mertens, *supra,* 81 AM. BANKR. L.J. at 148-49). Thus, it is reasonable to conclude that, in the absence of any express exception, unsecured creditors are not entitled to post-petition attorneys' fees. *See Andrus v. Glover Const. Co.,* 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). Indeed, the Supreme Court has previously held that Section 506(b) has "the substantive effect of denying undersecured creditors postpetition interest on their claims-just as it denies *over* secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the

SummitBridge National Investments III LLC v. Faison, Slip Copy (2017)
2017 WL 5714111, 64 Bankr.Ct.Dec. 247

claim, will exceed the value of the collateral." *Timbers, 484 U.S. at 372.* To allow SummitBridge's unsecured claim for post-petition fees under § 502 arguably renders the language of § 506(b) superfluous, and this Court agrees with those that have found that the Code is most properly interpreted to allow only oversecured creditors to add post-petition attorneys' fees. *In re Auge,* 559 B.R. 223, 229 (Bankr. D.N.M. 2016).

**\*4** Finally, the Court has considered the equities in allowing a secured creditor to file an unsecured claim to recover post-petition attorneys' fees, which would "reduce the pool of assets available" to other unsecured creditors seeking to recover their prepetition debt. *In re Glob. Indus. Techs., Inc.,* 327 B.R. at 240. The equities clearly weigh

in favor of the protection of assets for distribution to all creditors. It is for all of these reasons that the Court affirms the judgment of the bankruptcy court.

<u>CONCLUSION</u>

For the foregoing reasons, the order of the bankruptcy court is AFFIRMED.

SO ORDERED, this <u>22nd</u> day of November, 2017.

**All Citations**

Slip Copy, 2017 WL 5714111, 64 Bankr.Ct.Dec. 247

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Disagreed With by In re Pioneer Carriers, LLC, Bankr.S.D.Tex.,
February 8, 2018

574 B.R. 63
United States Bankruptcy Court,
E.D. North Carolina,
Raleigh Division.

IN RE: Ollie William FAISON, Debtor

CASE NO. 14–00073–5–SWH
|
Signed 07/13/2017

**Synopsis**
**Background:** Individual Chapter 11 debtor objected to
proof of claim filed by creditor for postpetition attorney
fees and costs.

**[Holding:]** The Bankruptcy Court, Stephani W.
Humrickhouse, J., held that oversecured creditor that had
already received conveyance of real property securing its
claim pursuant to terms of debtor's confirmed Chapter 11
plan had received all that it was due under the Bankruptcy
Code, and was not entitled to unsecured claim for its
postpetition attorney fees and costs.

Objection allowed.

West Headnotes (8)

**[1]    Bankruptcy**
         Fees, Costs, or Charges; Attorney Fees

         Applicable state law determines whether
         oversecured creditor is entitled to postpetition
         attorney fees as addition to its secured claim.
         11 U.S.C.A. § 506(b).

         1 Cases that cite this headnote

**[2]    Costs**
         Contracts

         Under North Carolina state law, reasonable
         attorney fees incurred in connection with

collection of debt may be recovered when
promissory note provides for such recovery.
N.C. Gen. Stat. Ann. § 6-21.2.

Cases that cite this headnote

**[3]    Bankruptcy**
         Fees, Costs, or Charges; Attorney Fees

         Oversecured creditor that had already
         received conveyance of real property securing
         its claim pursuant to terms of debtor's
         confirmed Chapter 11 plan had received all
         that it was due under the Bankruptcy Code,
         and was not entitled to unsecured claim
         for its postpetition attorney fees and costs
         regardless of whether such fees and costs were
         recoverable under state law. 11 U.S.C.A. §§
         502, 506(b).

         1 Cases that cite this headnote

**[4]    Bankruptcy**
         Fees, Costs, or Charges; Attorney Fees

         Bankruptcy statute governing rights of
         oversecured creditors is the only means within
         the Bankruptcy Code by which a secured
         creditor may recover postpetition attorney
         fees. 11 U.S.C.A. § 506(b).

         Cases that cite this headnote

**[5]    Bankruptcy**
         Amount; reasonableness thereof

         Bankruptcy statute governing rights of
         oversecured creditors allows such creditor
         to add postpetition interest and reasonable
         postpetition attorney fees to its secured claim
         to the extent of the value of its collateral. 11
         U.S.C.A. § 506(b).

         Cases that cite this headnote

**[6]    Bankruptcy**
         Fees, Costs, or Charges; Attorney Fees

         For a creditor to be entitled to postpetition
         attorney fees and costs, creditor must
         demonstrate that: (1) it is oversecured; (2) the
         underlying agreement provides for such fees

Case 1:15-cv-01116-RGA   Document 29-1   Filed 11/01/18   Page 7 of 82 PageID #: 1361

and costs; and (3) the requested fees and costs are reasonable. 11 U.S.C.A. § 506(b).

1 Cases that cite this headnote

[7]    **Bankruptcy**
👉 Claims allowable;what constitutes 'claim.'

**Bankruptcy**
👉 Fees, Costs, or Charges;Attorney Fees

Bankruptcy statute governing rights of oversecured creditors is an exception to the general rule that claims are determined as of petition date and permits a party to bring a claim for fees, costs, or charges incurred postpetition, provided that the party bringing the claim is oversecured creditor. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

[8]    **Bankruptcy**
👉 Contract provisions, necessity and effect

In absence of an agreement permitting recovery of reasonable attorney fees and costs, postpetition interest is the only added recovery available to oversecured creditor. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*64** John A. Northen, Vicki L. Parrott, Northen Blue, LLP, Chapel Hill, NC, for Debtor.

## ORDER ALLOWING OBJECTION TO CLAIM

Stephani W. Humrickhouse, United States Bankruptcy Judge

The matter before the court is the objection to claim filed by debtor O. William Faison with respect to SummitBridge National Investments III, LLC's proof of claim in the amount of $302,596.19. A hearing took place in Raleigh, North Carolina on March 1, 2017, at the

conclusion of which the court took the matter under advisement. For the reasons that follow, the court will allow the objection.

## BACKGROUND AND PROCEDURAL POSTURE

The debtor, O. William Faison ("Faison"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on January 3, 2014. The debtor is a trial attorney and remains in possession of certain assets, including sizeable real property holdings in Orange, Wake, and Vance counties. SummitBridge held prepetition claims against the debtor in the total amount of $1,627,239.82, secured by real property in Orange County. On November 10, 2016, SummitBridge filed a proof of claim ("Claim 16") in the amount of $302,596.19, seeking allowance of a non–priority unsecured claim for attorneys' fees **\*65** equal to 15% of the outstanding indebtedness. Specifically:

> Pursuant to the terms of its promissory notes and N.C.G.S. § 6–21.2, SummitBridge is entitled to payment by the Debtor of attorneys['] fees] equal to fifteen percent (15%) of the outstanding balance of its debt(s). Fifteen percent (15%) of the outstanding indebtedness amount of $2,017,307.93 is $302,596.19. SummitBridge asserts a general unsecured claim against the Debtor/bankruptcy estate in such amount.

> To the extent that the Court determines that SummitBridge is not entitled to attorneys' fees in the amount of fifteen percent (15%) of its outstanding indebtedness, and that, instead, SummitBridge is only entitled to a general unsecured claim for its actual attorneys' fees and costs, SummitBridge asserts a general unsecured claim in the total amount of $101,020.16 [for attorneys' fees, costs and expert witness fees incurred subsequent to the filing of the bankruptcy case].

Addendum to Proof of Claim of SummitBridge, Claim 16–1 Part 2.

The debtor's Fifth Amended Chapter 11 plan ("the Plan") was confirmed on November 15, 2016, and became effective on December 1, 2016. SummitBridge does not dispute the debtor's accounting of the procedural posture of the matter, which is as follows:

5. The Plan provided that Class 4 shall consist of the claims held by [SummitBridge] as set forth in (I) Claim No. 6, secured by Patterson Lots 16 & 17 and Walker Lots 1 & 2, (ii) Claim No. 5, secured by a first lien on Bellechene Lots 9 & 15, and the barn and acreage referred to as the "Barn Tract," and (iii) Claim No. 7, secured by a second lien on Bellechene Lots 9 & 15, and ... the "Barn Tract." ... As of the Petition Date, the loans which form the bases for the filed claims were not in default.

6. The Plan treated the Class 4 claims as an Allowed Secured Claim in the aggregate amount of $1,715,000 inclusive of principal, prepetition interest, postpetition interest, appraisal fees, late fees, and attorneys' fees incurred, as determined under Section 506 of the Bankruptcy Code. The Plan provided that the Debtor shall convey the SummitBridge Collateral to the holder of the Class 4 Claim or its designee, subject only to (i) ad valorem taxes for the calendar year 2016 and for the calendar year 2017, if applicable, and (ii) the existing deed of trust securing such indebtedness, in full satisfaction of such claim pursuant to Section 1129(b)(2)(A)(iii); provided however, such treatment shall not impair the right of the holder of the Class 4 Claim from filing or requesting allowance of an unsecured claim for attorneys' fees and expenses in addition to the Class 4 Allowed Secured Claim, nor the right of the Debtor or any party in interest to object to or oppose allowance of such an unsecured claim.

7. On December 1, 2016, SummitBridge provided written notice to the Debtor, pursuant to N.C.G.S. § 6–21.2, that SummitBridge intended to enforce the provisions in the loan documents which provide for recovery of its attorneys' fees and costs, and that the Debtor may avoid any obligation to pay such fees and costs by paying the entire outstanding balance due within 5 days of the date of the letter....

8. On December 1, 2016, the Debtor tendered to SummitBridge a deed, duly executed and acknowledged, sufficient to convey the SummitBridge Collateral to the designee of SummitBridge in satisfaction of the Class 4 Allowed Secured Claim....

**\*66** Debtor's Objection to Claim No. 16 Filed by SummitBridge (D.E. # 544) ("Debtor's Objection") at 2–3. At the time the petition was filed, the debtor was not in default.

The debtor contends that to the extent SummitBridge may be entitled under North Carolina law to recover its post-petition attorneys' fees and legal expenses, the mandatory written notice component of that recovery was satisfied by the debtor's delivery to SummitBridge of the duly executed and acknowledged deed to the SummitBridge collateral. Because delivery of the deed "constituted payment-in-kind in the full amount of the indebtedness," the debtor argues, SummitBridge cannot recover attorneys' fees or costs under state law. Alternatively, the debtor maintains that if tender of the deed did not constitute payment of the outstanding indebtedness "so as to bar recovery of any attorneys' fees or costs," then SummitBridge still is not entitled to recover those fees under applicable federal law: "SummitBridge has already received what was permitted under Section 506(b) pursuant to the Plan, and the Bankruptcy Code does not provide for allowance of an unsecured claim for post-petition attorneys' fees or costs." Debtor's Objection at 4.

Responding, SummitBridge points out that it "initially brought the attorneys' fee issue to the fore in an Amended Motion to Lift Stay filed on April 22, 2016." Reply by SummitBridge National Investments III, LLC To Objection (D.E. # 549) ("SummitBridge Reply") at 2. In the April 2016 motion to lift stay, which was heard in connection with the debtor's initial plan confirmation hearing, SummitBridge asked the court to lift or modify the stay to allow SummitBridge to serve the attorneys' fee notice required by N.C.G.S. § 6–21.2(5). By order entered on September 2, 2016, the court denied both confirmation and the motion to lift stay, without prejudice. (D.E. # 501) SummitBridge filed an additional motion for relief from stay on October 3, 2016. That motion was denied as moot in connection with the eventual confirmation of the debtor's Plan, which lifted the stay as a matter of law on the plan's effective date of December 1, 2016. This, SummitBridge argues, is relevant to the instant matter for the following reasons:

> [T]he Debtor takes the position that the deliver of the deed to SummitBridge constitutes "payment-in-kind" of the full amount of the SummitBridge indebtedness (within the statutory 5 day time period), and that SummitBridge is therefore not entitled to recover any attorneys'

fees under applicable North Carolina law. Had the Court lifted the automatic stay back when SummitBridge originally requested such relief (in the spring of 2016), and at a time when the surrender of SummitBridge's collateral was not contemplated, then the debtor would not have been able to (arguably) "pay" SummitBridge's debt via the delivery of a deed. By denying such relief, at the time that SummitBridge requested the same, this Court has effectively prejudiced SummitBridge's right to collect attorneys' fees. There is no discernable reason why the automatic stay should not have been lifted to allow SummitBridge to issue the attorneys' fee notice back in the spring of 2016. In fact, as stated above, this Court provided no such reasoning in its September 2, 2016 Order. By denying SummitBridge such relief, this Court has effectively created the timing "loophole" that the Debtor now seeks to take advantage of—tendering the deed in supposed full satisfaction of SummitBridge's debt on the same date that SummitBridge issued the attorneys' fees notice to the debtor....

SummitBridge Reply at 3–4. SummitBridge also contends that on these facts, **\*67** the interaction between 11 U.S.C. §§ 506 and 502 is such that SummitBridge has an unsecured claim for attorneys' fees which is allowable under § 502(a).

At the hearing, it became evident that there are three main issues before the court, each of which presents a purely legal question: 1) whether the debtor's delivery of the deed satisfied North Carolina's statutory five-day notice period such that compliance relieves the estate of the obligation to pay attorneys' fees; 2) whether the Bankruptcy Code permits SummitBridge to pursue this unsecured claim for post-petition attorney fees; 3) and, if so, whether such fees would be allowed at the 15% rate or in a "reasonable" or actual amount. At the conclusion of the hearing, the court informed the parties that this matter probably would be decided on the second issue, which is whether the

recovery of post-petition attorneys' fees sought here as an unsecured claim is permitted under 11 U.S.C. §§ 506(b) and 502(a) and (b). For the reasons that follow, the court concludes that it is not.

## DISCUSSION

**[1]  [2]** Section 506(b) of the Bankruptcy Code provides to oversecured creditors like SummitBridge the right to seek reimbursement for "reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." Whether the attorneys' fees are recoverable under § 506(b) is based on an interpretation of applicable state law. 11 U.S.C. § 506(b); *see In re Ormond*, 2015 WL 1000218 at *4–6 (Bankr. E.D.N.C. Mar. 3, 2015); *In re Winslow*, 2011 WL 5902619 at *2 (Bankr. E.D.N.C. Jun. 22, 2011), *citing Independence Nat'l Bank v. Dye Master Realty, Inc. (In re Dye Master Realty, Inc.)*, 15 B.R. 932 (Bankr. W.D.N.C. 1981). Under North Carolina state law, reasonable attorneys' fees incurred in connection with the collection of a debt may be recovered when the note provides for such recovery. North Carolina General Statute § 6–21.2 provides in part:

Obligations to pay attorneys' fees upon any note, conditional sale contract or other evidence of indebtedness, in addition to the legal rate of interest or finance charges specified therein, shall be valid and enforceable, and collectible as part of such debt, if such note, contract or other evidence of indebtedness is to be collected by or through an attorney at law after maturity, subject to the following provisions:

(1) If such note, conditional sale contract or other evidence of indebtedness provides for attorneys' fees in some specific percentage of the "outstanding balance" as herein defined, such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said "outstanding balance" owing on said note, contract or other evidence of indebtedness.

(2) If such note, conditional sale contract or other evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the "outstanding balance" owing on said note, contract or other evidence of indebtedness.

77 Collier Bankr.Cas.2d 1977

N.C. Gen. Stat. § 6–21.2.

**[3]** The debtor and SummitBridge have differing interpretations of precisely which bankruptcy statutes apply here, as well as how federal bankruptcy law intersects with the North Carolina statute. Leaving aside for the moment the question of the extent to which the debtor's delivery of the deed could constitute payment within the meaning of N.C.G.S. § 6–21.2(5), the court turns first to the applicability of **\*68** §§ 506 and 502. The debtor contends that SummitBridge already has "received what was permitted under Section 506(b) pursuant to the Plan, and the Bankruptcy Code does not provide for allowance of an unsecured claim for post-petition attorneys' fees or costs." Debtor's Objection at 4. SummitBridge argues that the Bankruptcy Code says "nothing whatsoever" about the allowance or disallowance of attorneys' fees on unsecured or undersecured claims, and that "the conclusion that unsecured (and undersecured") creditors are entitled to allowed claims for postpetition attorneys' fees is inescapable." SummitBridge Reply at 13.

**[4]** **[5]** Citing precedent from within this district, the debtor argues that this court "previously has considered, and denied, a secured creditor's request for post-petition attorney's fees where there was no excess collateral value available under Section 506(b)." Debtor's Objection at 4, *citing In re Croatan Surf Club, LLC*, 2012 WL 1906386 (Bankr. E.D.N.C. May 25, 2012) *and In re Construction Supervision Servs.*, 2015 WL 4873062 (Bankr. E.D.N.C. Aug. 13, 2015), *aff'd*, 2016 WL 2764328 (E.D.N.C. 2016). In *Construction Supervision Services*, this court held that § 506 (b) is "the *only* means within the Bankruptcy Code in which a secured creditor is entitled to postpetition attorney's fees." 2015 WL 4873062 at \*4. The post-petition interest and/or attorneys' fees cannot exceed the value of the collateral. "This section allows the holder of a secured claim to add post-petition interest and reasonable post-petition attorneys' fees to the secured claim to the extent of the value of the collateral." *Id., quoting Croatan*, 2012 WL 1906386 at \*6.

**[6]** **[7]** For a creditor to "show entitlement to the requested post-petition amounts," the creditor must demonstrate that "(1) it is oversecured; (2) the underlying agreement provides for such fees and costs; and (3) the requested fees and costs are reasonable." *In re Parker*, 2015 WL 5095948 at \*2 (Bankr. E.D.N.C. 2015), *citing*

*In re Gwyn*, 150 B.R. 150, 154 (Bankr. M.D.N.C. 1993). More recently, in *In re Davis*, Judge Warren of this district noted that § 506(b) is "the only section of the Code that expressly authorizes a creditor to be reimbursed for post-petition attorneys' fees as part of its secured claim." *In re Davis*, 570 B.R. 522, 525 (Bankr. E.D.N.C. 2017) (citing *Construction Supervision* ). Moreover, § 506(b) " 'is an exception to the general rule contained within § 502 that claims are determined as of the date of the petition and 'permits a party to bring a claim for fees, costs, or charges incurred postpetition, *provided that the party bringing the claim is an oversecured creditor.*' " *Id., quoting Ins. Co. of N. Am. v. Sullivan*, 333 B.R. 55, 61 (D. Md. 2005) (emphasis in original).

The debtor urges the court to focus on the "plain language of Sections 502(b), 506(a) and 506(b) which, taken together, lead to the conclusion that post-petition interest, fees, costs and charges become part of an allowed claim *only* as a result of being allowed in favor of an oversecured creditor under Section 506(b)." Debtor's Objection at 5; *See Anderson v. Hancock*, 820 F.3d 670, 674 (4th Cir. 2016) (court must interpret the provisions of the Bankruptcy Code "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions inconsistent, meaningless or superfluous"). Under the debtor's analysis, the step-by-step process applicable here requires the court to determine the amount of any "claim" as of the date the petition was filed under § 502(b), then use the amount of that allowed claim in § 506(a) "to determine (i) the amount which is secured and (ii) the amount which **\*69** is unsecured, where the value of the collateral is less than the amount of the allowed claim." Debtor's Objection at 5. *Only* if the value of the collateral exceeds the amount of that allowed claim does § 506(b) permit an oversecured creditor to recover its post-petition fees and expenses and to receive the "special treatment" provided under the statute for claims secured by liens on property of the estate. *Id.*

**[8]** These fees aren't "allowed" so much as they are "added" within the meaning of *United States v. Ron Pair Enterprises, Inc.*, the debtor argues: "The natural reading of the phrase entitles the holder of an oversecured claim to post-petition interest and, in addition, gives one having a secured claim created pursuant to an agreement the right to reasonable fees, costs, and charges provided for in that agreement.... Therefore, in the absence of an agreement,

post-petition interest is the only *added* recovery available." *Id.* at 6, *quoting United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (emphasis in Debtor's Objection). In sum, the debtor concludes, post-petition fees are "added" by § 506(b) rather than "allowed" by § 502(b), and thus are not permitted in favor of undersecured or unsecured creditors. *Id.*

SummitBridge frames the question differently, arguing that § 506(b) does not apply, and that § 502 does. It reasons that

> [t]he topic of Section 506 of the Bankruptcy Code is the allowance of secured claims. Section 502, on the other hand, deals with the allowance and disallowance of claims generally. Section 506 is wholly silent as to what happens if a claim is not allowed as a secured claim. Section 502(b) disallows claims for postpetition interest, but says nothing about postpetition attorneys' fees. *By negative implication, unsecured claims for attorneys' fees are allowable under Section 502(a).* "There is universal agreement that whereas section 506 furnishes a series of useful rules for determining whether and to what extent a claim is secured (and, therefore, entitled to priority), it does not answer the materially different question of whether the claim itself should be allowed or disallowed.... Rather, the general rules that govern the allowance or disallowance of claims are set out in section 502." *Gencarelli v. UPS Capital Bus. Credit,* 501 F.3d 1, 5 (1st Cir. 2007).

SummitBridge Reply at 9–10 (italics by the court). SummitBridge thus asserts an unsecured claim for postpetition attorneys' fees based on its contractual (*i.e.* pre–petition) entitlement to such a claim, notwithstanding the fact that the debtor was not in default at the time the petition was filed, and no such fees had been incurred.

SummitBridge, like the debtor, also cites supporting precedent from within this district, including *In re F & G Leonard, LLC,* 2011 WL 5909463 (Bankr. E.D.N.C. 2011). In that case, oversecured creditor Textron filed a claim for actual, reasonable, and necessary attorneys' fees and expenses under 11 U.S.C. § 506(b) and N.C.G.S. § 6–21.2, and the debtor objected to the amount of fees sought. In *F & G,* Judge Leonard wrote that § 506(b) "is not a disallowance statute," and "merely allows an oversecured creditor to include reasonable attorneys' fees as part of its secured claim." 2011 WL 5909463 at *2. If the fees

sought are "allowable under state law, but found to be unreasonable under § 506(b), the fees may be recovered as an unsecured claim." *Id.,* citing *Welzel v. Advocate Realty Investments, LLC,* 275 F.3d 1308, 1318–19 (11th Cir. 2001).

And, in *In re Holden,* the court overruled a debtor's objection to the attorneys' fees sought by wholly *unsecured* creditor **\*70** SSB on grounds that the purpose of § 502 is to allow or disallow claims, and no provision of § 502 expressly disallowed unsecured claims for attorneys' fees. *In re Holden,* 491 B.R. 728, 739 (Bankr. E.D.N.C. 2013). The *Holden* court noted, however, that cases like *Croatan* and *F & G Leonard* were "not analogous to the present facts *as they involve secured claims, which automatically necessitate an analysis pursuant to § 506(b),* whereas SSB's claims are wholly unsecured and do not trigger the implications of § 506(b)." *In re Holden,* 491 B.R. 728, 738 (Bankr. E.D.N.C. 2013) (emphasis by the court).

SummitBridge asks the court to adopt the expansive interpretation set out in *Holden* and to take it another big step further, arguing that the distinction cited above

> is a distinction without a difference. Yes, partially secured claims do require an analysis under Section 506(a) and (b). But once the value of the collateral is devoured (by principal, interest and fees), the balance of the claim is a generic Section 502(a) general unsecured claim. Section 502(a) governs the allowance of wholly unsecured claims as well as the unsecured component of partially secured claims. The fact that Sections 506(a) and (b) are employed to assess what portion of a claim is secured has no bearing on the remaining unsecured portion. Under the statutory scheme envisioned by Judge Doub, wholly unsecured creditors would be permitted to reap the full benefit of their contractual bargains through the medium of Section 502, while undersecured creditors would be uniquely singled out for unfavorable treatment by the operation of Section 506(b).

There is no conceivable explanation as to why Congress might have wanted undersecured creditors to be treated in so draconian a fashion. Creating that sort of uneven playing field would be antithetic to the general policy of the Bankruptcy Code, which tends to favor secured creditors in the first place. *Accord Gencarelli v. UPS Capital Business Credit*, 501 F.3d 1, 5 (1st Cir. 2007).

SummitBridge Reply at 12.

It is true that a number of courts adopt some version of the position advanced by SummitBridge, and hold generally that post-petition attorneys's fees are allowable as an unsecured claim, irrespective of whether the creditor is oversecured. *See In re 804 Congress, L.L.C.*, 756 F.3d 368 (5th Cir. 2014), *on remand*, 529 B.R. 213 (Bankr. W.D. Tex. 2015); *In re SNTL Corp.*, 571 F.3d 826, 842 (9th Cir. 2009); *In re Welzel*, 275 F.3d 1308 (11th Cir. 2001) (adopting a bifurcation framework for 506(b) whereby, after a reasonableness analysis, fees deemed reasonable constitute a secured claim and the balance is treated as an unsecured claim). Other jurisdictions adhere to the view held by this court, that § 506(b) provides "the *only* means within the Bankruptcy Code in which a secured creditor is entitled to post-petition attorneys' fees." *Construction Supervision Servs.*, 2015 WL 4873062 at *4, *citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc's, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). "If attorneys' fees were allowable on the unsecured portion of a debt, there would be no need for [§ 506(b) ]. If Congress had intended for the holders of both secured claims and unsecured claims to recover attorneys' fees, it could have easily said so. But it did not." *In re Saunders*, 130 B.R. 208, 210 (Bankr. W.D. Va. 1991), *quoted in In re Miller*, 344 B.R. 769 (Bankr. W.D. Va. 2006) (adopting same position that undersecured or unsecured creditors cannot be allowed an unsecured claim for post-petition contractual attorneys' fees); *see also, e.g.,* **\*71** *In re Electric Machinery Enterprises, Inc.*, 371 B.R. 549, 550–51 (Bankr. M.D. Fla. 2007) (summarizing competing views, citing cases, and setting out primary reasons why most courts conclude that "post-petition attorneys' fees should not be allowed as part of an unsecured claim").

The court acknowledges that there are conflicting views expressed by decisions within this district, and divergent views expressed by courts elsewhere. And, while the position taken herein is consistent with what appears to still be the majority consensus among courts to address the question, this court acknowledges further that SummitBridge's interpretation is a viable one, given the recent circuit court opinions cited above. A thoughtful and thorough discussion of the current split is set out in *In re Auge*, wherein the court canvassed the main points advanced by both sides before concluding, like this court, that § 506(b) "allows only *oversecured* creditors to add 'reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.'" *In re Auge*, 559 B.R. 223, 229 (Bankr. D.N. M. 2016) (internal quotation omitted). The Fourth Circuit has not specifically addressed the question.

Ultimately, this court is not persuaded that it should deviate from its prior holdings on this issue, and concludes that SummitBridge's position fails to fully credit the plain language of § 506(b), which unquestionably applies to it. There is no viable reading of § 506(b) that could render that statute "inapplicable" here, nor is there a plausible basis upon which to consider it redundant, which is what SummitBridge's interpretation would do. SummitBridge hopes to take an alternative path [1] by pursuing an unsecured claim for post-petition attorneys' fees on the premise that these fees are independent of and separate from its secured claim, but that effort would run afoul of both the plain language of the statute and the policy behind it.

A key component of that policy is judicial review of the fees sought. Section 506(b) establishes a nondiscretionary process by which such fees, if otherwise appropriate, *shall* be allowed. In connection with that, § 506(b) incorporates the bankruptcy courts' oversight in determining the *reasonableness* of those fees. [2] In so doing, the statute goes beyond facilitating oversecured creditors' recovery of the post-petition fees to which they're entitled; it also protects the interests of the bankruptcy estate and unsecured creditors by precluding the recovery of fees that are outside the bounds of reasonableness and/or a percentage cap as stipulated by statute. Oversight of these competing interests is within the province of the bankruptcy courts, and application of § 506 in this manner balances of the rights of oversecured creditors to collect fees with the estate's need **\*72** to protect assets for distribution to other creditors.

**In re Aiken, 574 B.R. 63 (2017)**
77 Collier Bankr.Cas.2d 1977

## CONCLUSION

For the reasons set forth above, the debtor's objection to SummitBridge's unsecured claim for post-petition attorneys' fees is **ALLOWED.** Having disposed of the issue on the basis of § 506, it is not necessary for the court to evaluate whether return of the collateral satisfies the state statutory notice requirements. SummitBridge may recover its post-petition attorneys' fees as provided for in the Plan and to the extent of the value of the collateral.

**SO ORDERED.**

**All Citations**

574 B.R. 63, 77 Collier Bankr.Cas.2d 1977

Footnotes

1   In essence, SummitBridge claims a "springing right" to attorneys' fees since there was no default (and thus no right to attorneys' fees) as of the petition date.

2   A bankruptcy court "retains broad discretion in determining the amount of fees and expenses to be allowed under § 506(b)." *Parker*, 2015 WL 5095948 at *2; *see also In re 804 Congress*, 756 F.3d at 376 (noting that bankruptcy court "has the power to arrive at a reasonable attorneys' fee even if the contractual attorneys' fee provision is valid under state law" (internal quotation omitted)). As this court explained in *Parker*, "[t]he reasonableness limitation found in § 506(b) serves to prevent the squandering of estate assets by oversecured creditors that 'fail to exercise restraint in the attorneys' fees and expenses they incur, perhaps exhibiting excessive caution, overzealous advocacy and hyperactive legal efforts,'" and a "key determinant" in a court's assessment is whether the creditor undertook actions that a similarly situated creditor might reasonably believe to be necessary. *Id.* at *4, quoting Gwyn*, 150 B.R. at 155.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 6603817
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Delaware.

IN RE: B456 SYSTEMS, INC., et al.,[1] Debtors

Case No. 12–12859 (KJC) (D.I. 1318)
|
Signed December 22, 2017

**Attorneys and Law Firms**

D. J. Baker, Christopher R. Harris, Adam S. Ravin,
Caroline A. Reckler, Annemarie V. Reilly, Matthew
L. Warren, Latham & Watkins LLP, New York, NY,
Mark D. Collins, Michael Joseph Merchant, Drew G.
Sloan, Amanda R. Steele, Marisa A. Terranova, Richards
Layton & Finger, P.A., Wilmington, DE, Alicia C. Davis,
Latham & Watkins LLP, Chicago, IL, for Debtor.

**OPINION**[2]

BY: KEVIN J. CAREY, UNITED STATES
BANKRUPTCY JUDGE

**\*1** Before the Court is the objection filed by the
Official Committee of Unsecured Creditors (the "Claim
Objection") to the proof of claim filed by Daimler
Purchasing Coordination Corp. ("DPCC") for damages
arising from the Debtors' rejection of DPCC's contract
with A123 Systems, Inc. ("Old A123").[3] For the reasons
set forth below, the Claim Objection will be sustained, in
part, and the parties will be directed to confer concerning
recalculation of DPCC's claim in accordance with the
Court's conclusions.

Uncontested Facts[4]

Old A123 manufactured and supplied batteries for electric
and hybrid-electric vehicles. In 2010, Daimler and Old
A123 began negotiations for the manufacture and supply
of lithium-ion starter batteries (the "Starter Batteries") for
use in certain Mercedes–Benz car lines. Daimler issued
a requirements contract to DPCC for the purchase and

supply of 60Ah and 80Ah Starter Batteries.[5] DPCC, in
turn, issued a requirements contract to Old A123 for
the purchase and supply of the 80Ah and 60Ah Starter
Batteries that would be delivered to Daimler's plants.
Specifically, DPCC sent proposed purchase contracts
to Old A123 in May 2011 and November 2011 (the
"Purchase Contracts"). The parties signed an amendment
in December 2012 (the "Amendment"), which expressly
modified certain terms of the Purchase Contracts.[6]

**\*2** As part of the Contract, Old A123 and Daimler
agreed that Old A123 would be reimbursed over time for certain
upfront nonrecurring engineering and development costs
associated with the Starter Batteries (known as "NRE
Costs") through a "piece price amortization." The parties
determined an amount that was added to the base price
for each Starter Battery (the "NRE Adder") that would
reimburse Old A123 for the NRE Costs.

The Debtors filed chapter 11 bankruptcy petitions on
October 16, 2012 (the "Petition Date"). On December
11, 2012, the Court entered an order approving the sale
of substantially all of the Debtors' assets to Wanxiang
American Corporation (D.I. 640) (the "Sale Order").
Under the terms of the sale to Wanxiang, Old A123's name
was changed to A123 Systems, LLC ("New A123").

On February 13, 2013, the Court entered an Order
Authorizing the Debtors' Rejection of Certain Unexpired
Leases and Executory Contracts (D.I. 1029) (the
"Rejection Order"). The Rejection Order further provided
that "[a]ll executory contracts to which the Debtors are a
party and which are not listed on Exhibits A or B hereto
(the "Rejected Contracts") are hereby rejected, effective as
of the date of this Order."[7]

After the sale of the business, DPCC and New A123
entered into a series of purchase contracts for the Starter
Batteries. In September 2014, Daimler began purchasing
Starter Batteries directly from New A123. DPCC made
its final purchase from New A123 in March 2015. DPCC
does not have a current purchase contract with New A123.

On March 11, 2013, DPCC filed a proof of claim in the
amount of $25.5 million (Claim No. 770) (the "Claim")
for damages resulting from the Debtors' rejection of the
Contract. On March 29, 2013, the Official Committee of
Unsecured Creditors (the "Committee") filed an objection

to the Claim (D.I. 1318) (the "Claim Objection") on the grounds that the Claim failed to attach supporting documentation and, therefore, failed to comply with Bankruptcy Rule 3001.

On May 20, 2013, the Court entered an Order confirming the Modified First Amended Joint Plan of Liquidation of B456 Systems, Inc., (the "Plan") (D.I. 1675–4). The Plan established a Liquidation Trust and, pursuant to Section 9.01(b) of the Plan, the Liquidation Trustee was charged with prosecuting any claim objections filed by the Debtors and the Committee, including this Claim Objection.

On August 2, 2013, the Court entered a scheduling order for the Claim Objection (D.I. 1992), which bifurcated the proceedings. The first issue had two parts: (i) whether there was a binding and enforceable contract between A123 and DPCC, and (ii) if so, whether the contract was a requirements-based contract with a six-year term (the "Contract Issues"). The second issue requires the Court to fix the amount of the Claim. [8] The parties filed cross-motions for summary judgment on the Contract Issues.

**\*3** By Order and Opinion dated July 24, 2015, I decided that Old A123 and DPCC were parties to a binding and enforceable requirements contract under which Old A123 would supply Starter Batteries to DPCC for use by Daimler. [9] However, I also determined that conflicting documents raised issues of material fact about the length of the contract. [10]

At a status hearing on August 13, 2015, the parties informed the Court that they agreed to collapse the remaining issues (*i.e.,* (i) the length of the contract between DPCC and Old A123, and (ii) the amount of DPCC's claim (the "Remaining Issues")) into one consolidated evidentiary hearing. On December 10, 2015, the Court entered a second scheduling order (D.I. 2325), setting a limited discovery schedule and setting a mediation conference regarding the Remaining Issues. Mediation was unsuccessful.

On May 15, 16, 17 and 19, 2017, the Court held an evidentiary hearing on the Remaining Issues. After the hearing, the parties submitted proposed findings of fact and conclusions of law.

### Discussion

DPCC filed its proof of claim in the amount of $25,530,912, for damages arising from the Debtors' rejection of the Contract, including the following: (i) cover damages, including damages under Section 2–712 of the Uniform Commercial Code, totaling $25,108,942.65; and (ii) incidental damages, including damages under Section 2–715 of the Uniform Commercial Code, totaling $421,970. The Trustee argues that DPCC's claim is significantly inflated because (i) the Contract expressly provided for a one-year term, rather than a multi-year term; (ii) DPCC calculated its claim for cover damages on overstated inputs and unwarranted assumptions, including outdated projections for the number of batteries purchased, spare parts costs, and freight charges; and (iii) DPCC advocates use of an inappropriate discount rate and fails to value the claim as of the petition date. The Trustee argues that DPCC's rejection damages claim should be no more than $1,152,035. [11]

#### (1) Term of the Contract

##### (A) Findings of facts regarding the term of the Contract

In 2010, Daimler sought a supplier for Starter Batteries for a series production of car lines to be manufactured beginning in 2013. [12] Daimler sent a Request for Quotation ("RFQ") for the Starter Batteries to Old A123 and other suppliers in July 2010. [13] The RFQ stated, in part, "[p]lease quote your feasible [ ] rates/price developments for a *multi-year* agreement on basis of the product life cycle concerning continuous improvement activities." [14] The RFQ contained other terms indicating a request for a multi-year contract, including (for example): (i) a 3YP clause requiring that a supplier provide spare parts for three years following the end of series production at the last year's series production price; [15] and (ii) "CIP" or continuous improvement process rates which are "peculiar to the automotive industry" requiring a supplier who is building a part and receives a multi-year contract to provide for a price decrease that is "supposed to happen twice a year over the term of the contract." [16]

**\*4** On September 1, 2010, Old A123 sent Daimler a response to the RFQ (the "Response"). [17] The

"Commercial Proposal" in the Response set forth prices for 80Ah and 60Ah batteries, setting a price per unit for each year during the period of 2013 through 2017. [18] The Commercial Proposal also included CIP price decreases as requested in the RFQ. [19] Throughout the negotiations between Daimler and Old A123 for the Starter Batteries, Old A123 quoted prices for the period of 2013–2017. [20]

Daimler and Old A123 also negotiated the amount for the non-recurring engineering costs (or "NRE Costs") and the terms of NRE recovery. [21] Generally, Daimler reimburses a supplier for NRE Costs over a period of years through a "piece price amortization," that is, amortizing the agreed-upon NRE Costs over a chosen time period by adding part of the NRE Costs to the base price of a product. [22] The parties agreed that Old A123 would recover NRE Costs over multiple years during series production. [23]

In December 2010, Old A123 was nominated to be Daimler's supplier of the Starter Batteries. [24] In the confirmation between Daimler and Old A123, the parties agreed to a price line from 2013 through 2017, recovery of NRE Costs over multiple years of series production, and Daimler's 3YP Policy for end of series production ("EOP"). [25] Following nomination, Old A123 and Daimler immediately began working on the development of the Starter Batteries to meet the 2013 start of production ("SOP") date. [26]

On April 7, 2011, Daimler issued a purchase contract to DPCC for the 80Ah Starter Batteries. [27] The Daimler purchase contract states that it has a validity period until 12/31/2017. [28] On May 5, 2011, DPCC, in turn, issued a purchase contract to Old A123 for the 80Ah Starter Batteries (the "First Purchase Contract"). [29] On its first page, the First Purchase Contract states "Annual Purchase Contract is valid from 06/27/2011 to 12/31/2011." [30] However, on a later page, the First Purchase Contract identifies the Starter Battery parts and states "Line item validity period until 12/31/2017" and also "Price valid: 06/27/2011–12/31/2011." [31]

After DPCC issued the First Purchase Contract, Old A123 indicated that it had to increase the price of the 80Ah Starter Batteries. [32] Daimler felt pressured to renegotiate

with Old A123 to prevent the entire project from stalling. [33] In September 2011, executives of Daimler and Old A123 met at Old A123's facilities in Livonia, Michigan to discuss the contract terms. [34] The parties agreed to revised contract terms for the Starter Batteries. [35] Notes from the meeting show that the parties agreed to new prices for 80Ah and 60Ah Starter Batteries for the period 2013 to 2017, and changes to the amortization of the NRE Costs, among other things. [36] After the Livonia meeting, Daimler issued revised purchase contracts to DPCC for 80Ah and 60Ah Starter Batteries. [37] DPCC likewise issued revised purchase contracts to Old A123 for the 80Ah and 60Ah Starter Batteries (the "Updated Purchase Contracts"). [38]

**\*5** 60Ah Starter Batteries: Purchase Contract 6900067 dated 11/15/2011 between DPCC and Old A123 states that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012" and the page containing the prices for the 60Ah Starter Batteries states "line item validity period until: 12/31/2017" and "Price Valid: 6/2/2011 to 12/31/2011." [39] The contract also includes an "Agreed price adjustment" provision, indicating agreed reductions in price between 2012 and 2017. [40]

80Ah Starter Batteries: Purchase Contract 6900061 dated 05/05/2011 between DPCC and Old A123 states that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012" and the page containing the prices for the 80Ah Starter Batteries states "line item validity period until: 12/31/2017" and "Price Valid: 6/27/2011–12/31/2011." [41] The contract also includes an "Agreed price adjustment" provision, indicating agreed reductions in price between 2012 and 2017. [42]

The Updated Purchase Contracts also include an "Onward Delivery" provision, permitting DPCC to extend the Contract for the batteries for another year and "the prices most recently agreed between the parties shall remain valid," although if DPCC extends the term, both parties have the right to terminate the Contract, in writing, not earlier than June 30 of the following year and on at least six months' notice. [43]

On December 10, 2012, DPCC and Old A123 signed an "Amendment to Purchase Contracts" (the "Amendment") setting forth DPCC's agreement to

pay $280,000 to Old A123 "for third party testing required under the Contracts that DPCC, in its sole discretion, deems critical to meet applicable production schedules." [44] The Amendment acknowledged that the "Contracts continue in full force and effect except to the extent expressly amended by this Amendment." [45] In the 2015 Decision, I wrote that "[t]he Amendment, together with the Purchase Contracts and their attachments, provide unequivocal evidence of a binding, enforceable requirements contract between [Old] A123 and DPCC." [46] However, genuine issues of material fact prevented summary judgment on the issue of the term of the Contract.

(B) Discussion regarding the term of the Contract

**\*6** The Trustee's position on the term of the Contract is straight-forward: The Purchase Contracts expressly stated that their terms expired on December 31, 2012, and the contracts were not extended or renewed beyond that date. The Trustee claims that the parties contemplated a multi-year agreement through a series of one-year renewable purchase contracts, but in 2013 DPCC did not issue a new annual contract to Old A123. Thus, the Trustee argues, DPCC did not suffer any damages as a result of Old A123's rejection of the Contract because the Contract was rejected *after* the term expired, and DPCC's claim should be denied in its entirety.

DPCC, on the other hand, contends that the Trustee's argument rests on a single line in a contract and does not take into account the terms of the agreement as a whole or the parties' course of performance, both of which demonstrate that the Contract is a multi-year contract to supply Starter Batteries through 2017, with an option to extend the Contract through 2018.

Under Michigan law, [47] "if two provisions of a contract irreconcilably conflict with each other, the language of the contract is ambiguous." [48] "Further, courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity. Instead contracts must be construed so as to give effect to every word or phrase as far as practicable." [49]

A review of the entire contract shows that its express terms are contradictory. Despite stating that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012,"

the Updated Purchase Contracts also include the following provisions that indicate the parties' agreement to a term that is longer than one year:

(1) the "Subject Matter of the Agreement" states that "The Supplier [Old A123] shall provide Daimler Purchasing Coordination Corp. (DPCC) with the parts required for *series production* and spare parts as specified in this Agreement;" [50]

(2) the "3 Year Policy" (or "3YP") provision for spare parts required Old A123 to provide spare parts "[a]fter the end of delivery for series production" at a price fixed for a period of three years "calculated from the most recently applicable series production price plus the costs actually incurred by the Supplier for special packaging;" [51]

(3) the "Agreed price adjustment" paragraph setting forth agreed price decreases in 2015, 2016, and 2017; [52] and

(4) Pricing for each battery is listed with having a "Line item validity period until 12/31/2017." [53]

"When contractual language is ambiguous, a fact-finder's primary objective is to ascertain the intentions of the parties." [54] A court can consider relevant extrinsic evidence to aid in the interpretation of ambiguous contractual language without violating the parol evidence rule. [55]

> If the contract in question were ambiguous or doubtful, extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in construction of the disputed terms.

**\*7** The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practices to aid in interpretation. [56]

At trial, DPCC presented evidence demonstrating that the parties contemplated a multi-year contract throughout their negotiations in 2010 and 2011 concerning the Contract:

- The RFQ for the Starter Batteries asked for a binding offers from suppliers, including a quote for "feasible CIP rates/ price developments for a *multi-year agreement* on basis of the product life cycle concerning continuous improvement activities." [57]

- The parties negotiated recovery of the NRE development costs over a period of years in a multi-year contract through a "piece price amortization." [58]

- After Old A123 was nominated for the Contract in 2010, the parties' development teams immediately began working on the Starter Batteries so they could meet the anticipated rollout or start of production dates in 2013. [59]

- Old A123's internal communications, as well as communications with DPCC, in November and December 2010 always contained a price line for 80Ah and 60Ah Starter Batteries from 2013 to 2017. [60]

- After negotiations at the September 2011 meeting in Livonia, Michigan, DPCC agreed to pay Old A123 higher prices for the Starter Batteries for the period of 2013 through 2017, which were summarized contemporaneously at the meeting by Mr. Monteiro in an Excel spread sheet. [61] For the most part, the prices in the Contract matched the pricing structure agreed to at the Livonia meeting. [62]

DPCC also presented testimony showing that everyone involved in negotiating and carrying out the Contract for the Starter Batteries understood it to be a multi-year deal:

- Mr. Monteiro testified that Daimler viewed the Contract as a having a 5–year term from 2013 through 2017. [63]

- Ms. Block testified that the Contract extended to 2017 and explained that the one-year term stated on the first page of the Contract was an error. [64]

- Samuel Trinch, Old A123's Vice President of Automotive Sales, testified at his deposition that Old A123 provided DPCC with multi-year pricing for the Starter Batteries through the series production. [65]

**\*8** • Rex Belden, the Program Manager for the Starter Batteries at Old A123, testified at his deposition that the parties were going to do business through 2017. [66]

DPCC further argues that the Trustee's claim that the parties intended to enter into a one-year contract is contradicted by the parties' course of performance. The Uniform Commercial Code ("UCC") allows evidence of the parties' course of performance to explain or supplement a written agreement. [67] "[T]he course of actual performance by the parties is considered the best indication of what they intended the writing to mean." [68] The UCC defines "course of performance" as:

[A] sequence of conduct between the parties to a particular transaction that exists if both of the following are met:

(a) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party.

(b) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. [69]

DPCC argues that the parties' course of performance after issuance of the Updated Purchase Contracts indicates that both sides intended a long-term contract for the full series production. The following conduct supports a finding that the parties did not intend or expect the Contract to expire on December 31, 2012:

- Both parties invested millions of dollars in their respective facilities to prepare for the Starter Battery program. [70]

- In late November 2012, Daimler conducted a "Line Readiness Audit" of Old A123's facilities to ensure that Old A123's production line was ready for SOP. [71]

- On December 10, 2012, a few weeks after the Line Readiness Audit, the parties signed the Amendment by which $280,000 in NRE Costs were pulled forward to fund certain critical testing that Old A123 could

not finance, all so that development of the Starter Battery would remain on track for SOP. [72]

- In December 2012, DPCC was setting up Old A123 on the electronic data interchange ("EDI"), which was a system allowing Old A123 to receive orders and payments from Daimler for the Starter Batteries. [73] EDI was only used for "production material suppliers that had frequent and ongoing shipments over long periods of time." [74] The process of setting up Old A123 on the EDI system continued into January 2013. [75]

**\*9** Based on the evidence before me, I conclude that the parties intended to enter into a multi-year agreement for Old A123 to supply Starter Batteries for Daimler's series production through 2017. This was understood by representatives of both DPCC and Old A123. Evidence of the parties' intent is reinforced by their course of performance in December 2012 when the parties invested more money, signed the Amendment and, in every appearance, were forging ahead to meet SOP. These activities did not in any way indicate that the parties expected the Contract to terminate at the end of 2012. The evidence before me indicates that the parties intended the Contract to be have a multi-year term ending in 2017.

DPCC further argues that for calculating damages, this Court should determine that the Contract term would have been extended through 2018 pursuant to the provision entitled "Onward Delivery Module," which provides that:

> If DPCC wishes to continue the Supply Agreement after the end of the term for the relevant part number, but, during the term of this Agreement, the parties are unable to agree on a valid price for the period after the end of this Agreement, the Agreement for this part number shall be extended for another year and the prices most recently agreed between the parties shall remain valid. In such a case, both parties shall be entitled to terminate in writing the Agreement concerning the relevant part number by June 30 of the following year at the earliest

with a notice period of at least six months to the end of the month. [76]

The Trustee counters that, when calculating rejection damages, a Court should not assume that parties will exercise a future option to extend a contract. [77] When considering whether an option to extend a contract should be included in calculating rejection damages, a court may find that the future extension may be too remote or speculative. [78] DPCC asserts that, due to the passage of time, we need not guess whether Daimler would have exercised the option to extend the Contract. Mr. Monteiro testified that in the "actual world" (*i.e.,* what actually happened after rejection of the Contract), Daimler has opted to continue purchasing the Starter Batteries through mid–2018 under its contract with New A123. [79] After that time, Daimler expects to begin using a new generation of Starter Batteries. [80] The decision about whether to extend the Contract rested solely with DPCC. [81]

Because Daimler did, indeed, extend its contract with New A123, there is no need to speculate. The record supports a finding that the Contract would have been extended for six months through mid–2018.

### (2) Calculation of DPCC's Damages under the Contract

#### (A) Findings of fact related to Contract damages

**\*10** After filing its chapter 11 case, Old A123 sold most of its assets to New A123, and rejected its Contract with DPCC. Because the SOP date was closing in, and because the parties had already expended considerable costs and effort on the project, DPCC and Daimler felt pressured to negotiate with New A123 to supply the Starter Batteries. [82] New A123 supplied the Starter Batteries to Daimler for the series production, but New A123 imposed a substantial price increase, raising the base price, the NRE Adder and the freight charges. [83] The parties made some minor technical changes to the batteries over the life of the contract. [84]

Except for pricing, the contracts with New A123 contained similar terms as those used in the contracts with Old A123, including a term through December 31, 2017, an "onward delivery" provision and the "3 Year Policy" provision for spare parts. [85]

Because New A123 charged a higher price for the Starter Batteries, DPCC and Daimler purchased fewer batteries than the originally estimated amount of 37,500 per year.[86] The increase in price caused Daimler to alter its plan to use the Starter Batteries in the high volume C Class model series production.[87] Instead, the batteries were purchased for use in lower volume models.

In 2014, Daimler's management switched all contracts that had been handled through DPCC to contracts between Daimler and the suppliers, directly.[88] In September 2014, Daimler entered into a series of purchase contracts with and started purchasing Starter Batteries directly from New A123.[89] DPCC made its final purchase from New A123 in March 2015.[90]

#### (B) Discussion regarding Contract damages

Bankruptcy Code § 502(b) provides that if an objection is made to a claim, then "the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount [subject to certain exceptions, not applicable here].[91] The burden of proof as to the validity of a claim shifts between parties.[92] Here, the Trustee has presented sufficient evidence to rebut the *prima facie* validity of DPCC's claim, so the burden of proof reverts to DPCC to prove the validity of its claim by a preponderance of the evidence.

**\*11** A bankruptcy court consults state law to determine the validity of a claim.[93] The rejected Contract is governed by Michigan law.[94] Since the Contract is for the sale of goods, the Michigan Uniform Commercial Code ("UCC") applies.[95] Remedies under the Michigan UCC "must be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed ...."[96]

UCC Section 2–711 provides that when a seller fails to deliver or repudiates a contract, the buyer's remedies include (i) "cover," or (ii) recovering damages for nondelivery as provided in UCC Section 2–713.[97]

UCC Section 2–712, ("Cover"; procurement of substitute goods; buyer's damages) provides:

(1) After a breach within the preceding section [UCC Section 2–711] the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 2715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.[98]

UCC Section 2–713 (Nondelivery or repudiation; buyer's damages) provides:

(1) Subject to the provisions of this article with respect to proof of market price (section 2723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 2715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.[99]

Initially, the Trustee argues that the price of the batteries that DPCC purchased from New A123 cannot be used to determine the "cover" price or "market" price for damages because, the Trustee contends, New A123's batteries had significant technical and performance improvements over the Starter Batteries that were the subject of the Contract.[100] Comment 2 to UCC Section 2–712 provides that:

> The definition of "cover" ... envisages a series of contracts or sales, as well as a single contract or sale; goods not identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case;

and contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances. The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective. [101]

**\*12** "Although Comment 2 instructs that the substitute need not be the least expensive cover, nothing in the [UCC] indicates that the buyer is free to pass over an identical substitute and to select his own windfall.... Recovery of costs for an improved product depends in part on evidence suggesting a more comparable substitute was not available." [102]

New A123 purchased substantially all of the assets of Old A123, which included the technology and manufacturing capability that Daimler and Old A123 had developed specifically for Daimler's series production. Mr. Monteiro testified that Daimler felt that its only option, especially in light of the time frame for SOP, was to negotiate and buy the Starter Batteries from New A123. Given the timing and the circumstances, DPCC and Daimler's purchase of substitute batteries—for the most part, virtually identical batteries—from New A123 was entirely reasonable, even considering the performance improvements that occurred over time. [103]

Damage Calculations

Both parties relied upon expert witnesses to calculate DPCC's rejection damage claim. The Trustee's expert, Jonathon Vanderveen, calculated the present value of DPCC's damages at $1,152,035 "at most." [104] DPCC's expert, Jeffrey L. Johnston, calculated the present value of DPCC's damages at $14,915,220. [105] Although the experts generally applied the same methodology, their damage calculation totals differ significantly because the experts used different information for certain inputs in the damage models. The issues regarding these inputs are examined below.

(i) Determining the price delta for the Starter Batteries

The first step in calculating damages requires a determination of the "price delta." DPCC purchased Starter Batteries from New A123 to "cover" the batteries it could not buy from Old A123 after it rejected the Contract. Both experts agreed that measuring DPCC's damages starts by calculating the difference between the Starter Batteries' price in the Old A123 Contract and the higher price charged by New A123 (referred to as the "price delta"). The price delta is then multiplied against the number of batteries needed (which is another source of dispute, discussed below).

**\*13** The Contract price for the Starter Batteries consists of a base price (which includes the NRE Adder) and freight costs. [106] There were so many price changes and new versions of the Purchase Contracts between DPCC and Old A123 that the parties disagree which prices should be used to calculate damages.

One issue here is a price change included in the 2012 Amendment. Because DPCC would be paying "Critical Test Costs" up front, the Amendment reduced the price of "each Battery" to $487.43. [107] The Amendment defines the "Batteries" as "certain Lithium Ion 12V starter batteries," which were the subject of the "Contracts," and the "Contracts" included the Updated Purchase Contracts for both 60Ah and 80Ah batteries. [108]

The experts disagreed about whether the Amendment's price reduction applied only to the 80Ah batteries, or to both the 80Ah and 60Ah batteries. The Trustee's expert applied the change in price to both 80Ah and 60Ah batteries, while DPCC's expert applied the Amendment's price change only to the 80Ah batteries. The Updated Purchase Contracts at J104 show that, for the 2012–2014 period, the 60Ah battery's base price was $448, and the 80Ah battery's base price was $489.30. [109] In December 2012, only the price of the 80Ah battery could be *reduced* to $487.43; if the change was applied to the 60Ah battery, it would *raise* the price from $448 to $487.43. Further, at the time the Amendment was signed, the parties anticipated that the 60Ah battery would not be available until 2014. [110] Based on the record before me, I conclude that the price change in the Amendment applies only to the 80Ah Starter Batteries. DPCC's expert estimated that

In re A123 Systems, Inc., Slip Copy (2017)

2017 WL 6603817, 94 UCC Rep.Serv.2d 549

this difference caused the Trustee's damages calculation to be understated by as much as $850,000. [111]

The next cost issue arises out of the September 2011 Livonia meeting. [112] There, the parties discussed revised pricing and the use of a cheaper 60Ah battery, which was in development. [113] If the 60Ah battery was not available in 2015, then they agreed that Old A123 would continue shipping the 80Ah battery, but charge the 60Ah base price, which was $412. [114] Because the 60Ah battery was not available until July 2015, and took 6 months to integrate into the production, DPCC's expert's damages calculations reduced the 80Ah battery's price to $412 starting in 2015. [115] The Trustee, however, points out that neither the Updated Purchase Contracts nor the Amendment include that revised term from the Livonia meeting. Mr. Monteiro testified that the purchase contracts issued after the Livonia meeting included some of the revised terms agreed to at the meeting. [116] However, none of the post-Livonia contracts incorporated any agreement about reducing the price of the 80Ah battery to $412 if the 60Ah battery was not delivered in 2015. Although evidence shows that the parties agreed to the price reduction at the Livonia meeting, Mr. Monteiro testified that it was not incorporated into the Updated Purchase Contracts because the parties were thinking "positively in the sense that we assumed the [60Ah] battery would come." [117]

**\*14** The Purchase Contracts issued after the Livonia meeting included some of the parties' changes, but no terms related to reducing the 80Ah battery price if the 60Ah battery was not available. Even after the Livonia meeting, the parties continued to revise their agreement. Because that specific revision never made it into a purchase contract, I conclude that DPCC's expert's price delta calculation improperly reduced the base price of the 80Ah batteries to $412 after 2015. Accordingly, DPCC's damages calculation based on this piece of the price delta is overstated, although there is no evidence in the record to show how much this change would decrease DPCC's damage claim.

The next issue is whether to include the increased freight costs (or delivery charges) when measuring Old A123's price against New A123's price. DPCC's expert testified that he included the delivery charge increases in the price

delta calculation because freight costs were an element of the Old A123 Contract that increased in the New A123 contract. [118] In contrast, the Trustee's expert did not include freight costs in the damages calculation, because he assumed that in the "but for" world (*i.e.,* what would have occurred "but for" rejection of the contract), DPCC and Old A123 would have renegotiated the old Contract's terms, and DPCC would bear any increased freight costs. [119] Testimony from Mr. Monteiro indicated that Daimler typically paid transportation costs, either by picking up parts or by reimbursing sellers with a freight surcharge. [120] Accordingly, I conclude that the Trustee's expert is correct and that Daimler would end up paying for shipping even if the freight costs increased.

In summary, both experts' inputs to calculate the price delta between the Old A123 Contract price and New A123 contract price are incorrect. The Trustee's expert should not have applied the Amendment's price reduction to the 60Ah batteries. DPCC's expert should not have reduced the price of the 80Ah battery to $412 in 2015, and should not have included increased freight charges in the price delta calculation. Both experts' price delta calculations must be adjusted accordingly.

(ii) <u>Determining the quantity of Starter Batteries</u>

The amount of the rejection damages claim varies widely depending on the number of batteries multiplied against the price delta. There are two options for quantity that may be used in the damage calculations: (i) the number of batteries that the parties estimated would be required by DPCC under the rejected Contract (*i.e.,* 37,500/year for the series production period of 2013 to mid–2018) (the "Estimated Amount"); or (ii) the number of batteries that DPCC and Daimler actually purchased (and forecast will be purchased) from New A123 for the series production period from 2013 to mid–2018 (*i.e.,* 64,409 for the entire period) (the "Cover Amount"). If the Cover Amount is used, the Trustee raises a sub-issue of whether to limit the Cover Amount to only those Starter Batteries purchased by DPCC from New A123, thereby excluding any batteries purchased directly by Daimler.

#### (a) The Estimated Amount—
#### Expectation Damages under UCC 2–713

DPCC argues that its damage calculation should be based upon UCC Section 2–713, which provides that damages for a seller's nondelivery or repudiation of a contract are measured by the difference between the market price at the time the buyer learned of the breach and the contract price, together with any incidental and consequential damages provided in UCC Section 2–715, but less expenses saved in consequence of the seller's breach. [121] This section, DPCC contends, bases damages on the entire amount of batteries that would have been purchased under the Contract, without regard to the number of batteries actually purchased to cover the losses. Because the Old A123 Contract was a requirements contract, damages would be based on the number of batteries the parties estimated DPCC would purchase from Old A123, which was 37,500 Starter Batteries each year of series production. In this case, the Estimated Amount is much higher than the actual Cover Amount.

**\*15** Notably, DPCC's proof of claim as filed did not include reference to damages under Section 2–713 of the UCC (entitled "Nondelivery or repudiation; buyer's damages"). The addendum attached to DPCC's Claim for rejection damages provides that those damages include:

• Cover damages, including damages under Section 2–712 of the Uniform Commercial Code, totaling $25,108,942.65.

• Incidental damages, including damages under Section 2–715 of the Uniform Commercial Code, totaling $421,970.

The Claim Addendum also states that "DPCC expressly reserves the right to amend this Proof of Claim to include damages resulting from resourcing production of any A123 product to alternate suppliers, including any damages resulting from project delays and all engineering, rework and tool production expenses." [122]

Generally, timely filed claims may be amended after the bar date "to describe the claim with greater specificity or even to plead a new theory of recovery on facts established in the original claim." [123] "Only 'amendments'

which assert an entirely new claim after the bar date are prohibited." [124]

If a court determines that the amendment may relate back to the timely filed claim, the court should also examine whether it would be equitable to allow the amendment. [125] The analysis may review factors such as (i) whether the debtor, or other creditors, would be unduly prejudiced by the amendment (or whether, instead, other creditors would receive a windfall from the disallowance of the amendment), and (ii) whether the late claimant acted in good faith and the delay was justified. [126] Of these, the critical consideration is whether the opposing party will be unduly prejudiced by the amendment. [127]

The Trustee asserts that DPCC's reliance on UCC Section 2–713 for recovery of damages is untimely since it was not raised until the "eve of trial" (*i.e.*, May 8, 2017) in DPCC's trial brief. The Claim was filed on March 11, 2013, and DPCC asserts that it amended its proof of claim later in March 2013, when DPCC emailed a detailed calculation of its $25 million claim to Old A123 that multiplied the price delta by 37,500 batteries per year for seven years of series production. [128] The email does not mention UCC Section 2–713. Instead, the email refers to its damages calculation as the "Gross Cover Cost." [129] The email reinforces DPCC's claim for cover damages, yet provides no indication that DPCC was amending its claim to include a theory of damages based upon UCC Section 2–713. Further, there is nothing in record to indicate that DPCC sought to amend the Claim or provide fair and timely notice to the Debtors, or the Liquidating Trustee, of its assertion of damages under Section 2–713. In this long fought battle of well-represented parties, and based on the circumstances before me, I conclude that DPCC should be held to the original claim of damages as set forth in its proof of claim. [130] DPCC's request for recovery of damages under UCC Section 2–713 comes too late into the litigation process and it would be unfair to the Trustee to allow it at this stage.

#### (b) The Cover Amount—Cover
#### Damages under UCC 2–712

**\*16** DPCC's Claim seeks to recover for the actual and forecasted purchases made by DPCC *and Daimler* for the

series production period from 2013 through mid–2018, which its expert calculated to set at 64,409 in total. [131] The Trustee does not quarrel with DPCC's claim for cover damages based upon the number of Starter Batteries actually purchased by DPCC from New A123. However, the Trustee argues that Daimler's direct purchases from New A123 should not be included in DPCC's claim since DPCC has argued that Daimler and DPCC are separate entities.

DPCC argues in response that Daimler's direct purchases are consequential damages under UCC Section 2–715, which describes consequential damages resulting from a seller's breach as including:

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty. [132]

Courts have discussed the difference between incidental and consequential damages as follows:

> While the distinction between the two is not an obvious one, the [UCC] makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting. [133]

"The seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or

particular requirements at the time of contracting." [134] "The test is foreseeability." [135] "The question asked is whether a reasonably prudent person in the position of the breaching party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of this type of breach." [136]

It can come as no surprise to the Debtors that rejecting DPCC's contract would prevent DPCC from supplying Starter Batteries to Daimler for the series production. Old A123 was well aware that it was providing DPCC with Starter Batteries for use by Daimler in Daimler's vehicles. Old A123 responded to the RFQ for Starter Batteries that was issued by Daimler. Old A123 negotiated contract terms with Daimler, and engaged in development efforts with Daimler for Starter Batteries that would be used in Daimler's vehicles. Old A123's Contract with DPCC required delivery of the Starter Batteries directly to Daimler. The Debtors' rejection of the Contract forced Daimler to purchase Starter Batteries for the series production at higher prices, first through DPCC, and later directly from New A123. Daimler's direct purchase of Starter Batteries from New A123 is a foreseeable consequence of the rejection of Old A123's Contract, and, therefore, Daimler's direct purchases may be included in DPCC's claim.

**\*17** Alternatively, DPCC is entitled to recover damages under the indemnification provision in the Purchase Contracts, which provides:

> (b) Indemnification. Seller will defend, indemnify, and hold DPCC harmless against all claims, liabilities, losses, damages, and settlement expenses in connection with any breach by Seller of these general conditions or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing this order, either on DPCC's property of [sic] in the course of their employment. [137]

"An indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation." [138] Under Michigan law, '[i]ndemnity contracts are construed in accordance with the general rules for construction of contracts." [139] The Court determines "the parties' intent by examining the language of the contract according to its plain and ordinary meaning." [140] The indemnification provision at issue here contains broad language providing that Old A123 will indemnify and hold DPCC harmless from "*all* claims, liabilities, losses [and] damages" "in connection with *any* breach" by Old A123. Using the terms "all" and "any" provides for the broadest possible obligation to indemnify. [141]

The Trustee argues that the DPCC does not have a claim based on the indemnification provision because Daimler has not sought to recover its damages from DPCC, and the Trustee argues that Daimler is unlikely do so. Considering a similar argument, the Supreme Court of Michigan wrote:

> While the indemnity clauses specifically mention a "claim," they also trigger liability more broadly, when "damages, losses, demands," or "expenses," result from "any act, omission, fault, negligence, or breach...." Furthermore, the definition of "claim" itself is broad. *Black's Law Dictionary* defines a claim as the "aggregate of operative facts giving rise to a right *enforceable* by a court," and "any *right* to payment or to an equitable remedy...." [142]

There is no dispute that Old A123's rejection of the Contract left DPCC unable to fulfill its contractual obligations to deliver Starter Batteries to Daimler at the Contract prices. That inevitably forced Daimler to purchase Starter Batteries at higher prices demanded by New A123, leaving DPCC liable to Daimler for the premium Daimler paid over the Contract price. DPCC's liability to Daimler is a direct result of Old A123's breach and is one that Old A123 expressly agreed to assume responsibility for under the indemnity provision.

**\*18** Accordingly, DPCC's claim against Old A123 may include the consequential damages based on the higher price paid by Daimler for Starter Batteries purchased directly from New A123 to cover the batteries DPCC was required to deliver to Daimler under the Contract,

but could not due to Old A123's breach. The price delta should be multiplied against the entire Cover Amount as determined by DPCC's expert: 64,409 batteries.

#### (iii) Spare Parts

DPCC's claim includes damages based on the extra cost to obtain spare parts from New A123 after the end of the series production (or "EOP"). The 3 Year Policy ("3YP") provision of the Purchase Contracts provides:

> After the end of delivery for series production, the price for the spare parts shall be calculated from the most recently applicable series production price plus the costs actually incurred by the Supplier for special packaging. This price is fixed for a period of three years from the end of series production. The parties agree to renegotiate the new prices for the provision of spare parts no later than three months prior to the end of the three-year period. Until a new price has been agreed, the most recently agreed price shall apply. The parties must not unduly hinder negotiations on agreement of a new price. [143]

The Purchase Contracts also provide that they are subject to the Mercedes–Benz Special Terms ("MBST"), which provide in pertinent part that:

> The supplier undertakes to supply DAIMLER spare parts **for the product for a period of at least 15 years after discontinuation of production.** Delivery is made at the request of Daimler. [144]

The Trustee's expert did not include any damages for spare parts in DPCC's claim because he assumed that, following expiration of the 3YP period, Old A123 and Daimler would have renegotiated and agreed on a market price for the spare parts—and the market price would be the same price that will be charged by New A123. [145] However, the Contract (specifically the 3YP provision) sets the price for spare parts at the last series production base price for

the first three years after EOP. Further, the spare parts pricing *after* the 3YP period (*i.e.,* beginning in 2022), is based on a multiple of the base price. [146] Because the spare parts pricing is based on the last series production base price, rejection of the Contract requires Daimler to pay more for spare parts than it would have paid to Old A123, because New A123's base price for the Starter Batteries is higher. DPCC's claim should include damages based on the increased cost Daimler will incur for spare parts as a result of rejection of the Contract.

**\*19** The spare parts damage calculation by DPCC's expert relies on three primary components: the spare parts price delta, volume, and duration (or the number of years for supplying the spare parts). [147] The Contract sets the duration at 15 years after EOP. The Trustee disagrees with DPCC's expert's conclusions regarding pricing and volume.

To establish spare parts pricing, DPCC's expert relied on information from Mr. Monteiro, who was responsible for procuring a variety of Daimler's spare parts between 2005 and 2010. [148] Mr. Monteiro advised that "spare parts pricing at Daimler, and in the automotive supply industry generally, is based on a percentage increase model, wherein the spare parts price is periodically (every 3–5 years) increased over time by a percentage of the last series production price." [149] At trial, Mr. Monteiro explained that prices for spare parts increase over time because, as the technology develops, often the part is no longer being manufactured in a series and, especially with complex components, it can be very costly to changeover production facilities to produce a smaller number of those components as spare parts. [150] Based on Mr. Monteiro's experience and familiarity with procurement at Daimler, and with the Starter Batteries at issue, DPCC's expert relied on Mr. Monteiro's estimate that the price for spare parts would increase as follows:

### (a) Spare Parts Pricing

| Number of years following series production | Price [151] |
| --- | --- |
| Years 1–3 | Last production price (3YP) |
| Years 4–7 | 100% increase over last production price |
| Years 8–11 | 200% increase over last production price |
| Years 12–15 | 300% increase over last production price |

DPCC's expert also spoke to Sam Trinch, Executive Vice President of New A123, who advised that, consistent with his experience in the industry, spare price pricing is based on a multiple of the last production price. [152] Mr. Trinch expected an initial increase of 1.5 to 2.0 times the last series production price after 3YP. [153] Based on these discussions, DPCC's expert accepted Mr. Monteiro's assumptions about anticipated spare parts price increases. [154]

To rebut DPCC's spare parts pricing analysis, the Trustee provided testimony of Dr. Bart Riley, who holds a Ph.D. and an M.S. in Materials Science from Cornell University, was one of the principal inventors of A123's battery technology (along with being named inventor on more than 60 other patents), and has deep technical knowledge and considerable experience with Old A123's actual manufacturing process. [155] Based on his experience and expertise in overall cost structures of series and spare parts production and manufacturing at Old A123, Dr. Riley testified that a reasonable and conservatively high estimate of spare parts pricing assumes an increase of, at most, 50% over series production prices. [156] Dr. Riley based his estimate on "three basic factors that would affect cost structure in a sporadic demand or lower demand environment" than series production: (1) raw materials,

In re A123 Systems, Inc., Slip Copy (2017)
2017 WL 6603817, 94 UCC Rep.Serv.2d 549

(2) managing factory utilization (*i.e.,* switchovers and downtime); and (3) managing finished goods inventory to optimize the cost structure. [157]

**\*20** Dr. Riley estimated that a 15% increase in price would account for any increase in the cost of raw materials. [158] He testified that many of the materials needed for the batteries are "readily abundant and not subject to commodity fluctuations" resulting in "very high confidence and very stable, cheap pricing for our raw materials." [159] He also described a strategy of inventorying raw materials as a way to manage costs and provide stability of the supply chain. [160]

Next, Dr. Riley estimated a 25% increase in price to cover the "cost for lost production time, which takes into account line changeover and lost efficiency of production." [161] Dr. Riley testified that line changeovers are "a very managed process" and could be achieved in "less than a single shift operation." [162] Based on his experience overseeing manufacture of lithium-ion batteries at Old A123 for Daimler's Formula 1 program, Dr. Riley testified that Old A123 "optimized a system to minimize the number of changeovers, to have sufficient inventories of the right parts when we needed them, and we would use inventorying of finished goods as part of our strategy to minimize cost." [163] He noted lithium-ion cells can be stored at room temperature for long periods of time, and that warehousing space is inexpensive in China or Michigan; therefore, A123 could produce more spare parts and inventory them to get a cost-effective use of a changeover. [164]

In addition to the price increase of 15% for raw material costs and 25% for lost production time, Dr. Riley also estimated a 10% incremental margin to incentivize the manufacturer. [165] Together, these costs account for the 50% increase to the series production base price that Dr. Riley estimated for spare parts. He also disagreed with Mr. Monteiro's inclusion of a periodic price increase (every 3–5 years) for spare parts over the 15 year obligation, stating that, although the risk that a supplier will discontinue a product increases over time, the cost of mitigating that risk by proper management of the supply chain does not change. [166]

DPCC has the burden of proving that the figure it relies on for spare parts damages is reasonable. There is no doubt that Mr. Monteiro has experience in procuring spare parts for Daimler and familiarity with the manufacturing process for Starter Batteries. However, he did not provide much detail for his estimate of the 100–200–300 percent increase, except by referring to his experience. On the other hand, Dr. Riley's presented a detailed and specific analysis of the elements underlying his price increase, which provided a sound basis to successfully rebut Mr. Monteiro's estimate. Accordingly, I conclude that Dr. Riley's estimate of a 50% price increase was better supported and should form the basis for calculating the price delta for the piece of DPCC's claim related to spare parts damages.

(b) Spare Parts Volume

DPCC's expert considered two primary factors in estimating the number of spare parts batteries that will be required: "(1) the estimated useful life of the battery; and (2) the number of vehicles that were manufactured with an original battery that are expected to be in service at the time the original battery reaches the end of its estimated useful life." [167] New A123 represented to Daimler that the useful life of the battery is 10 years. [168] To calculate the number of vehicles expected to be on the road ten years after receiving an original battery, DPCC's expert consulted Daimler's spare parts forecasting group, called Global Service Parts or "GSP." [169] It is GSP's task "to forecast the need for spare parts and everything else related to the spare parts business of Daimler." [170] GSP provided DPCC's expert with a rate of decline of approximately 11% per year. [171] DPCC's expert then wrote:

> **\*21** Using this rate of annual decline and the actual and projected number of batteries to be supplied during the series production contract term of 2013 through 2018, I calculated the number of vehicles containing original batteries supplied by New A123 that would be expected to remain in service 10 years after such vehicle was produced. I have assumed that this

number of vehicles is a reasonable estimate of the number of spare parts batteries that will be required to be supplied by New A123 through 2033 (the 15 year period following the end of series production in 2018). [172]

Based on this methodology, DPCC's expert estimated the number of spare parts that will be required by Daimler during the 15–year spare parts period to be 20,056. [173] The Trustee offered no evidence to rebut this calculation.

### (c) Spare parts conclusion

Accordingly, DPCC's spare parts damages should be determined by multiplying the volume of 20,056 parts against a spare parts price delta based the base prices for the 3YP period and a 50% price increase for remaining spare parts period.

### (iv) Determining the present value of the Claim

#### (a) The Discount Date

Recognizing the time-value of money, courts have reduced claims for future damages to present value as of the petition date. [174] "Discounting is consistent with the fundamental goal of treating similar claims in the same manner ... and reflects the economic reality that a sum of money received today is worth more than the same amount received tomorrow ...." [175] The Trustee argues that DPCC's claim is an unsecured, prepetition claim for future contract damages that should be reduced to present value as of the petition date.

There is support in the Bankruptcy Code for using the petition date in such an exercise. Rejection of an executory contract under Bankruptcy Code § 365 constitutes a breach of that contract immediately before the date the bankruptcy petition was filed. [176] A rejection claim shall be determined, and shall be allowed, as if the claim arose before the date the bankruptcy petition was filed. [177] Section 502(b) of the Bankruptcy Code provides that, if an objection is made, "the court, after notice and a hearing, shall determine the amount of such claim in

lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount," subject to certain exceptions not applicable here. [178]

DPCC, on the other hand, claims that discounting its damages claim to the petition date is contrary to Michigan law and the decision by the Court of Appeals for the Third Circuit in *In re Oakwood Homes Corp.* [179] DPCC asserts that Michigan law, which applies here, defines "future damages" as only those damages arising after the date judgment is entered. [180] Therefore, DPCC asserts that the appropriate discount date is the date this Court issues a decision on its claim amount. In his report, DPCC's expert used an approximate hearing date (May 1, 2017) for the discount date. [181]

**\*22** DPCC also argues that it is entitled to recover pre-judgment interest on its claim under Michigan law, and, therefore, discounting its claim to present value as of the petition date results in the type of "double discounting" that the Third Circuit rejected in *Oakwood Homes*. [182]

In *Oakwood Homes,* the Third Circuit determined that Section 502(b) does not require *all* claims to be discounted to present value as of the petition date, writing:

> Stated simply, 11 U.S.C. § 502(b) speaks in terms of determining the "amount" of a claim "as of" the petition date. However, given that the remainder of the Bankruptcy Code uses the term "value, as of," to signify discounting to present value, and "amount" and "value" are not synonymous, we cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations. [183]

> ....

> We do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value, but instead that the statute does not clearly and unambiguously *require* it for all claims evaluated under § 502. In general, we of course acknowledge that money negotiated to be received in the future, and reduction in recognition of that basic economic fact may sometimes be appropriate. The subsections of § 502(b) encompass various financial circumstances,...; therefore, we must

Case 1:15-cv-01116-RGA   Document 29-1   Filed 11/01/18   Page 29 of 82 PageID #: 1383

In re Old Carco LLC, Not Reported in Fed. Rptr. (2017)
2017 WL 6603817, 94 UCC Rep.Serv.2d 549

look at the interplay between the subsection at issue here, § 502(b)(2), and § 502(b) as a whole. [184]

The *Oakwood Homes* Court reviewed two rulings by the bankruptcy court on an objection to a claim based on interest-bearing debt. The first bankruptcy court ruling disallowed any portion of the claim attributable to post-petition "unmatured" interest under § 502(b)(2). [185] The second bankruptcy court ruling determined that the principal amount of the claim should be discounted to present value pursuant to § 502(b). [186] The Third Circuit held that the bankruptcy court erred, deciding:

> [T]he interplay between § 502(b) and § 502(b)(2), as reflected in both the legislative history and basic economics, acknowledges that once unmatured interest has been disallowed, discounting the remainder of the claim to present value would inequitably twice penalize the creditor for the time value of money. We wholeheartedly agree that future liabilities must be reduced in some way to reflect the time value of money, but doing so twice is ... "double discounting" .... [187]

DPCC's reliance on *Oakwood Homes* is misplaced. *Oakwood Homes* is limited to claims based on interest-bearing debt, and DPCC's underlying claim is not based upon an interest-bearing instrument and did not include any bargained-for right to interest. [188] The Third Circuit recognized that stripping the post-petition interest from an interest-bearing debt left a claim for principal—or the present value of the debt. Discounting the principal amount to present value results in a double-discounting. Here, the rejection damages claim seeks recovery of future damages, which is not akin to a claim for principal. Instead, future damage claims are typically discounted to present value. [189]

**\*23** DPCC's assertion of a right to pre-judgment interest (arising here post-petition), based on Michigan law, is also flawed. "The 'basic federal rule' in bankruptcy is that state law governs the substance of claims,... Congress having 'generally left the determination of property

rights in the assets of a bankruptcy's estate to state law.' " [190] "Creditors' entitlements in bankruptcy arise from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or contrary provisions of the Bankruptcy Code.*" [191] In other words, the amount and validity of claims are determined by state law to the extent that law does not conflict with the Bankruptcy Code.

Although DPCC's contractual damages are determined by Michigan law, issues such as the timing of payment or adding post-petition interest to its claim, are subject to provisions in the Bankruptcy Code. "The general rule is that payment of any post-petition interest ... on pre-petition unsecured claims is prohibited by the Bankruptcy Code." [192] Because DPCC is not entitled to pre-judgment interest, discounting the amount of DPCC's claim to the petition date does not result in the "double discounting" that was criticized in *Oakland Homes.*

Finally, DPCC also contends that equitable considerations weigh against discounting its rejection damages claim to the petition date. DPCC contends that it is disadvantaged because the litigation over its claim has dragged on and prevented it from receiving a distribution at the same time as other unsecured creditors. A similar argument was rejected in *USGen New England.* [193] There, the creditor argued that its claim was no longer for "future damages" because the litigation stretched out beyond the term of the contract and, at the time of the judgment, no future payments were due. [194] The Court decided:

> [Section] 502(b) provides that a bankruptcy court "determine the amount [of a claim] ... as of the date of the filing of the petition." At the time USGen filed its bankruptcy petition on July 8, 2003, future payments remained due under the Contract. Thus discounting to the Petition Date is required. The fact that the litigation over the amount of the claim spanned beyond the term of the Contract is irrelevant. Adopting [the creditor's] position would require the Court to treat unsecured claims of creditors differently depending on the date that their claim was finally adjudicated. This outcome violates a fundamental objective of bankruptcy, namely, to treat similarly situated creditors equally. [195]

I agree that the length of the litigation is irrelevant to determining the claim amount. At the time Old A123 filed its bankruptcy case in 2012, the DPCC contract imposed future obligations upon both parties through 2018. Pursuant to § 502(b), DPCC's claim should be determined as of the petition date.

### (b) The Discount Rate

**\*24**  The parties also disagree about the appropriate discount rate that should be used to discount the claim to present value as of the petition date. The discount rate is applied to the total future damages claim for the purpose of reducing the claim to an amount consistent with the allowed amounts of other prepetition unsecured claims. [196]  "[T]he discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk." [197]

DPCC argues that Michigan law requires using a risk free discount rate to place the nonbreaching party in the position it would have enjoyed if the breaching party had fully performed. In other words, DPCC argues that compensating a creditor for future damages requires setting a sum which, if securely invested at a simple interest rate, would amount to the desired damage award at the end of applicable time period. [198]  At trial, DPCC's expert testified that the risk free rate as of the petition date (October 16, 2012) was 2.51%. [199]

The Trustee, however, argues that the appropriate discount rate should account for the risk of Old A123's non-performance of the Contract. The Trustee's expert, relying on publicly available information about Old A123's debt in Form 10–Ks, calculated the weighted average cost of debt ("WACD") for Old A123 in 2012 at 13.71% for use as the applicable discount rate. [200]

In *Chemtura Corporation,* the bankruptcy court considered a similar issue of whether to apply a risk-free discount rate, or a discount rate that accounts for the risk that the debtors might not perform under the contract. [201] The *Chemtura* Court explained that:

> The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed. But there is a tension, many might agree, between trying to match the original bargain in the damages award, on the one hand, and requiring the prevailing party to endure market risk to get the benefits of its damages award, on the other. Ultimately, however, I believe that existing case law and common sense require that the discounting to fix the damages award must reflect the same payment risk ... as the original contract did. [202]

From an economic standpoint, the appropriate discount rate should reflect the investment risk of an alternative investment with similar characteristics. [203] The *Chemtura* Court decided that the discount rate should reflect the risk of nonperformance at the time the parties entered into the underlying contract. [204] The *Chemtura* Court rejected both parties' proposed discount rates. The creditor's risk free rate did not account for any risk premium. The debtor's discount rate based on Chemtura's weighted average cost of capital ("WACC") included too high a risk premium that reflected "the company as it had evolved, and incorporated all of the risks that might affect the value of the company" while only a subset of those risks would apply at the time the original contract was entered into between the creditor and a predecessor to the debtor. [205]

**\*25**  In *Mirant Corporation,* the court also decided that an appropriate discount rate would reflect the risk of the debtor's non-performance prior to the bankruptcy filing. [206] The *Mirant* Court applied a discount rate that was based upon the interest rates the debtors paid for borrowed money prepetition, when the debtors were more creditworthy. [207] The *Mirant* Court decided that the prepetition interest rates represented a fair measure of the market's assessment of the risk associated in dealing with the debtors. [208]

I agree with the analyses of the courts in *Chemtura* and *Mirant* that the appropriate discount rate should reflect the risk associated with Old A123 at the time the parties entered into the Contract. Accordingly, DPCC's risk free discount rate cannot be used here. The Trustee's expert calculated the WACD for Old A123 as of the 4th quarter of 2012, which was after the Debtors filed bankruptcy. [209] There is no clear contract date in this matter. As discussed in my 2015 Decision on cross-motions for summary judgment, DPCC issued Purchase Contracts to Old A123 starting in May 5, 2011. [210] The parties continued to discuss terms and DPCC issued revised Purchase Contracts on November 15, 2011 and November 29, 2012. [211] The Debtors filed their bankruptcy petitions on October 16, 2012. Finally, in December 2012, Old A123 and DPCC reach a "critical juncture in their relationship" and executed the Amendment to the Purchase Contracts to memorialize Daimler's agreement to pay some of Old A123's NRE Costs up front to complete testing of the Starter Batteries. [212] In the Amendment, the parties confirmed the full force and effect of the prior Purchase Contracts. [213] The Trustee argues that the contract date is December 10, 2012, when the parties signed the Amendment, which was post-petition.

However, even if I consider the Contract date as early as May 2011, evidence shows that DPCC and Daimler knew that contracting with Old A123 involved a serious level of risk. The internal Daimler report evaluating Old A123's response to Daimler's RFP against a competitor's response assessed the companies on numerous points, including "Risk Status." [214] The report permitted assignment of risk at the following levels (in the following order): "Go, Concern, Watch, Recovery, Restructuring, Bankrupt, tbd." [215] Old A123 was assigned the risk of "Restructuring," while the competitor's proposal was assigned "tbd." [216]

DPCC and Daimler clearly knew that contracting with Old A123 had a significant level of risk. Despite this risk level, the WACD calculation by the Trustee's expert is based upon a post-petition date. An analysis of Old A123's WACD may not change significantly between the first Purchase Order issued in May 2011 and the final amendment signed in December 2012. However, setting the discount rate solely on the post-petition date may skew toward too high of a risk. It is more appropriate to

analyze the Debtors' WACD as of the date of the first written Purchase Contract—or May 2011. Because Old A123 may have already been on a financial precipice, additional analysis may not yield a lower discount rate, but I believe it is more appropriate to reject both proposed discount rates and await further analysis of the discount rate at a more appropriate date.

### (v) Attorney Fees

**\*26** DPCC also argues that the Contract's indemnification provisions provide that its claim should include recovery of attorney's fees arising from Old A123's breach. Since rejection of the Contract occurred postpetition, the attorney's fees at issue were incurred postpetition. Courts have been divided over the issue of whether an unsecured creditor can recover postpetition attorney's fees and costs as part of its allowed claim against the bankruptcy estate. [217] I considered a similar issue in *Tribune Co.,* and agreed with the analysis of the court in *Global Industrial Technologies* that the plain language of Bankruptcy Code § 502(b) and § 506(b), when read together, indicate that postpetition interest, attorney's fees and costs are recoverable only by oversecured creditors. [218] DPCC is not entitled to recover post-petition attorney's fees as part of its unsecured rejection damages claim.

### CONCLUSION

For the reasons stated above, I conclude that both experts incorrectly calculated DPCC's rejection damages claim. Calculation of the price delta between the Old A123 Contract and the New A123 contract for the Starter Batteries during series production must be adjusted because the parties mistakenly (i) changed the price of 60Ah Starter Batteries based on the Amendment, (ii) reduced the price of the 80Ah Starter Battery when 60Ah Starter Battery was not available; and (iii) included freight costs in the Claim calculation. DPCC's spare parts damages also must be revised based on a 50% price increase, rather than DPCC's 100–200–300% price increase calculation. Finally, an appropriate discount rate must be determined based upon the Debtors' weighted average cost of debt as of the date of the First Purchase Contract.

The parties should confer to determine if they can agree upon a revised rejection damages claim amount consistent

with my conclusions, I will schedule a status conference to discuss the revised Claim amount. An appropriate Order follows.

**All Citations**

Slip Copy, 2017 WL 6603817, 94 UCC Rep.Serv.2d 549

Footnotes

1    The debtors in these chapter 11 cases are B456 Systems, Inc. (f/k/a A123 Systems, Inc.), A123 Securities Corporation, and Grid Storage Holdings LLC (the "Debtors").

2    This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and § 157(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

3    DPCC is a United States-based purchasing affiliate of Daimler AG ("Daimler"), a German original equipment manufacturer.

4    The parties filed a Joint Pretrial Memorandum (D.I. 2412) ("JPM") on May 10, 2017, which included a recitation of the procedural background of this matter and a statement of uncontested facts. The facts and background set forth in this section are taken from the uncontested facts in the JPM.

5    80Ah (or 80 amp hours) and 60Ah (or 60 amp hours) refers to two different size Starter Batteries that were to be manufactured and supplied by Old A123 under the Contract (defined below).

6    In cross-motions for summary judgment, the Trustee disputed whether there was an enforceable contract between DPCC and Old A123. By Order and Opinion dated July 24, 2015, I decided that A123 and DPCC were parties to a binding and enforceable requirements contract under which Old A123 would supply Starter Batteries to DPCC for use by Daimler. *In re B456 Systems, Inc.,* No. 12–12859, 2015 WL 4512070 (Bankr. D. Del. July 24, 2015) (the "2015 Decision").

     As discussed in more detail in the section entitled "Facts Related to the Term of the Contract," *infra,* DPCC issued more than one purchase contract to Old A123 as the parties negotiated and changed the terms of the deal. Based on the 2015 Decision and the evidence now before me, I conclude that the Purchase Contracts attached in Joint Exhibit J104, together with the Amendment, make up the "Contract" at issue here. Those Purchase Contracts also reference purchase contract number 1285702867, issued by Daimler to DPCC, located in Joint Exhibit J074, which is also the operative purchase contract between Daimler and DPCC in the matter now before me.

7    In the Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts (D.I. 895) (the "Rejection Motion"), the Debtors stated, "[t]he Debtors and their professionals have used their best efforts to identify and list on Exhibit C to the Proposed Order all Rejected Contracts. However, to the extent the Debtors have inadvertently failed to include a Rejected Contract on Exhibit C, the Debtors request that any order granting this Motion be deemed to apply to such Rejected Contract." (Rejection Motion, ¶ 8 (footnote omitted)).

8    The 2015 Decision, 2015 WL 4512070 at *5.

9    *Id.* at *9.

10    *Id.*

11    At one point, the Trustee advised the Court that he expected distributions to unsecured creditors to result in a 60– 65% recovery (Tr. 3/28/2017 at 19:22–20:11), hence, the divide between the parties' respective rejection damage claim calculations is economically meaningful.

12    Tr. 5/15/2017 at 18:8–21:25 (D.I. 2433). (Testimony of Paul Ribeiro–Monteiro, the Purchasing Manager for Daimler during the relevant time period. ("Monteiro")). *See* JPM, at 14. "Series production" refers to mass production of a certain type of vehicle. Tr. 5/15/2017 at 21:10–21:25 (Monteiro).

13    Tr. 5/15/2017 at 22:14–23:18 (Monteiro). Joint Exs. J002, J003.

14    Joint Ex. J002 at B456LT00001244 (emphasis added).

15    Joint Ex. J002 at B456LT00001243. Tr. 5/15/2017 at 26:17–27:9 (Monteiro).

16    Tr. 5/15/2017 at 29:1–29:15 (Monteiro).

17    Joint Ex. J007.

18    Joint Ex. J007 at B456LT00001002. Old A123 listed alternative prices for the batteries based on whether the volume of batteries to be provided was 25,000/year or 50,000/year. *Id.*

19    *Id.*

20    *See, e.g.,* Joint Ex. J010 at 28; Joint Ex. J017 at B456LT00010603; and Joint Ex. J024.

Case 1:15-cv-01116-RGA Document 29-1 Filed 11/01/18 Page 33 of 82 PageID #: 1387
In re BTC Systems, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 6603817, 94 UCC Rep.Serv.2d 549

21    Tr. 5/15/2037 at 51:3–53:5, 53:16–54:18 (Monteiro); and Joint Ex. J025.

22    Tr. 5/15/2017 at 37:9–38:23 (Monteiro).

23    Tr. 5/15/2017 at 53:20–54:18; *See* Joint Ex. J083 and Joint Ex. J084.

24    Joint Ex. J033.

25    Joint Ex. J032.

26    Tr. 5/15/2017 at 62:24–63:9 (Monteiro).

27    Joint Ex. J047.

28    *Id.* at DPCC003310.

29    Joint Ex. J052, identifying the contract as Purchase Contract 6900061. Daimler had "purchasing guidelines [requiring] any kind of supply contracts with American U.S. suppliers ... to go via Purchasing Coordination. At least those regulations existed at the time." Tr. 5/15/2017 at 67:8–67:12 (Monteiro).

30    Joint Ex. J052 at B456LT00001744.

31    *Id.* at B456LT00001750.

32    *See* Joint Ex. J0057. This internal Old A123 email indicates that Daimler's representative "was very upset with our 'post-nomination' behavior and the huge price increase." *Id.* at B456LT00001445.

33    Tr. 5/15/2017 at 68:20–69:11; 70:25–71:12 (Monteiro).

34    2015 Decision, 2015 WL 4512070 at 3. Tr. 5/15/2017 at 74:18–75:16 (Monteiro).

35    Ex. P007. Tr. 5/15/2017 at 76:2–81:12 (Monteiro).

36    Ex. P007.

37    Joint Ex. J072 and Joint Ex. J074.

38    Joint Ex. J104. The Updated Purchase Contracts are dated November 15, 2011 (for Purchase Contract 6900067 for 60Ah Starter Batteries) and May 5, 2011 (for Purchase Contract 6900061 for 80Ah Starter Batteries). Due to a system restriction, once the purchase contract is initiated, DPCC could not change the date as updated purchase contracts were issued. Tr. 5/16/2017 at 97:2–97:18 (Testimony of Margarita Block, the Purchasing Manager for DPCC at the relevant time period ("Block")). *See* JPM at 14.

39    Joint Ex. J104 at B456LT00005674, B456LT00005680. Previously, on November 15, 2011, DPCC had issued the original purchase contract for the 60Ah Starter Batteries, stating that it was an "Annual Purchase Contract" valid from 6/27/2011 to 12/31/2011. Joint Ex, J066.

40    Joint Ex. J104 at B456LT00005679

41    Joint Ex. J104 at B456LT00005690, B456LT00005696. Like the date of the Contract (*see* n. 38, *supra* ) the statement appearing below each price of "Price valid 6/27/2011–12/31/2011" appears to be a term that was never updated in the contract, as it is outdated whether finding that the term ended on December 31, 2012 or December 31, 2017. J104 at B456LT00005680, B456LT00005696.

42    Joint Ex. J104 at B456LT00005695.

43    Joint Ex. J104 at B456LT00005678–79, B456LT00005694–95.

44    Joint Ex. J111 at DPCC000073. The Amendment defines the "Contracts" as including Purchase Contracts dated November 29, 2012 (No. 1285703299), November 15, 2011 (No. 6900067), and May 5, 2011 (No. 6900061).

45    Joint Ex. J111 at DPCC000074.

46    2015 Decision, 2015 WL 4512070 at *9.

47    The DPCC "General Terms and Conditions" attached to the Contract provide that "all transactions between DPCC and Seller will be governed by and construed in accordance with the laws of Michigan as if entirely performed therein." Joint Ex. J104 at B456LT00005688, B456LT00005704. Neither party disputes that Michigan law applies here.

48    *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 467, 663 N.W.2d 447, 453 (Mich. 2003) quoting *Hunter v. Pearl Assurance Co., Ltd.,* 292 Mich. 543, 545, 291 N.W. 58 (Mich. 1940) (internal punctuation omitted).

49    *Id.*

50    Joint Ex. J104 at B456LT00005674 and B456LT00005690 (¶ 1.a) (emphasis added).

51    Joint Ex. J104 at B456LT00005678, B456LT00005694.

52    Joint Ex. J104 at B456LT00005679, B456LT00005695.

53    Joint Ex. J104 at B456LT00005680, B456LT00005696.

54    *Whitesell Corp. v. Whirlpool Corp.,* No. 1:05–CV–679, 2009 WL 3585427, *1 (W.D. Mich. Oct. 27, 2009) (citing *Klapp,* 663 N.W.2d at 454).

2017 WL 6603817, 94 UCC Rep.Serv.2d 549

| | |
|---|---|
| 55 | *Klapp*, 663 N.W.2d at 454 |
| 56 | *Id.* quoting *Penzien v. Dielectric Products Eng'g Co., Inc.,* 374 Mich. 444, 449, 132 N.W.2d 130 (Mich. 1965) (internal punctuation omitted). |
| 57 | Joint Ex. J002 at B456LT00001243–44 (emphasis added). |
| 58 | Tr. 5/15/2017 at 37:9–38:8; 51:3–54:18 (Monteiro). |
| 59 | Joint Ex. J029; Tr. 5/15/2017 at 62:24–63:9 (Monteiro). |
| 60 | Joint Exhibits J010 at 28, 31; J011 at B456LT00000428; J031 at B456LT00003839. |
| 61 | Ex. P007; Ex. P008; Ex. P012; Tr. 5/15/2017 74:18–76:14; 77:1–77:7 (Monteiro). |
| 62 | Ex. P008; Joint Ex. J104. Although the prices for the 80Ah Starter Batteries appear to be higher in the Contract than in the Livonia documentation, Mr. Monteiro explained that the price in the Contract for the 80Ah Starter Batteries include the $477 base price, plus $12 piece price amortization for NRE Costs which the parties decided would be added to only the 80Ah Starter Batteries. Tr. 5/15/2017 at 98:12–99:16 (Monteiro). |
| 63 | Tr. 5/15/2017 at 34:4–34:15; 48:20–49:9; 53:16–54:18; 65:2–65:10; 80:12–80:15 (Monteiro). |
| 64 | Tr. 5/16/2017 at 97:2–99:8; 101:25–102:6 (Block). The Trustee argues that the one-year term in the Contract between DPCC and Old A123 was not an error, because it mirrors the language in the contract between Daimler and DPCC, providing:<br><br>This Agreement has a term of one year and shall be extended by an additional year, respectively, if the parties have agreed the prices for the subsequent year. (Joint Ex. J047 at DPCC003313).<br><br>The one-year term language, however, is not found in the later Daimler/DPCC purchase contracts issued on December 7, 2011 (Joint Ex. J072) and on January 24, 2012 (Joint Ex. J074), which provided the basis for the Updated Purchase Contracts between DPCC and Old A123. |
| 65 | Dep. Tr. 10/14/2013 at 41:1–43:11; 44:15–45:5; 49:17–50:25 (Trinch). |
| 66 | Dep. Tr. 10/16/2013 at 92:6–92:11; 99:15–99:20 (Belden). |
| 67 | Mich. Comp. Laws § 440.2202. |
| 68 | Mich. Comp. Laws § 440.2202, cmt. 2. |
| 69 | Mich. Comp. Laws § 440.1303(1). |
| 70 | Joint Ex. J070; Dep. Tr. 2/4/2014 at 143:17–144:6 (Jason Forcier ("Forcier") was the Executive Vice President of the Automotive Solutions Group at Old A123 during the relevant time period. *See* JPM at 16.). |
| 71 | Dep. Tr. 10/16/2013 at 139:15–141:4 (Belden); Joint Exhibits J101, J102. |
| 72 | Joint Ex. J111; Dep. Tr. 10/16/2013 at 141:9–142:2 (Belden); Joint Exhibits J095 at B456LT00005170; J099; J103 at B456LT00035648 |
| 73 | Joint Ex. J117; Tr. 5/16/2017 at 92:25–94:5 (Block). |
| 74 | Tr. 5/16/2017 at 94:6–94:10 (Block). |
| 75 | Tr. 5/16/2017 at 100:16–102:6 (Block). |
| 76 | Joint Ex. J104 at B456LT00005678–79, B456LT00005694–95. |
| 77 | In support, the Trustee cites to *In re Weaver Oil Co., Inc.,* No. 08–40379, 2008 WL 8202063, *4 (Bankr. N.D. Fla. Nov. 17, 2008), in which the Court, deciding whether to approve rejection of a contract, considered whether the size of the resulting rejection damages claim prevented the estate from benefiting from the contract rejection. Without any discussion on the issue, the Court determined the potential rejection damages claim without including an option to extend the contract for a further five-year term. |
| 78 | *See In re Henderson,* 297 B.R. 870, 874 (Bankr. M.D. Fla. 2003) (Court considering a landlord's rejection damages claim against the debtor-guarantor of the lease obligation would not reduce the rent claim based on the assumption that the replacement tenant would exercise options to renew the lease). |
| 79 | Tr. 5/15/2017 at 94:13–96:9 (Monteiro). |
| 80 | *Id.* |
| 81 | Tr. 5/17/2017 at 123:18–124:44 (D.I. 2439) (Jeffrey Johnston, DPCC's expert witness on damages calculation ("Johnston"); *See* JPM at 14; Tr. 5/17/2017 at 16:4–16:21 (Johnston). |
| 82 | Tr. 5/15/2017 at 99:24–102:23 (Monteiro); Exhibit P31. |
| 83 | Tr. 5/15/2017 at 103:2–104:24 (Monteiro). |
| 84 | Tr. 5/15/2017 at 110:12–111:13: 112:14–113:14 (Monteiro). |
| 85 | Compare Joint Ex. J104 and Joint Ex. J129. See also Ex. P031, Ex. P033 and P051. |

| | |
|---|---|
| 86 | Tr. 5/16/2017 at 74:11–75:7 (Monteiro). |
| 87 | Tr. 5/15/2017 at 21:19–21:25; 43:20–45:89 (Monteiro); Old A123 knew the price would affect which car lines would use the batteries and, in turn, how many batteries were purchased. Joint Ex. J011 at B456LT0000428 ("[T]he only hurdle to jump over is the price line;" "The platform managers at Daimler will cancel this technology right away if there is no gap closure"); Joint Ex. J013 at B456LT00004294 ("[T]he platform manager can easily put their veto on this new technology if the price gap is too big."). |
| 88 | Tr. 5/15/2017 at 107:19–108:9 (Monteiro). |
| 89 | JPM, Uncontested Facts, ¶ 11. Ex. P33. |
| 90 | JPM, Uncontested Facts, ¶ 12. |
| 91 | 11 U.S.C. § 502(b). |
| 92 | *In re Land Source Cmty. Dev. LLC,* 485 B.R. 310, 317 (Bankr. D. Del 2013) (citing *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992)), which describes the shifting burden of proof as follows: |
| | Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case.... In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.... The burden of persuasion is always on the claimant. |
| | *Allegheny Int'l,* 954 F.2d at 173–74 (citations omitted). |
| 93 | *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 450–51, 127 S. Ct. 1199, 167 L.Ed. 2d 178 (2007) (citing *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S. Ct. 1951, 147 L.Ed. 2d 13 (2000)). |
| 94 | Joint Ex. J104 at B456LT00005688, B456LT00005704. |
| 95 | Mich. Comp. Laws § 440.2101 *et seq.* |
| 96 | Mich. Comp. Laws § 440.1305. |
| 97 | Mich. Comp. Laws 440.2711. |
| 98 | Mich. Comp. Laws 440.2712 (footnote omitted). |
| 99 | Mich. Comp. Laws 440.2713 (footnote omitted). |
| 100 | Tr. 5/17/2017 at 215:8–216:24 (Testimony of Dr. Gilbert Neal Riley, Jr., [fill in title]. Dr. Gilbert, a co-inventor of the Old A123 batteries, testified about performance improvements in the Starter Batteries supplied by New A123. |
| 101 | Mich. Comp. Laws 440.2712 cmt. 2. |
| 102 | *Natron Corp. v. Amway Corp,* 1999 WL 33435058, *3 (Mich. Ct. App. Oct. 12, 1999) (citations omitted). The Trustee cites case law that is easily distinguished from the facts before me. In *Valley Die Cast Corp. v. A.C. W., Inc.,* 181 N.W.2d 303 (Mich. Ct. App. 1970), the covering party purchased a brush car wash as cover for a pressure car wash. The brush car wash was more expensive and operated on distinctly different principles from the pressure car wash. In *IDX Sys. Corp. v. St. John Health Sys.,* 2003 WL 25676069 (E.D. Mich. Mar. 28, 2003), the Court granted a motion in limine to exclude evidence related to damages incurred when a health care company purchased multiple systems to replace the single, integrated software system that it had contracted to buy. In this matter now before me, no evidence of an alternative source of batteries was produced. |
| 103 | Tr. 5/15/2017 at 110:12–111:13: 112:14–113:14 (Monteiro). |
| 104 | Joint Ex. J141 at 17. |
| 105 | Joint Ex. J139 at 23. |
| 106 | Joint Ex. J104 at B456LT00005680, B456LT0005696; Joint Ex. J141 at 4 n. 9; Joint Ex. J139 at 9 (stating that the pricing consisted of three separate components: the base price, the NRE Adder and the delivery charges (or freight costs)). |
| 107 | Joint Ex. J111. This change reduced the NRE Adder from $12.30 to $10.43. Tr. 5/17/2017 at 68:21–69:23 (Johnston). |
| 108 | Joint Ex. J111. |
| 109 | Joint Ex. J104 at B456LT00005680, B456LT00005696. |
| 110 | Tr. 5/15/2017 at 77:8–78:24 (Monteiro). |
| 111 | Tr. 5/17/2017 at 71:14–71:24 (Johnston). |
| 112 | See the 2015 Decision, 2015 WL 4512070 at *3. |

Case 1:15-cv-01116-RGA Document 29-1 Filed 11/01/18 Page 36 of 82 PageID #: 1390

In re A123 Systems, Inc., Not Reported in B.R. Rptr. (2017)
2017 WL 6603817, 94 UCC Rep.Serv.2d 549

113  Tr. 5/15/2017 at 77:8–79:6 (Monteiro).

114  *Id., see also* P007.

115  Joint Ex. J139 at 11–13. Tr. 5/17/2017 at 79:9–80:23 (Johnston).

116  Tr. 5/15/2017 at 82:25–84:16; 98:12–99:16 (Monteiro).

117  Tr. 5/15/2017 at 84:11–84:13 (Monteiro).

118  Tr. 5/17/2017 at 76:14–78:37 (Johnston).

119  *Id.*

   FN120. Q: In any event, the costs of freight are borne by Daimler, correct?
   A: Well, ultimately, yes. The question is whether it's directly right away or indirectly[;] either way I pay my own freight
   forward or I pay the service provided by that supplier.

   Tr. 5/16/2017 at 32:18–32:24

121  Mich. Comp. Laws 440.2713.

122  Joint Ex. J122.

123  *In re Stone & Webster, Inc.,* 547 B.R. 588, 606 (Bankr. D. Del. 2016). *See also In re Speigel, Inc.,* 337 B.R. 816, 820
   (Bankr. S.D.N.Y. 2006) (allowing an amendment to a timely filed claim that (i) corrects a defect of form in the original
   claim; (ii) describes the original claim with greater particularly; or (iii) pleads a new theory of recovery on the facts set
   forth in the original claim).

124  *Stone & Webster,* 547 B.R. at 606 citing *Plains Mktg., L.P. v. Bank of America, N.A. (In re SemCrude, L.P.),* 443 B.R.
   472, 477–78 (Bankr. D. Del. 2011).

125  *Speigel,* 337 B.R. at 820 (citing *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),* 419 F.3d
   115, 133 (2d Cir. 2005)).

126  *Speigel,* 337 B.R. at 820.

127  *Id.*

128  Ex. P–30.

129  *Id.*

130  *See In re ADI Liquidation, Inc.,* 555 B.R. 423, 435–37 (Bankr. D. Del. 2016).

131  Joint Ex. J139 at 18–20. Mr. Johnston arrived at this figure by reviewing Daimler's records of the actual number of Starter
   Batteries supplied by New A123 to DPCC and Daimler from 2013 through March 31, 2016, and New A123 and Daimler's
   forecasts of the number of Starter Batteries to be supplied through 2018. *Id.* at 8. The Cover Amount is split between
   59,910 80Ah Starter Batteries and 7,499 60h Starter Batteries

132  Mich. Comp Laws § 440.2715(2).

133  *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.,* 480 N.W.2d 623, 631, 192 Mich.App. 333, 347 (Mich. Ct. App., 1991)
   (quoting *Petroleo Brasileiro, S.A. v. Ameropan Oil Corp.,* 372 F.Supp. 503 (E.D.N.Y. 1974)).

134  G. Wallach, *The Law of Sales,* ¶ 10.04[1][b], Cmt. 3 to § 2–715 quoted with approval in *Step–Saver Data Sys., Inc. v.
   Wyse Tech.,* 912 F.2d 643, 653 (3d Cir. 3990).

135  *Step–Saver,* 912 F.2d at 653.

136  *Contempo Design, Inc. v. Chi & N.E. Ill. Dist. Council of Carpenters,* 226 F.3d 535, 554 (7th Cir. 2000) *cert. denied* 531
   U.S. 1078 (2001) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 351).

137  Joint Ex. J104, ¶ 11 at B456LT00005686, B456LT00005702.

138  *Miller–Davis Co. v. Ahrens Constr., Inc.,* 495 Mich. 161, 173, 848 N.W.2d 95, 101–02 (Mich. 2014) (citing 41 Am. Jur.
   2d, Indemnity, § 4, p. 417).

139  *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.,* 262 Mich. App. 345, 686 N.W.2d 756, 761 (Mich. Ct. App. 2004).

140  *Miller–Davis,* 848 N.W.2d at 102.

141  *Id.* at 102–03.

142  *Miller–Davis,* 848 N.W.2d at 103 (quoting *Black's Law Dictionary* (9th ed.), pp. 281–82).

143  Joint Ex. J104 at B456LT00005678, B456LT00005694.

144  Joint Ex. J151 at DPCC2008010 (emphasis in original); Tr. 5/15/2017 at 88:2–89:7 (Monteiro).

145  Tr. 5/19/2017 at 45:12–49:5 (Vanderveen). Mr. Vanderveen testified, "I've worked for a fair number of automotive
   suppliers. And in my experience, the relationship is very delicate between an OEM and an automotive supply company.
   It's mutually dependent on each other. I don't think I have to explain that the supplier needs the business and the OEM
   needs the supplier's business desperately.... [I]n the economic system in which these contracts exist, the parties could

agree to a particular price, and that would be a market price." *Id.* at 48:5–48:18. Mr. Vanderveen also did not include spare parts costs as part of DPCC's damages because DPCC stopped purchasing batteries in early 2015 and, therefore, would not purchase spare parts after series production. However, as explained earlier in this Opinion, Daimler's direct purchases are included as part of DPCC's damage claim.

146    *See, e.g.,* Tr. 5/15/2017 at 117:11–1182 (Monteiro).

147    Tr. 5/17/2017 at 44:2245:17 (Johnston).

148    Joint Ex. J139 at 16–17.

149    Joint Ex. J139 at 17.

150    Tr. 5/15/2017 at 115:8–123:15 (Monteiro); Tr. 5/16/2017 at 54:4–57:12 (Monteiro).

151    Joint Ex. J139 at 17.

152    Joint Ex. J139 at 17.

153    *Id.*

154    *Id.* at 17–18. Tr. 5/17/2017 at 46:19–51:25 (Johnston).

155    Joint Ex. J142, Ex. A; Tr. 5/17/2017 at 163:11–169:15 (Riley).

156    Joint Ex. J142; Tr. 5/17/2017 at 173:14–174:1; 175:1–176:4 (Riley).

157    Tr. 5/17/2017 at 192:16–193:22 (Riley).

158    Joint Ex. 142 at 5; Tr. 5/17/2017 at 195:7–195:14 (Riley).

159    Tr. 5/17/2017 at 193:23–195:6 (Riley).

160    Tr. 5/17/2017 at 186:21–188:1 (Riley).

161    Joint Ex. 142 at 5.

162    Tr. 5/17/2017 at 190:7–190:22 (Riley).

163    Tr. 5/17/2017 at 184:6–184:23 (Riley).

164    Tr. 5/17/2017 at 185:10–186:20 (Riley).

165    Joint Ex. 142 at 5; Tr.

166    Tr. 5/17/2017 at 198:22–199:18.

167    Joint Ex. J139 at 20; Tr. 5/17/2017 at 54:14–54:25 (Johnston).

168    Joint Ex. J139 at 20; Tr. 5/17/2017 at 56:17–57:3 (Johnston).

169    Joint Ex. J139 at 20–21; Tr. 5/17/2017 at 57:4–57:13 (Johnston).

170    Tr. 5/17/2017 at 57:8–57:13 (Johnston).

171    Joint Ex. J139 at 21; Tr. 5/17/2017 at 57:24–58:19 (Johnston).

172    Joint Ex. J139 at 21.

173    *Id.*

174    *USGen New England, Inc. v. TransCanada Pipelines, Ltd.* (*In re USGen New England, Inc.*), 429 B.R. 437, 490 (Bankr. D. Md. 2010) quoting *Pension Benefit Guar. Corp. v. Belfance* (*In re CSC Indus., Inc.*), 232 F.3d 505, 508 (6th Cir. 2000) ("[T]he bankruptcy court must value present claims and reduce claims for future payment to present value while also keeping in mind that a fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally.").

175    *In re Oakwood Homes Corp.*, 449 F.3d 588, 604 (3d Cir. 2006) (Smith, J. dissenting) (quoting *In re Trace Int'l Holdings, Inc.*, 284 B.R. 32, 38 (Bankr. S.D.N.Y. 2002)).

176    11 U.S.C. § 365(g)(1).

177    11 U.S.C. § 502(g)(1).

178    11 U.S.C. § 502(b).

179    449 F.3d 588 (3d Cir. 2006).

180    DPCC Proposed Findings of Fact and Conclusions of Law (D.I. 2450) at ¶ 136 citing Mich. Comp. Laws 600.6013; 600.6301.

181    Tr. 5/17/2017 at 101:6–101:13 (Johnston).

182    *Id.* at ¶ 137–38.

183    *Oakwood Homes,* 449 F.3d at 595. The Court noted that when "the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term 'value, as of' a certain date. *See, e.g.,* 11 U.S.C. § 1129 ('value, as of the effective date of the plan'), 1173 (same), 1225 (same), 1325 (same), 1328 (same)." *Id.* at 597.

184    *Oakwood Homes,* 449 F.3d at 598 (emphasis in original) (footnote omitted).

2017 WL 6603817, 94 UCC Rep.Serv.2d 549

185    *Oakwood Homes,* 449 F.3d at 591; 11 U.S.C. § 502(b)(2) (disallowing claims to the extent such claim is for unmatured interest).

186    *Id.*

187    *Id.* at 601.

188    *Id.* at 603.

189    *See, e.g., In re O.P.M Leasing Servs., Inc.,* 79 B.R. 161, 167 (S.D.N.Y. 1987) ("Equality of treatment at distribution is a fundamental principle underlying the bankruptcy laws. By discounting a claim arising from the postpetition rejection of an executory contract or unexpired lease, the postpetition claimant is treated the same as the pre-petition claimant, an explicitly stated purpose of 11 U.S.C. § 365.") (citation omitted); *Matter of Penn Central Transp. Co.,* 596 F.2d 1102, 1316 (3d Cir. 1979) ("Plainly, the promise of a dollar payable in several years is not worth 100 cents today.").

190    *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S. Ct. 1951, 1955, 147 L.Ed.2d 13 (2000) quoting *Butner v. United States,* 440 U.S. 48, 57, 99 S. Ct. 914, 59 L.Ed.2d 136 (1979).

191    *Raleigh,* 530 U.S. at 20 (emphasis added) citing *Butner,* 440 U.S. at 55; *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161–62, 67 S. Ct. 237, 91 L.Ed. 162 (1946). *See also Unsecured Creditors Comm. of Highland Superstores, Inc. v. Strobeck Real Estate, Inc. (In re Highland Superstores, Inc.),* 154 F.3d 573, (6th Cir. 1998) ("[Courts] have uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6).") (citations omitted).

192    *In re W.R. Grace & Co.,* 475 B.R. 34, 159 (D. Del. 2012); *Hacienda Heating & Cooling, Inc. v. United Artists Theatre Circuit, Inc. (In re United Artists Theatre Co.),* 406 B.R. 643, 651 (Bankr. D. Del. 2009). *See also In re Energy Future Holdings Corp.,* 540 B.R. 109 (Bankr. D. Del. 2015).

193    *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.),* 429 B.R. 437, 491 (Bankr. D. Md. 2010).

194    *Id.*

195    *Id.* (citing *CSC Indus.,* 232 F.3d at 508).

196    *In re Mirant Corp.,* 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005).

197    *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1333 (Fed. Cir. 2002).

198    DPCC Proposed Findings of Fact and Conclusions of Law, D.I. 2450, at ¶ 127 citing *Rivers v. Bay City Traction & Elec. Co.,* 128 N.W. 254, 259 (Mich. 1910).

199    *See* Demo. P19, Joint Ex. J139 at 22 n. 45.

200    Tr. 5/19/2017 at 54:18–55:20 (Vanderveen); *see also* Demo D22.

201    *In re Chemtura Corp.,* 448 B.R. 635, 672 (Bankr. S.D.N.Y. 2011).

202    *Id.* at 673.

203    *Id.* at 673 (citing *Teachers Ins. and Annuity Assoc. of Am. v. Ormesa Geothermal,* 791 F.Supp. 401, 416–17 (S.D.N.Y. 1991)).

204    *Chemtura,* 448 at 676. The *Chemtura* Court distinguished cases that used a risk free discount rate, specifically *In re Highland Superstores, Inc.,* 154 F.3d 573 (6th Cir. 1998) and *Kucin v. Devan,* 251 B.R. 269 (D. Md. 2000). The *Mirant* Court also noted that the analyses of the courts in *Highland* and *Kucin* were flawed since they "presented a dichotomy between a risk-free discount rate and a discount rate that takes into account the debtor's creditworthiness *at the time of the breach.* Neither Court considered the appropriateness of including in the discount rate a risk factor based upon an *ex ante* view of the debtor's creditworthiness at the time the parties entered into the contract." *Mirant,* 332 B.R. at 157 n.49. I agree that those cases are distinguishable and conclude that the reasoning underlying both *Chemtura* and *Mirant, supra,* is applicable to the rejection damages claim here,

205    *Chemtura,* 448 B.R. at 676–77.

206    *Mirant,* 332 B.R. at 158.

207    *Id.* at 159.

208    *Id.*

209    *See* Demo D22.

210    *B456,* 2015 WL 4512070 at *2–*3.

211    *Id.*

212    *Id.* at *6.

213    *Id.* at *7.

214    Exhibit P2, p. 6.

In re Bed Systems, Inc., Slip Copy (2017)
2017 WL 6603817, 94 UCC Rep.Serv.2d 549

215    *Id.*

216    *Id.*

217    *In re Tribune Co.,* 2015 WL 7307305, *3 (Bankr. D. Del. Nov. 19, 2015).

218    *Id.*

---

**End of Document**                                        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

570 B.R. 546
United States Bankruptcy Court,
N.D. Texas, Dallas Division.

IN RE: WOODHAVEN TOWNHOUSE
ASSOCIATION, INC., Debtor.

CASE NO. 16–34424–BJH
|
Signed March 31, 2017

**Synopsis**

**Background:** Debtor townhouse association objected to homeowner's claim arising from breach of contract claim in state court lawsuit asserting association was responsible to repair the foundation of her townhome.

**Holdings:** The Bankruptcy Court, Barbara J. Houser, J., held that:

[1] under Texas law, association's bylaws and covenants were ambiguous, and therefore court would look to extrinsic or parol evidence to determine whether they imposed a contractual or other duty on the association to repair homeowner's foundation, and

[2] under Texas law, parties did not intend for association's ambiguous bylaws and covenants to impose a contractual or other duty on the association to repair homeowner's foundation.

Objection sustained.

West Headnotes (12)

[1] **Bankruptcy**
👉 Presumptions and burden of proof

Objecting party may rebut prima facie validity of proof of claim by producing evidence of a probative force equal to that of the creditor's proof of claim. Fed. R. Bankr. P. 3001(f).

Cases that cite this headnote

[2] **Bankruptcy**
👉 Presumptions and burden of proof

Once the prima facie validity of a proof of claim is established, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency; this can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question. Fed. R. Bankr. P. 3001(f).

Cases that cite this headnote

[3] **Bankruptcy**
👉 Presumptions and burden of proof

Once an objecting party produces evidence rebutting the prima facie validity of a proof of claim, the burden then lies with whichever party would normally bear such burden under relevant substantive law. Fed. R. Bankr. P. 3001(f).

Cases that cite this headnote

[4] **Bankruptcy**
👉 Sufficiency of Filing

Claimant is not required to reduce the evidence submitted with its proof of claim into a form that would be admissible under state law; indeed, requiring a claimant to produce additional evidence to overcome a hearsay or other evidentiary objection directly undermines bankruptcy rule governing form and content of proof of claim. Fed. R. Bankr. P. 3001.

Cases that cite this headnote

In re Woodhaven Townhouse Association, Inc., 573 B.R. 545 (2017)

**[5]**   **Contracts**
    👉 Application to Contracts in General

**Evidence**
    👉 Grounds for admission of extrinsic evidence

Under Texas law, the court's first task in interpreting a contract is to determine whether the contract is enforceable as written, without resort to parol evidence.

Cases that cite this headnote

**[6]**   **Contracts**
    👉 Language of contract

Under Texas law, the court's primary objective in interpreting a contract is to ascertain the parties' intent as expressed in the contract.

Cases that cite this headnote

**[7]**   **Contracts**
    👉 Construction as a whole

Under Texas law governing contract interpretation, the court should examine the entire contract in order to harmonize and give effect to all of its provisions so that none will be rendered meaningless, and in doing so, the court must be wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole.

Cases that cite this headnote

**[8]**   **Contracts**
    👉 Existence of ambiguity

Under Texas law, a contract is unambiguous if it can be given a definite or certain legal meaning.

Cases that cite this headnote

**[9]**   **Contracts**
    👉 Existence of ambiguity

Under Texas law, ambiguity does not arise because of a simple lack of clarity, or because

the parties proffer different interpretations of the contract, rather, a contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction.

Cases that cite this headnote

**[10]**   **Evidence**
    👉 Showing Intent of Parties as to Subject-Matter

Under Texas law, if a contract is ambiguous, courts may consider parol evidence to ascertain the parties' intent.

Cases that cite this headnote

**[11]**   **Evidence**
    👉 Grounds for admission of extrinsic evidence

Under Texas law, townhouse association's bylaws and covenants were ambiguous, and therefore court would look to extrinsic or parol evidence to determine whether they imposed a contractual or other duty on the association to repair homeowner's foundation, given that provisions of the governing documents were arguably inconsistent.

Cases that cite this headnote

**[12]**   **Common Interest Communities**
    👉 Relationship with unit owners in general

**Common Interest Communities**
    👉 Maintenance, repair, and replacement; responsibility for condition

Under Texas law, parties did not intend for townhouse association's ambiguous bylaws and covenants to impose a contractual or other duty on the association to repair homeowner's foundation; president of the association's board of directors testified that, since she had been president, the association had consistently taken the position that repairing foundations was each owner's responsibility, not the responsibility of the association, and further testified that given the

low monthly dues, it was unrealistic of owners to think that the association was responsible for foundation repairs, that the association had consulted counsel and was advised that foundation repairs were not its responsibility under the governing documents, and that when the foundation underlying her own townhome and the townhomes of other owners in her building that shared the common foundation needed repair, those owners went together and had their common foundation repaired at their expense, not the association's expense.

[Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*548** [Joyce W. Lindauer](#), [Joyce W. Lindauer](#) Attorney, PLLC, Dallas, TX, for Debtor.

[Meredyth Kippes](#), United States Trustee, Dallas, TX, for U.S. Trustee.

**Related to ECF Nos. 40 & 41**

**MEMORANDUM OPINION**

[Barbara J. Houser](#), United States Bankruptcy Judge

Before the Court is the Debtor's Amended Objection to Claim of Christina Dudek (Claim No. 3) [ECF No. 40] and the Debtor's Amended Objection to Claim of Nacol Law Firm (Claim No. 4) [ECF No. 41] [1] (together, the "**Claim Objections**"). The debtor is Woodhaven Townhouse Association, Inc., which, as its name implies, is a townhome association located in Richardson, Texas (the "**Debtor**" or the "**Association**"). The Court heard the Claim Objections on March 7, 2017 and, after reopening the evidence, concluded the hearing on March 27, 2017. This Memorandum Opinion contains the Court's findings of fact and conclusions of law in accordance with [Federal Rule of Bankruptcy Procedure 7052](#). [2]

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Christina Dudek ("**Dudek**") caused Proof of Claim No. 3 to be filed on December 13, 2016 by her counsel, through which she asserts a claim of $69,139.35 against the Association (the "**Dudek Claim**"). Attached to the Dudek Claim is a state court petition through which she sought to obtain a judgment against the Association for (i) its alleged breach of contract—*i.e.*, the written Bylaws of the Woodhaven Townhouse Association, Inc. [Association Ex. 8] (the "**Bylaws**") and other related documents, (ii) its alleged negligence and gross negligence, (iii) its alleged breach of fiduciary duty owed to Dudek, and (iv) the attorney's fees she incurred in bringing the breach of contract claim in her state court lawsuit. Because the state court lawsuit **\*549** was pending and had not proceeded to trial when the Association filed its bankruptcy petition, Dudek's Claim was unliquidated as of the petition date.

The factual predicate for the Dudek Claim revolves around foundation problems Dudek experienced at her townhome and her desire to have the Association make and pay for the necessary repairs. In oversimplified terms, Dudek contends that under the terms of the Bylaws and related documents, the Association is responsible to repair the foundation of her townhome. Attached to the Dudek Claim as Exhibit C is an itemization of her alleged actual damages plus attorney's fees, costs of suit, and future repairs she apparently asserts will be necessary to the interior of her townhome, all of which total the $69,139.35 sought in the Dudek Claim. [3]

The Nacol Law Firm, PC, Dudek's counsel in the state court lawsuit and here, filed Proof of Claim No. 4 on December 13, 2016 on its own behalf, asserting a $22,602.35 claim against the Association (the "**Nacol Firm Claim**"). The state court petition that was attached to the Dudek Claim was also attached to the Nacol Firm Claim, which seeks to recover the attorney's fees and expenses the firm expended on Dudek's behalf in the state court lawsuit. However, a careful review of the Nacol Firm Claim confirms that it duplicates the Dudek Claim with respect to the requested fees and expenses.

As noted previously, the Claim Objections were set for hearing before the Court on March 7, 2017 (the "**Hearing**"). The Association, having filed a witness and exhibit list in accordance with the Local Rules for the Northern District of Texas, was permitted to offer evidence in support of the Claim Objections at the Hearing. However, neither Dudek nor the Nacol

Law Firm filed a witness and/or exhibit list. Because of this, the Association objected to the introduction of any evidence by Dudek and/or the Nacol Law Firm at the Hearing, alleging unfair surprise and prejudice. The Court sustained the Association's objection, and neither creditor was permitted to offer evidence at the Hearing. [4]

However, on March 23, 2017, the Court advised the parties by email from its Courtroom Deputy that (i) it had reconsidered its ruling sustaining the Association's evidentiary objection and that it wished to hear a proffer of the testimony that Nacol had sought to give at the Hearing, and (ii) once the proposed testimony was proffered, the Court would give the Association the opportunity to explain how it would be unfairly surprised and/or prejudiced by the admission of that proposed testimony. Nacol proffered his testimony on March 24, 2017, at a hearing already scheduled to consider, among other things, confirmation of the Association's proposed plan of reorganization. As the Court suspected, Nacol's testimony only related to the reasonableness of the fees that the Nacol Law Firm had incurred in representing Dudek. Because copies of the Nacol Law Firm's fee statement were attached to both the Dudek Claim and the Nacol Firm Claim, the Court concluded **\*550** that there was no unfair surprise or prejudice to the Association and scheduled a further evidentiary hearing for March 27, 2017.

At this later hearing, the Court reopened the evidentiary record to permit Nacol to testify consistent with his proffer and for the Association to offer rebuttal evidence, if any. At the hearing, Nacol offered testimony in support of the reasonableness of the fees and expenses the Nacol Law Firm incurred in its representation of Dudek (both before and after the Association's bankruptcy filing) and was subject to cross-examination. In turn, the Association offered rebuttal testimony regarding the reasonableness of the Nacol Law Firm's fees and expenses from: (i) its state court counsel, Jason Reed, with respect to the claimed prepetition fees and expenses of the Nacol Law Firm, and (ii) its bankruptcy counsel, Joyce Lindauer, with respect to the claimed post-petition fees and expenses of the Nacol Law Firm. The Court then re-closed the evidentiary record and heard further oral argument on the Claim Objections. The Court also permitted the parties to submit limited post-hearing briefs. Nacol filed the last brief on March 30, 2017, at which time the Court took the matter under advisement.

## II. LEGAL ANALYSIS

With this background in mind, the Court will turn to its analysis of the Association's objection to the Dudek Claim. For the reasons explained below, the Court sustains the objection and disallows the Dudek Claim in its entirety.

**[1]** **[2]** In bankruptcy, a proof of claim filed in accordance with Bankruptcy Rule 3001 is "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f); *see California State Board of Equalization v. Official Unsecured Creditors' Committee ( In re Fidelity Holding Co., Ltd.)*, 837 F.2d 696, 698 (5th Cir. 1988). However, the objecting party may rebut this prima facie validity by producing evidence of "a probative force equal to that of the creditor's proof of claim." *Fidelity Holding Co., Ltd.*, 837 F.2d at 698; *Simmons v. Savell ( In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985); *see Southland Corp. v. Toronto–Dominion ( In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998). In other words, and as this Court recently held, once the prima facie validity of a proof of claim under Bankruptcy Rule 3001(f) is established,

> [t]he burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question.

*In re Wyly*, 552 B.R. 338, 379 (Bankr. N.D. Tex. 2016) (citations omitted).

**[3]** Thus, once an objecting party produces evidence rebutting a proof of claim, the burden then lies with whichever party would normally bear such burden under relevant substantive law. *Id.* at 378. Here, that relevant substantive law is Texas state law, which puts the burden of proof on Dudek to establish her breach of contract, negligence, gross negligence, and/or breach of fiduciary duty claims against the Association, along with her entitlement to a recovery of reasonable attorney's fees **\*551** and expenses on her breach of contract claim. *See, e.g., Montoya v. Las Palmas Med. Center,* 2015 WL 12551109, at \*9 (W.D. Tex. August 6, 2015) (plaintiff bears the ultimate burden of proof on its negligence claims); *Travelocity.com v. CGU Ins. Co.,* 2003 WL 21501779, at \* 3 (N.D. Tex. June 25, 2003) (plaintiff carries the ultimate burden of proof on breach of contract claims); *Edwards v. Pena,* 38 S.W.3d 191, 198 (Tex. App.–Corpus Christi 2001, no pet.) (plaintiff bears ultimate burden of proof on breach of fiduciary duty claim); TEX. CIV. PRAC. & REM. Code § 38.001 (Procedure for Recovery of Attorney's Fees).

With this understanding of the shifting burdens, the Court returns to its analysis. As previously explained, a proof of claim executed and filed in accordance with Bankruptcy Rule 3001 constitutes "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). As applicable here, the general requirements under Bankruptcy Rule 3001 are that the proof of claim conform substantially with the appropriate Official Form, is executed by the creditor or the creditor's authorized agent, and, if the claim is based on a writing, it attach a copy of that writing. The Dudek claim meets these requirements. It was filed on Official Form 410, which is the official proof of claim form utilized in bankruptcy cases, and was signed by Nacol as Dudek's attorney. Claim No. 3 at 1–3. Moreover, Dudek attached multiple documents to her claim, including among these: (i) Plaintiff's Original Petition filed in the state court action, (ii) the Residential Earnest Money Contract (Resale) under which Dudek purchased her townhome and related documents, (iii) a copy of a prior version of the By–Laws, [5] and (iv) an itemized list of Dudek's alleged damages.

**[4]** Despite this, the Association argues that the Dudek Claim should not be afforded prima facie validity because (i) it fails to establish the required elements for its claims for breach of contract, negligence, and gross

negligence, (ii) it is internally inconsistent, and (iii) the documents attached to the claim are inadmissible hearsay. Association's Letter Brief [ECF No. 88] at 1–4. Basically, the Association argues that, at the proof-of-claim stage, a claimant must submit evidence that fully supports its claim in a form that would be admissible under relevant evidentiary rules to be afforded prima facie validity. The Association, however, fails to cite the Court to a single case holding a proof of claim to such a high evidentiary standard before affording it prima facie validity. Instead, the Association relies on cases outside the proof-of-claim context to discuss burdens of proof and/or conflates the requirements for prima facie validity under Bankruptcy Rule 3001 with a party's ultimate burden at trial. *Id.* However, "nothing in Rule 3001 or other bankruptcy rules requires a claimant to reduce the evidence submitted with its proof of claim into a form that would be admissible under state law. Indeed, requiring a claimant to produce additional evidence to overcome a hearsay or other evidentiary objection directly undermines Rule 3001." *In re Walston,* 606 Fed.Appx. 543, 547 (11th Cir. 2015) (unpublished); *see also LTV Corp. v. Gulf States Steel, Inc. of Ala.*, 969 F.2d 1050, 1058 (D.C. Cir. 1992) (explaining that "[p]roofs of claim are not intended to be elaborately detailed documents"); *In re Burkett,* 329 B.R. 820, 827 (Bankr. S.D. Ohio 2005) ("[T]he rules governing claims **\*552** are intended to simplify the claims allowance process and provide a fair and inexpensive process for all parties including creditors."). [6]

Accordingly, based upon its review of the Dudek Claim, the Court concludes that it complies with the requirements of Bankruptcy Rule 3001 and serves as prima facie evidence of the validity and amount of Dudek's claims against the estate. FED. R. BANKR. P. 3001(f).

Because the Dudek Claim is afforded prima facie validity, it is the Association's burden to rebut that validity by "produc[ing] evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Wyly*, 552 B.R. at 375 (citing cases). In this regard, the Association argues that it has not breached any contract with Dudek because the Bylaws and related documents do not require it to repair Dudek's foundation. The Association further argues that it (i) did not fail to act as a reasonably prudent homeowner's association, (ii) carried out its duties under the Bylaws and related documents, and (iii) did

not purposefully breach its duty to Dudek for which it could be held liable to Dudek for negligence and/or gross negligence. Finally, the Association argues that it did not breach any fiduciary duty to Dudek, since it has acted in a manner consistent with its duties under the Bylaws and related documents. And, because it is not liable to Dudek for any breach of contract, it is not liable to pay her reasonable attorney's fees and expenses. In support of its objection, the Association introduced various exhibits into evidence at the Hearing including the Bylaws [Association Ex. 8] and the Declaration of Covenants, Conditions and Restrictions of the Woodhaven Townhouse Subdivision [Association Ex. 9] (the "**Covenants**"), along with the testimony of: (i) Elena Garrett ("**Garrett**"), the President of the Association's Board of Directors, and (ii) Luis Capote ("**Capote**"), the owner of The Foundation Company.

Before considering this evidence, however, it is helpful for the Court to boil the parties' dispute down to its most basic element. Simply put, this dispute turns on the proper interpretation of the legal documents governing the parties' relationship—*i.e.*, the Bylaws and the Covenants—and whether they impose a contractual or other duty on the Association to repair Dudek's foundation. [7] As explained below, however, the Bylaws and Covenants are not particularly clear on this issue, and neither party filed pre-Hearing legal briefs addressing the treatment of this issue under state law. Thus, at the Court's request, both Dudek and the Association submitted post-Hearing briefs; however, neither party found any controlling case law. Nor did the Court through its independent research.

 **[5]** **[6]** **[7]** **[8]** **[9]** **[10]** The parties, however, agree that Texas law governs this issue. Thus, Court must interpret the By–Laws and Covenants in accordance with the general principles of contract interpretation articulated **\*553** by the Texas Supreme Court. [8] *See generally Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983). The Court's first task is to determine whether the contract is enforceable as written, without resort to parol evidence. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The Court's primary objective is to ascertain the parties' intent as expressed in the contract. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000) (citation omitted). To achieve this objective, the Court should examine the entire contract in order to "harmonize and give effect to all of its provisions so that none will be rendered meaningless." *J.M. Davidson,*

128 S.W.3d at 229 (citation omitted). In doing so, the Court must be wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.* (citation omitted). Ambiguity does not arise because of a "simple lack of clarity," or because the parties proffer different interpretations of the contract. *DeWitt Cnty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999) (citations omitted). Rather, a contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction. *Webster*, 128 S.W.3d at 229 (citation omitted). If the contract is ambiguous, courts may consider parol evidence to ascertain the parties' intent. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008).

With this precedent in mind, the Court has carefully analyzed all of the provisions of the Bylaws and the Covenants; however, three provisions of the Bylaws and one provision of the Covenants are particularly relevant to the Courts' analysis. Article VIII, § 2(h) of the Bylaws is the starting point. It provides, in pertinent part, that:

> It shall be the duty of the Board of Directors:
>
> * * *
>
> (h) to maintain and operate the underground water sprinkler system on each Lot (referred to in the Declaration and herein as the ("System")) and to provide exterior maintenance for each Lot, which exterior maintenance shall include exterior painting, repairing[,] replacing and caring for roofs, fences, gutters, downspouts, exterior surfaces, trees, shrubs, grass, walks and other exterior improvements, but such exterior maintenance shall not include maintenance of glass, glass surfaces, screens and screen doors, exterior doors and window fixtures and hardware and the interior of any Patio Area and the interior of any house. In the event that the need for any maintenance or repair is caused through the willful or negligent act or omission of the Owner, his family, guests, invitees, or tenants or his tenants' family, guests, or invitees, the cost of such maintenance or repairs shall be added to and become a part of the assessment to which such Lot is subject.

By–Laws [Association Ex. 8] Art. VII, § 2(h).

In re Dudek Townhouse Association, Inc., 573 B.R. 545 (2017)

**\*554** Thus, the question becomes are repairs to the foundation of Dudek's townhome "exterior maintenance for each Lot." "Lot" is a defined term in the Bylaws and "shall mean and refer to any plot of land shown upon any recorded subdivision map of the Properties with the exception of the Recreation and Common Areas." *Id.* at Art. II, § 4. Obviously, examples of what the phrase "exterior maintenance for each Lot" includes and does not include are expressly stated, but foundation repairs are not mentioned as being either included or excluded. While the Court would not normally consider repairs to a home's foundation as "exterior maintenance for each Lot," it would not have thought that "repairing, replacing and caring for roofs...gutters, downspouts" constituted exterior maintenance for each Lot either. [9] Thus, this provision, standing alone, is not clear and the Court will look for further guidance in the relevant documents.

The second relevant provision is Article XII, § 2 entitled "Purposes of Assessments." It provides that:

> [t]he assessments levied by the Association shall be used exclusively for promoting the recreation, health, safety and welfare of the residents in the Properties and for improving and maintaining the Properties excluding the interiors, but including the exterior of Owners' dwelling on the Lots and the yard portion of the Lots outside any Patio Area, the System installed on each Lot and services and facilities devoted to these purpose and related to the use and enjoyment of the Lots and Recreation and Common areas.

*Id.* Art. XII, § 2. At the Hearing, Garrett testified that Members of the Association pay monthly dues to the Association of $225.75 each, for an aggregate monthly total of approximately $9,000–$10,000, given that some Members do not pay their dues on time and/or are behind in their payments. As Article XII, § 2 states, assessments may be used to maintain the Properties (defined in the Covenants as "the Lots and the Recreation and Common Areas...") "including the exterior of Owners' dwelling on the Lots...." So, the question becomes, is Dudek's foundation part of the exterior of her "dwelling?" And, once again, the Court would not normally consider the

foundation to be part of the exterior of Dudek's dwelling, thinking that the exterior of her home would be the brick or siding covered walls, along with the roof.

Finally, Article XII, § 4 entitled "Special Assessments" provides that:

> In addition to the annual assessments and charges authorized above, the Association may levy in any assessment year a special assessment applicable to that year only for the purpose of, in whole or in part a deficit in the budget, the cost of any construction or reconstruction, unexpected repair or replacement of a described capital improvement upon the Recreation and Common Areas, including the necessary fixtures and personal property related thereto....

*Id.* Art. XII § 4. So, this provision would permit a Special Assessment if there were a deficit in the annual budget of the Association, but sheds no real light on what exterior maintenance of a Lot includes or whether the foundation is part of the exterior of Dudek's dwelling.

So, while the Bylaws are not particularly clear, the Court would likely conclude that repairing an Owner's foundation was not **\*555** the obligation of the Association. However, a provision of the Covenants adds to the uncertainty regarding the correct interpretation of the governing documents. Specifically, Article IX, § 3 of the Covenants entitled "Responsibility of Owners" provides:

> Each Owner shall be responsible for the reconstruction, repair or replacement of the interior of his main residential structure, including without limitation the floor coverings, wall coverings, window shades, draperies, interior walls, furniture, furnishings, decorative light fixtures and all appliances located therein irrespective of whether such appliances are "built in."

Covenants [Association Ex. 9] Art. IX, § 3. And, while it clearly provides that each owner shall be responsible for the "repair ... of the interior of his main residential structure," the Court would not normally consider the foundation to be part of the interior of Dudek's "main residential structure" like floor coverings, wall coverings, window shades, draperies, interior walls, etc.

**[11]** But, that leaves us where we started. Who is responsible for repairs to the foundation of Owners' townhomes? Someone is responsible for them and there are only two possibilities—*i.e.*, the Association or the Owners. Given that the provisions of the Bylaws and Covenants are arguably inconsistent with each other, the Court concludes that the governing documents are ambiguous. To resolve this ambiguity, the Court can no longer rely solely on the language of the governing documents to determine the parties' intent, and must look to extrinsic or parol evidence. *Carpenters Amended and Restated Health Ben. Fund v. Holleman Const. Co. Inc.*, 751 F.2d 763, 766 (5th Cir. 1985). If a contract is ambiguous, as here, then "[p]arol evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties...." *See Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir.2010). [10]

**[12]** From the Court's perspective, the Association has introduced evidence "equal in probative force" to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the Dudek Claim's legal sufficiency. It did this by (i) placing the Bylaws and Covenants into evidence, and (ii) adducing the testimony of Capote (the owner of The Foundation Company) who testified that in his opinion the foundation is not an exterior surface. The Association's counsel also made legal arguments regarding the effect of the governing documents.

But the Association went even further, it offered the testimony of Garrett, who testified that since she had been President of the Association's Board of Directors, the Association had consistently taken the position that repairing foundations was each Owner's responsibility, not the responsibility of the Association. Moreover, Garrett credibly testified that given the low monthly dues, it was unrealistic of Owners to think that the Association was responsible for foundation repairs. Garrett also testified that the Association had consulted

counsel and was advised that foundation repairs were not its responsibility under the governing documents. *See, e.g.*, Association Ex 26. Finally, Garrett testified that when the foundation underlying her townhome (and the townhomes of other Owners in her building that share the common **\*556** foundation) needed repair, those Owners went together and had their common foundation repaired at their expense, not the Association's expense. This testimony is admissible parol evidence of the course of performance of the Association and other Owners consistent with the Association's view regarding the proper interpretation of the governing documents —*i.e.*, that the Association is not responsible to repair the foundation of Dudek's townhome.

Thus, the ultimate burden of persuasion has shifted back to Dudek to prove her claim by a preponderance of the credible evidence. And, given her failure to file a witness or exhibit list or come to the Hearing with any witnesses other than Nacol (who only testified to the reasonableness of his attorney's fees and expenses), there is simply no evidence in the record establishing that, at the time the Bylaws and Covenants were executed, the parties intended that foundation repair was the Association's responsibility. Without evidence that the Association is contractually obligated to repair the foundations of individual Owner's townhomes, the Dudek Claim fails.

Moreover, Dudek put on no evidence regarding the amount of her alleged damages. Thus, even if the Association is responsible for the repair of Dudek's foundation, which Dudek has failed to prove, the Dudek Claim must be disallowed for her failure to prove up the cost to repair her foundation. [11]

For these reasons, the Court concludes that the Association's objection must be sustained and the Dudek Claim disallowed. As noted previously, the Nacol Firm Claim was withdrawn on the record on March 24, 2017 as a duplicate, derivative claim of the Dudek Claim.

The Court directs counsel for the Association to upload an Order disallowing the Dudek Claim within seven days of the **\*557** entry of this Memorandum Opinion on the Court's docket.

**All Citations**

570 B.R. 546

In re Dudek, In re Lindauer Townhome Association, Inc., 573 B.R. 542 (2017)

Footnotes

1    At a hearing held on March 24, Mark Nacol ("**Nacol**"), the principal shareholder of the Nacol Law Firm, agreed that (i) the Nacol Firm Claim duplicated the Dudek Claim, (ii) the right to recover attorneys' fees and expenses belonged to Dudek, and (iii) the Nacol Firm Claim would be withdrawn since the Dudek Claim included the request for attorneys' fees and expenses. Accordingly, the Court need not consider further the Association's objection to the Nacol Firm Claim, as it is subsumed into the objection to the Dudek Claim.

2    Any finding of fact more properly considered a conclusion of law, or any conclusion of law more properly considered a finding of fact, should be so considered.

3    Also included in the $69,139.35 amount are damages allegedly resulting from a break-in to Dudek's townhome because the locks to her doors would not engage due to the foundation issues. These non-repair damages include property not replaced after the break-in ($1,000), the costs of a locksmith ($337), installation and monthly fees for an alarm system ($2,750), and Lifelock fees since 2012 ($1,200).

4    Dudek did not attend the Hearing. The only witness that Dudek's counsel, the Nacol Law Firm, sought to have testify was Nacol, the principal lawyer at the firm representing Dudek here and in the state court action.

5    It appears that the By–Laws attached to the Dudek Claim is an older version of the document. At the Hearing, it was established that Association Ex. 8 was a copy of the operative By–Laws.

6    The Association initially also argued that, because Dudek failed to move the Dudek Claim into the record, the Court has no basis upon which to find that the claim is entitled to prima facie validity (despite the fact it is attached as Exhibit 1 to the Dudek Objection). The Association apparently abandoned this argument, however, as it failed to include it in the post-Hearing briefing of open issues requested by the Court.

7    At the hearing held on March 24, the parties agreed that the Bylaws and the Covenants were the governing documents and that the Court must construe those documents together.

8    While the parties disagree over the proper interpretation of the Bylaws and Covenants, they generally agree on the principles of contract interpretation in Texas—*i.e.*, that (i) "[t]he contract must be considered as a whole;" (ii) "each part of the contract should be given effect," and (iii) "no one phrase, sentence or section of a contract should be isolated from its setting and considered apart from the other provisions." Brief of Creditor [ECF No. 73] at 2; Association Brief [ECF No. 74] at 3 ("[t]he Court must examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless.").

9    These potential differences may be accounted for by the unique nature of townhome living. The building that includes Dudek's townhome also includes five other townhomes, each of which share a common roof and foundation.

10   "Course of performance" refers to a sequence of conduct between the parties to a particular transaction that takes place during the performance of the contract at issue, meaning that a course of performance occurs after contract formation. See TEX. BUS. & COM. CODE ANN. § 1.303(a).

11   Ironically, the Association provided Dudek some assistance in this regard when it admitted into evidence a $5,691.00 estimate of repair costs to Dudek's foundation, which was the estimate provided to the Association by The Foundation Company. Association Ex 21, repair estimate for unit 511. Thus, if an appellate court concludes that the Association has breached the governing documents by failing to repair Dudek's foundation, the maximum claim allowable here is $5,691, plus her reasonable attorneys' fees and expenses, which the Court finds to total $12,414.50 ($9,000.00 in fees and $3,414.50 of expenses). While those amounts represent a significant reduction of the fees and expenses requested by the Nacol Law Firm prior to the Association's bankruptcy filing, the Court believes the amounts requested were unreasonably high based on the evidentiary record before it. Moreover, the Court must disallow fees and expenses incurred post-petition, as Dudek is, at most, an unsecured creditor and the general rule in bankruptcy is that unsecured creditors cannot recover postpetition attorneys' fees and expenses. See *In re Pride Co., L.P.*, 285 B.R. 366 (Bankr. N.D. Tex. 2002) (citing cases). Although the Association argues that Dudek is not entitled to attorneys' fees under Texas law because she failed to properly present her claim in accordance with Texas Civil Practice and Remedies Code § 38.002, the Court disagrees. As clearly reflected in the letter from the Association's counsel to Dudek's counsel dated July 22, 2015 [Association Ex. 26], Dudek demanded that the Association pay to repair her foundation, and the Association refused. The fact that Dudek's initial demand itself is not in the record does not trouble the Court because the statute does not require a particular form of presentment. The only requirements are that: (i) the claimant must be represented by an attorney, (ii) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party, and (iii) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented. *See*

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 386–87 (Tex. App.–Houston [1st Dist.] 2006, no pet.) (citing cases). Association Ex. 26 clearly shows that Dudek met each of these requirements.

---

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Disagreed With by In re Pioneer Carriers, LLC, Bankr.S.D.Tex., February 8, 2018

559 B.R. 223
United States Bankruptcy Court,
D. New Mexico.

In re: Wayne Kenneth Augé, II, Debtor.

No. 14-10443 t11
|
Signed September 30, 2016

**Synopsis**

**Background:** In case converted from Chapter 11 to Chapter 7, Chapter 7 trustee sought court approval of settlement reached with judgment creditor that had filed proof of claim seeking nearly $3.4 million, which, inter alia, allowed judgment creditor's claim at $2.05 million and contained broad mutual releases, including a release of all claims against debtor personally. Debtor objected.

**Holdings:** The Bankruptcy Court, David T. Thuma, J., held that:

[1] under the section of the Bankruptcy Code allowing postpetition interest on unsecured claims in solvent bankruptcy cases, postpetition interest on judgment creditor's allowed claim accrued at the federal judgment rate;

[2] judgment creditor, as an unsecured creditor, was not entitled to recover postpetition attorney fees; and

[3] under the circumstances, the settlement was within the range of reasonableness and would be approved.

Settlement approved.

See also 344 P.3d 989.

West Headnotes (10)

**[1]    Bankruptcy**
         🔑 Judicial authority or approval

To be approved, a proposed settlement must be fair, equitable, and in the best interests of the estate. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[2]    Bankruptcy**
         🔑 Judicial authority or approval

To be approved, a proposed settlement need not represent the best possible outcome; rather, the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[3]    Bankruptcy**
         🔑 Judicial authority or approval

In assessing the reasonableness of a proposed settlement, the court must consider: (1) the probable success of the underlying litigation on the merits, (2) the possible difficulty in collection of a judgment, (3) the complexity and expense of the litigation, and (4) the interests of creditors in deference to their reasonable views. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[4]    Bankruptcy**
         🔑 Judicial authority or approval

Bankruptcy court's decision to approve a proposed settlement must be an informed one based upon an objective evaluation of developed facts. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[5]    Bankruptcy**
         🔑 Judicial authority or approval

In determining whether to approve a proposed settlement, the court is not required to conduct a "mini-trial" on the issues, nor does it need to decide the disputed legal or factual questions. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[6]**  **Bankruptcy**
   👈 Compromises, Releases, and Stipulations

If the outcome of litigation is uncertain, compromise may be an appropriate solution. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**[7]**  **Bankruptcy**
   👈 Post-petition interest

**Interest**
   👈 Computation of rate in general

Term "legal rate," as used in the section of the Bankruptcy Code allowing postpetition interest "at the legal rate" on unsecured claims in solvent bankruptcy cases, means the federal judgment rate, not the state law contract or judgment rate. 11 U.S.C.A. § 726(a)(5).

2 Cases that cite this headnote

**[8]**  **Bankruptcy**
   👈 Grounds and Circumstances

**Bankruptcy**
   👈 Fees, Costs, or Charges; Attorney Fees

Judgment creditor, as an unsecured creditor, was not entitled to recover postpetition attorney fees; instead, the recovery of such fees was limited to oversecured creditors. 11 U.S.C.A. §§ 502, 506(b).

3 Cases that cite this headnote

**[9]**  **Bankruptcy**
   👈 Post-petition interest

**Bankruptcy**
   👈 Post-petition debts or liabilities

Where a creditor holds a nondischargeable debt, the disallowed postpetition interest continues to accrue, and the creditor may collect the debt and postpetition interest after the debtor receives a discharge. 11 U.S.C.A. § 523(a).

2 Cases that cite this headnote

**[10]**  **Bankruptcy**
   👈 Judicial authority or approval

Chapter 7 trustee's proposed settlement with judgment creditor that had filed proof of claim seeking nearly $3.4 million, which, inter alia, allowed judgment creditor's claim at $2.05 million and contained broad mutual releases, including a release of all claims against debtor personally, was within the range of reasonableness and would be approved; aside from a relatively small reduction of about $75,000, debtor failed to show that he would succeed in disturbing the state-court judgment of approximately $1.6 million plus interest, attorney fees, and costs, which had preclusive effect, bankruptcy court's own calculations projected a claim of about $1.8 million, or 12% less than the actual settlement amount, and, given the complicated nature of the parties' dispute and questions concerning how much of the debt was dischargeable, that 12% appeared to be money well spent to eliminate the expense, delay, and uncertainty of continued litigation. Fed. R. Bankr. P. 9019.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*224** Bonnie P. Bassan, Daniel J. Behles, Arin Elizabeth Berkson, George M. Moore, Moore, Berkson, Bassan & Behles, P.C., Albuquerque, NM, for Debtor.

<u>**MEMORANDUM OPINION**</u>

Hon. David T. Thuma, United States Bankruptcy Judge

The chapter 7 trustee seeks approval of a settlement he reached with the estate's primary creditor. The proposed settlement allows the creditor's claim at $2,050,000 and contains broad mutual releases, including a release of all claims against the debtor personally. This latter term is important because an undetermined portion of the claim

is nondischargeable. The debtor objected, arguing that he owes the creditor substantially less than $2,050,000. The Court has reviewed the settlement terms and the legal issues involved and finds that, given the somewhat unusual circumstances of this case, the settlement is reasonable and should be approved.

## I. FACTS [1]

For the purposes of ruling on the settlement **\*225** motion, the Court finds: [2]

Northern New Mexico Orthopaedic Center, Inc. ("NNMOC") is a New Mexico corporation formed in 1988 by the debtor, Dr. Wayne K. Augé. NNMOC provided medical services and was headquartered in Santa Fe, New Mexico. It is no longer operating.

During the relevant time, NNMOC had four shareholders: Augé, Dr. Brent Bair, Dr. Steven Jones, and Dr. Sanford Schulhofer. Augé was the President and Treasurer of NNMOC until February 1, 2008, when Bair was elected President and Augé was elected Treasurer/ Secretary.

All the shareholders signed employment agreements with NNMOC. They also signed shareholder agreements with each other and with NNMOC. Augé prepared the documents. Augé represented to Bair, Jones, and Schulhofer that their employment agreements were similar to his, except his agreement did not have a noncompete provision and could only be terminated for cause. In fact, Augé's employment agreement also had substantially better deferred compensation terms.

Augé was in charge of calculating the shareholder bonuses due under the employment agreements. Judge Ortiz found that Augé paid himself improper bonuses of $173,187.54, [3] between August 2007 and December 31, 2008, and $199,233.83 in 2009. Augé did not tell the other shareholders about the overpayments and made efforts to conceal them.

According to Judge Ortiz, Augé was overpaid $185,424.89 in 2010. It is not clear whether the overpayments were of the same character as those in 2007-2009.

In late 2009 or early 2010, Augé proposed to take a leave of absence and prepared a draft agreement. From the ensuing discussions Jones, Bair, and Schulhofer learned about Augé's enhanced deferred compensation package. The parties never came to terms on a leave of absence.

Augé resigned from NNMOC effective December 30, 2010. Bair, Jones, Schulhofer, and NNMOC sued Augé in New Mexico's First Judicial District Court on January 14, 2011, Case No. D–101–CV–2011–00192. They alleged that Augé engaged in fraud, breach of fiduciary duty, embezzlement, and other wrongful conduct.

Judge Ortiz tried the action in February, 2012. On March 14, 2012, he entered detailed Findings of Fact, Conclusions of Law and Judgment (the "Findings and Conclusions"). Judge Ortiz found, inter alia, that Augé defrauded Bair, Jones, and Schulhofer by concealing and misrepresenting his enhanced deferred compensation terms. Judge Ortiz entered a judgment against Augé and in favor of NNMOC for $600,757.81 in compensatory damages, [4] $1,000,000 in punitive damages; pre- and post-judgment interest at 15% on "all amounts awarded to Plaintiffs;" and attorney's fees and costs in an amount to be determined. Augé appealed the judgment.

On February 14, 2014, Augé filed this chapter 11 case. NNMOC brought a nondischargeability adversary proceeding three months later. On April 22, 2015, the **\*226** Court entered a partial summary judgment in the adversary proceeding, ruling that $372,421.37 of the state court judgment was nondischargeable under § 523(a)(4) (embezzlement), including interest accruing at 15% from the date the state court complaint was filed. The Court found that fact issues prevented entry of summary judgment on the nondischargeable character of the remaining judgment amount.

Two other adversary proceedings remain pending: one filed by NNMOC for injunctive relief and to impose a constructive trust, and the other filed by the Trustee seeking to avoid NNMOC's liens pursuant to § 544.

On September 16, 2014, the New Mexico Court of Appeals affirmed the state court judgment, except that it remanded the compensatory damages award for recalculation. The remand relates to how NNMOC's accounting expert calculated the bonus money Jones was entitled to receive after he became a shareholder. From what the

Court can tell, the expert may have included in his calculations revenue generated by Jones before he became a shareholder. Per the employment agreement, such an inclusion would have been improper. Augé testified that, due to the slow-paying nature of Medicare, Medicaid, and private insurance, it takes months to collect billed fees. Thus, when the expert calculated the bonuses due to Jones, he might have used a revenue figure that was too high. The Court of Appeals determined there was not enough evidence to affirm Judge Ortiz's compensatory damage award in this respect:

> We affirm the district court's finding as to calculation of the damages in all respects except for the calculation and allocation of non-shareholder employee revenue generated by Jones before he became an NNMOC shareholder. We remand for recalculation of this amount.

(the "Jones Remand").

The New Mexico Supreme Court denied Augé's petition for certiorari.

The Court appointed a chapter 11 trustee on May 19, 2015, and converted the case to chapter 7 two months later. The chapter 11 trustee stayed on as the chapter 7 trustee. The estate will likely be solvent, especially if the settlement is approved.

NNMOC filed an amended proof of claim on August 19, 2015 for $3,386,864.37. The claim includes, inter alia, about $600,000 in post-petition attorney fees and 15% interest on all amounts, including fees and costs.

Since the petition date NNMOC has received three payments: $566,096 on March 20, 2015; $23,982 on or about April 3, 2015; and $500,000 on March 26, 2016. The first payment was available on June 26, 2014, but payment was delayed by NNMOC's (ultimately unsuccessful) challenge to Augé's homestead exemption.

The Trustee and NNMOC hired an experienced commercial mediator to mediate a settlement of their disputes. On April 21, 2016, after a full day of mediation, the parties arrived at a proposed settlement with the following terms:

- NNMOC's claim would be allowed at $2,050,000;

- $372,421.37 of that amount would bear interest at 15%; the balance would bear interest at .12%;

- All litigation between the Trustee and NNMOC in state court and bankruptcy court would be settled;

- Augé would not be able to pursue his objection to NNMOC's claim;

- Each party would bear its own attorney fees;

- **\*227** • The Trustee would release all estate claims against NNMOC, Jones, Bair, and Schulhoffer;

- NNMOC, Bair, Jones, and Schulhoffer would release all claims against the estate and Augé, other than NNMOC's allowed $2,050,000 claim.

If the settlement were not approved, Augé projects that NNMOC's allowed claim would be between $1,225,000 and $1,915,000, depending on the outcome of the Jones Remand. NNMOC projects its claim would be at least $2,900,000, with interest at 15% until paid.

## II. DISCUSSION

### A. Standard for Approving a Rule 9019 Settlement.

**[1]** **[2]** **[3]** A proposed settlement must be fair, equitable, and in the best interests of the estate. *In re Rich Global, LLC,* 652 Fed.Appx. 625, 631 (10th Cir. 2016); *In re American Reserve Corp.,* 841 F.2d 159, 161 (7th Cir.1987) (collecting cases). It need not represent the best possible outcome. *Tri–State Financial, LLC v. Lovald,* 525 F.3d 649, 654 (8th Cir. 2008). Rather, "the court need only determine that the settlement does not fall below the lowest point in the range of reasonableness." *Id. See also Rich Global,* 652 Fed.Appx. at 631; *In re Brutsche,* 500 B.R. 62, 71 (Bankr D.N.M. 2013). In assessing the reasonableness of the settlement, the court must consider: "(1) the probable success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; (4) and the interests of creditors in deference to their reasonable views." *In re Kopexa Realty Venture Co.,* 213 B.R. 1020, 1022 (10th Cir. BAP 1997); *In re Edwards,* 1992 WL 84354, \*3 (10th Cir. 1992) (listing the same factors).

*In re Adeje*, 539 B.R. 223 (2015)

[4]   [5]   [6]   The decision to approve a settlement must be "an informed one based upon an objective evaluation of developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir. 1989). However, the Court is not required to conduct a "mini-trial" on the issues, nor does it need to decide the disputed legal or factual questions. *Brutsche*, 500 B.R. at 71; *Rich Global, LLC*, 652 Fed.Appx. at 631. If the outcome of litigation is uncertain, compromise may be an appropriate solution. *In re Endoscopy Center of Southern Nevada, LLC*, 451 B.R. 527, 551 (Bankr. D. Nev. 2011).

B. Post-Petition Interest on NNMOC's Allowed Claim.

[7]   One significant issue affecting NNMOC's claim amount is whether post-petition interest accrues at the federal rate (.12%) or the judgment rate (15%). The case has been pending for about two and a half years, so the higher rate would increase NNMOC's claim by at least $400,000.

Section 726(a)(5) [5] allows post-petition interest on unsecured claims in solvent bankruptcy cases. It provides, in relevant part:

(a) Except as provided in section 510 of this title, property of the estate shall be distributed—

(5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection;

A 1998 case from this district ruled that under § 726(a)(5), the term "the legal rate" means "the rates prescribed [in] any underlying agreements, contracts or judgments." *In re Carter*, 220 B.R. 411, 417 (Bankr. D.N.M. 1998). The holding was   **228**   based in part on "the underlying policy of the Code to avoid producing a windfall for the debtor." *Id.* at 416–17.

This Court disagrees with *Carter's* holding. Many cases construe "the legal rate" as the federal judgment rate, not the state law contract or judgment rate. *See, e.g.*, *In re Dow Corning Corp.*, 237 B.R. 380, 397 (Bankr. E.D. Mich. 1999) (criticizing *Carter's* analysis); *In re Madison 92nd St. Assoc. LLC*, 472 B.R. 189 (Bankr. S.D.N.Y. 2012) (federal judgment rate is recognized by most courts as "the legal rate of interest" within the meaning of § 726(a)(5)). [6]

The reasons for this interpretation are well articulated in *Cardelucci*:

1. Using the definite article "the" instead of the indefinite article "a" indicates that Congress meant for a single source to be used to calculate postpetition interest;

2. Using the term "legal rate" indicates that Congress intended the source to be statutory, because the commonly understood meaning of "at the legal rate" is the rate fixed by federal statute;

3. Use of a single, federal rate promotes uniformity within federal law;

4. Holders of allowed claims are akin to holders of federal judgments, so using the federal judgment rate is proper;

5. The award of post-judgment interest is procedural in nature and thereby dictated by federal law;

6. Applying a single rate insures equitable treatment of creditors;

7. It is much easier to use a single rate, especially in cases with many creditors; and

8. Legislative history indicates that the term "interest at the legal rate" was chosen over the original "interest on claims allowed."

285 F.3d at 1234–36. The Court finds *Cardelucci* persuasive, and interprets § 726(a)(5) to mean interest at the federal judgment rate.

The Court acknowledges the Trustee faced significant risk on this issue. There is no controlling Tenth Circuit case, and *Carter* is the only local decision. The Court therefore took into account the risk litigating an issue that had been considered settled in this district for many years. *See, e.g.*, *In re Matthews*, 2014 WL 1277874, *2 (Bankr. N.D. Ga.) (the Trustee should consider whether it would be prudent to eliminate the inherent risks ... of litigation in an uncertain cause").

C. Post-Petition Attorney Fees.

[8]   Another big question is whether unsecured creditors can recover post-petition attorney fees, which could increase NNMOC's claim by about $600,000. *Carter*

stated: "This Court has already found that interest is appropriately awarded to an unsecured creditor when there is a solvent debtor ... The same is true regarding attorneys fees." 220 B.R. at 418. The *Carter* court made this ruling despite acknowledging that § 506(b) [7] did not apply because the creditor was unsecured. Again, the decision apparently was based on policy considerations rather than statutory interpretation.

**\*229** The Court also parts company with *Carter* on this issue. There is a substantial debate among courts and commentators about whether unsecured creditors can recover post-petition attorney fees. Two thoughtful law review articles addressed the issue: Scarberry, *Interpreting Bankruptcy Code Sections 502 and 506: Post-Petition Attorneys' Fees in a Post-Travelers World*, 15 Am. Bankr. Inst. L. Rev. 611 (2007); and Taylor and Mertens, *Travelers and the Implications on the Allowability of Unsecured Creditors' Claims for Post-Petition Attorneys Fees Against the Bankruptcy Estate*, 81 Am. Bankr. L.J. 123 (2007). The major cases on the matter include *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *In re Tribune Media Co.*, 2015 WL 7307305, at \*4 (Bankr. D. Del.); *In re Global Indus. Tech., Inc.*, 327 B.R. 230, 239 (Bankr. W.D. Pa. 2005); *In re SNTL Corp.*, 571 F.3d 826, 840 n. 16 (9th Cir. 2009); *In re Hedged–Investments Assoc., Inc.*, 293 B.R. 523 (D. Colo. 2003); *In re Sakowitz*, 110 B.R. 268, 275 (Bankr. S.D. Tex. 1989); *In re Seda France, Inc.*, 2011 WL 3022563 (Bankr. W.D. Tex.); and *Ogle v. Fid. & Deposit Co. of Maryland*, 586 F.3d 143 (2d Cir. 2009).

Cases holding that unsecured creditors may recover post-petition attorney fees view the fees as contingent claims under § 101(5) and point to § 502(b) as allowing such claims. *Ogle*, 586 F.3d at 146; *SNTL Corp.*, 571 F.3d at 840. Other cases and commentators argue: (1) such an interpretation renders § 506(b) absurd or superfluous; (2) it is questionable whether post-petition attorney fees are really contingent claims; and (3) the specific provisions in §§ 502 and 506 addressing post-petition fees trump the general definition of "claim." *See, e.g., Seda France*, 2011 WL 3022563; *Global Indus. Tech.*, 327 B.R. at 239.

The better reading of the Code, in the Court's opinion, is that § 506(b) allows only *oversecured* creditors to add "reasonable fees, costs, or charges provided for under the agreement of State statute under which such claim

arose." The debatable proposition that post-petition fees are "contingent" within the meaning of § 101(5)(A) cannot overshadow the clear meaning of §§ 502 and 506(b). This is particularly true since the Supreme Court found that § 506(b) has the substantive effect of denying undersecured creditors postpetition interest on their claims. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). [8] The Court concludes NNMOC would not be entitled to its post-petition attorney fees, and omitted such fees in its projections on the claim amount.

As discussed above, the Trustee had no way of knowing that the Court would not follow *Carter* when he negotiated the settlement. Consequently, the Court considered the split in authority and the existence of *Carter* in evaluating the settlement's reasonableness.

### E. Nondischargeable Debts versus Payment of Allowed Claims.

A third significant issue is the dischargeability of Augé's debt. NNMOC asserts that its entire judgment is nondischargeable under § 523(a)(2)(A). *See* **\*230** *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (interest, attorney fees, punitive damages stemming from a fraud claim are also nondischargeable). If NNMOC prevailed, its nondischargeable claim would easily exceed $2 million. The Court has already declared $372,421 of the compensatory damages nondischargeable, and would have to try the remaining issues if the settlement were not approved.

**[9]** The nondischargeable character of the debt affects the post-petition interest rate. Even though NNMOC's allowed claim against the estate can be limited to the federal judgment rate, NNMOC likely would be entitled to collect post-petition interest at 15% against Augé personally. This is because "where a creditor holds a nondischargeable debt, the disallowed post-petition interest continues to accrue, and the creditor may collect the debt and post-petition interest after the debtor receives a discharge." *In re Graves*, 2016 WL 552676, at \*2 (Bankr. D. Neb.); *In re Cohen*, 2011 WL 5509071, at \*6 (Bankr. E.D.N.Y.) (post-petition interest on nondischargeable fraud judgment continued to accrue at the contract rate, to the extent not paid in bankruptcy); *In re Tuttle*, 291 F.3d 1238 (10th Cir. 2002) (post-petition interest on nondischargeable tax debt continues to accrue and

remains an obligation of the debtor after entry of the discharge, if not paid by the estate); *In re Hanna*, 872 F.2d 829 (8th Cir. 1989) (same); *In re Kielisch*, 258 F.3d 315 (4th Cir. 2001) (post-petition interest on nondischargeable student loan debt continues to accrue). The settlement therefore is reasonable if a large portion of NNMOC's claim could be ruled nondischargeable.

F. Other Disputed Issues Resolved by the Settlement. If the settlement is not approved, a number of other matters would have to be litigated in this Court or state court, including:

1. The Jones Remand. On remand, it appears likely that the compensatory damages award would be reduced, perhaps by $75,303, which would reduce the nondischargeable portion of the judgment. Augé argues that the actual reduction could be significantly more than $75,303, and wishes to conduct discovery and introduce additional evidence.[9] Litigation of this issue could be time-consuming and expensive, and the outcome is uncertain.

2. Rule 60(b)(6)/Malicious Abuse of Process. Augé argues he recently discovered evidence sufficient to set aside the state court judgment, using a "fraud on the court" theory. According to Augé, he discovered documents controverting Bair's trial testimony that he did not approve a certain bonus to Augé. To prevail on the theory Augé would have to show: (1) the issue could be raised years later under Rule 60(b)(6) or a malicious abuse of process claim instead of 60(b)(2); (2) the newly discovered document is authentic (NNMOC disputes this); and/or (3) NNMOC's state court counsel concealed the evidence. The Court is not persuaded the action would have much chance of success, or that the settlement should be rejected so Augé could pursue it.

3. Augé's Standing. Only the Trustee has standing to litigate the Jones Remand and the fraud on the court issues, and he does not want to abandon any claims to Augé.

**\*231** 4. Additional Attorney Fees in State Court. Many questions remain about what additional attorney fees, if any, NNMOC could collect in state court, including fees incurred in state court (litigating the appeal and the Jones Remand) and bankruptcy court (the nondischargeability

action, claim objection, and other bankruptcy matters). Although the Bankruptcy Code does not provide a basis for post-petition fees, there is a chance NNMOC could get a sizeable additional attorney fee award from the state court.

5. Nondischargeability. The amount of NNMOC's nondischargeable debt has yet to be determined. If it is less than the entire compensatory damage award, the Court would have to determine how to apportion punitive damages, attorney fees, and interest under *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). If the claim were only partially nondischargeable, questions also remain about whether payments to NNMOC must first be applied to any nondischargeable amounts.

6. Interest Accrual. Difficult interest accrual questions would have to be litigated, including when interest started to accrue on each component of damages. In addition, there may be a question whether NNMOC is entitled to post-petition "interest on interest."

7. Application of Santa Fe House Proceeds. NMMOC received a $566,096 partial payment on March 20, 2015, the net proceeds from the sale of Augé's Santa Fe house. The proceeds were available about nine months before; payment was delayed by NNMOC's objection to Augé's homestead exemption. The Court would have to determine whether interest accrual stopped when NNMOC actually received the funds or when they first became available.

8. Claim Objection. Augé's claim objection would have to be tried; it is unclear whether the Jones Remand and/or the nondischargeability action should be part of the trial.

9. Venue. The Court would have to determine whether the fraud on the court action, the Jones Remand, and NNMOC's entitlement to attorney fees should be tried in state court or this Court.

10. Litigation Costs. The litigation costs for the disputes outlined above are unknown. Based on the litigation history and contentious relationship between the parties, it likely would be several hundred thousand dollars.

11. Delay. Another unknown is how long it would take to finally determine the foregoing disputes and any other

disputes not listed above. Including appeals, it could take several years, with interest accruing at 15% on at least some portion of NNMOC's claim.

G. Calculating a Reasonable Potential Outcome.

If every penny of Augé's debt to NNMOC were dischargeable, the settlement may be too generous to NNMOC, given NNMOC's inability to collect post-petition attorney fees or interest at more than .12%. A rough calculation of NNMOC's allowed claim amount yields an allowed claim figure of about $1,450,000.

If the entire debt were nondischargeable, on the other hand, the settlement figure is quite reasonable. A similar calculation based on 100% nondischargeability yields a claim of at least $2,100,000, without taking into consideration any post-petition attorney fees the state court might award, or any interest that has accrued since April 21, 2016.

The Court could approve the settlement based on the ranges and risks identified **232** above. Because each party has so much at stake, however, the Court ran its own calculations to satisfy itself that the settlement was fair. Except for the Jones Remand issue, the Court used most of the same assumptions as Augé, which reflects the Court's likely rulings if it were to liquidate the claim. The Court assumed that:

• The nondischargeable portion of the compensatory damages is $372,421;

• The Jones Remand yields a reduction of $75,303;

• This reduction reduces the nondischargeable portion to $297,118;

• Punitive damages and attorney fees are pro-rated between dischargeable and nondischargeable compensatory damages;

• The three partial payments are first applied to the nondischargeable debt;

• Pre-petition interest is 15%, starting on the state court filing date, except that interest did not start accruing on the $415,659 in attorney fees until December 7, 2015 (the date a specific amount was awarded); [10]

• Post-petition interest is .12% for the dischargeable portion and 15% for the nondischargeable portion;

• No post-petition attorney fees are awarded;

• NNMOC is deemed to have received the $566,096 partial payment on June 26, 2014 (when the funds were available); and

• All partial payments are applied first to interest, then to principal.

Using these assumption, NNMOC's claim amount is about $1,800,000 as of September 26, 2016. That's $250,000 less than the Trustee settled for. The $250,000 premium eliminates a great deal of uncertainty and expense, including:

• The risk that the nondischargeable portion of NNMOC's debt is higher than $297,118. Depending on the evidence at trial, it could be twice that;

• The risk that punitive damages are not pro-rated, but entirely traceable to the fraud;

• The risk that partial payments should be applied first to the dischargeable portion of the debt, or pro-rated among each different portion;

• The risk that NNMOC could recover additional attorney fees in state court;

• The risk that interest should accrue on the attorney fee award on the judgment date;

• The risk that the Santa Fe house proceeds should not been deemed applied until actually received;

• The risk that the Jones Remand would result in little or no reduction in compensatory damages;

• The accrual of interest at 15% on some portion of the debt until all litigation has been determined and the debt is paid in full; and

• The attorney fees the estate or Augé would have to pay to litigate the Jones Remand, the nondischargeability action, the claim objection, and the fraud on the court issue, including any appeals.

It is possible that Augé could do better than $1,800,000 if there were no settlement, particularly if he or the

Trustee were permitted to offer new evidence that the Jones Remand reduces his liability by more than $75,303. On the other hand, Augé has substantial downside risk that **\*233** NNMOC's claim could exceed the settlement amount, and that interest would continue to accrue while the litigation dragged on for years. Overall, the Court is convinced that the settlement is a good deal for the estate and for Augé.

H. Weighing the _Kopexa_ Factors.

**[10]** Based on the foregoing, the Court weighs the _Kopexa_ factors as follows:

The probable success of the underlying litigation. In this context, "success" means reducing NNMOC's allowed claim. Aside from the $75,303 adjustment, Augé has not demonstrated he will succeed in disturbing NNMOC's state court judgment. The Court's own calculations project NNMOC's claim would be about $1,800,000, which is 12% less than the actual settlement amount. That 12% eliminates a lot of expense, delay, and uncertainty, and appears to be money well spent. This factor weighs in favor of the settlement.

The possible difficulty in collection of a judgment. Not applicable, or neutral.

The complexity and expense of the litigation. The dispute between Augé and NNMOC is complicated, having taken place in three different courts over five years. NNMOC has spent over $575,000 in the bankruptcy case alone. As debtor in possession Augé spent over $120,000 [11] and is now spending his own money on litigation costs. Litigating the claims objection, the nondischargeability action, the Jones Remand and any appeals likely would

cost the estate or Augé several hundred thousand dollars. This factor weighs strongly in favor of the settlement.

The interests of creditors in deference to their reasonable views. The bankruptcy case primarily is a dispute between NNMOC and Augé. NNMOC supports the settlement, unsurprising since it is one of the settling parties. The other creditors in the case, professionals, are divided (Augé's professionals oppose the settlement; the others support it). This factor is neutral.

The _Kopexa_ factors weigh in favor of approving the settlement.

### III. CONCLUSION

This is a tricky, complicated dispute, with myriad established facts, disputed facts, and legal issues. The Trustee did his best to assess the potential outcomes and risks and arrive at a reasonable settlement; the Court has done the same to review it. NNMOC and Augé made thoughtful, persuasive arguments in support of their respective positions. All counsel were well prepared and presented their arguments well. The Court has some sympathy for Augé's view that the state court judgment was unduly harsh. Nevertheless, given that the judgment has preclusive effect except for the Jones Remand, the Court concludes that the settlement is within the range of reasonableness and should be approved. A separate order will be entered.

**All Citations**

559 B.R. 223

Footnotes

1     If any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa.
2     Many of these findings are from Judge Raymond Ortiz's Findings and Conclusions (defined below). The Court has previously determined that the Findings and Conclusions are binding on Augé and this Court.
3     This figure is subject to readjustment as part of the Jones Remand, defined below.
4     This figure is composed of a $527,821.49 negative balance under Augé's shareholder employment agreement and $72,936.32 in negative value of Augé's NNMOC shares.
5     All statutory references are to 11 U.S.C.
6     See also _In re Coram Healthcare Corp.,_ 315 B.R. 321, 346 (Bankr. D. Del. 2004); _In re Cardelucci,_ 285 F.3d 1231, 1234–35 (9th Cir. 2002), _cert. denied,_ 537 U.S. 1072, 123 S.Ct. 663, 154 L.Ed.2d 566 (2002); _In re Washington Mutual, Inc.,_ 461 B.R. 200, 242 (Bankr. D. Del. 2011), vacated in part 461 B.R. 200 (Bankr. D. Del. 2011); _In re Melenyzer,_ 143 B.R. 829, 833 (Bankr. W.D. Tex. 1992).

7    Under that section, oversecured creditors are entitled to reasonable fees, costs, and charges provided for by contract or state statute.

8    It is not clear NNMOC would be entitled to collect additional attorney fees in any event. The attorney fee provision in the shareholder employment agreement is limited. The corrected judgment does not explicitly provide for post-judgment attorney fees, and the New Mexico securities statute upon which NNMOC relies was not mentioned in the judgment.

9    The scope of the Jones Remand is subject to the state trial court's discretion, *Trujillo v. Sonic Drive–In/Merritt,* 122 N.M. 359, 924 P.2d 1371 (N.M. App. 1996), which adds to the uncertainty of the outcome.

10    The Court rejects Augé's argument that the attorney fee award should accrue interest at 8.75%, the New Mexico contract rate. In any event, it makes a difference of less than $10,000 based on the Court's other assumptions.

11    See the fee application approval orders filed as docs. 308 and 309.

---

**End of Document**         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

557 B.R. 376
United States Bankruptcy Court,
E.D. Pennsylvania.

In re Victor Alan Milbourne, Debtor

Case No. 14-16411-AMC
|
September 7, 2016

**Synopsis**
**Background:** Chapter 13 debtor, the owner of a condominium unit, objected to proof of claim filed by condominium association, challenging, inter alia, association's pre- and postpetition late charges and the majority of its pre-and postpetition attorney fees and costs. Hearing was held.

**Holdings:** The Bankruptcy Court, Ashely M. Chan, J., held that:

[1] association was not permitted under its governing documents to impose late charges against debtor;

[2] even if otherwise authorized, the late charges sought to be imposed by association constituted unenforceable penalties under Pennsylvania law;

[3] association's governing documents permitted it to recover prepetition attorney fees and costs, including interest and charges, even if such fees and costs were not incurred in connection with actions and proceedings it filed directly against debtor;

[4] association held a total allowed prepetition claim for attorney fees and costs equal to $6,819.27; and

[5] association, as an oversecured creditor, was entitled to reasonable postpetition attorney fees and costs only to the extent of the equity cushion in the unit, which was $30,721.74.

Objections sustained in part and denied in part.

West Headnotes (27)

**[1]    Bankruptcy**
        Effect of proof of claim

Properly filed, a proof of claim is prima facie evidence of the validity and amount of the claim, even if an objection is filed. 11 U.S.C.A. § 502(a); Fed. R. Bankr. P. 3001(f).

Cases that cite this headnote

**[2]    Bankruptcy**
        Presumptions and burden of proof

Prima facie proof of claim satisfies the claimant's initial obligation to go forward. 11 U.S.C.A. § 502(a).

Cases that cite this headnote

**[3]    Bankruptcy**
        Presumptions and burden of proof

Upon the filing of an objection to a properly filed proof of claim, the burden of going forward shifts from the claimant to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. 11 U.S.C.A. § 502(b).

Cases that cite this headnote

**[4]    Bankruptcy**
        Objections generally;time, form, and sufficiency;pleading

With regard to any objection to a proof of claim, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy. 11 U.S.C.A. § 502(b).

Cases that cite this headnote

**[5]    Bankruptcy**
        Presumptions and burden of proof

Party objecting to a proof of claim must produce evidence which, if believed, would refute at least one of the allegations that is

essential to the claim's legal sufficiency. 11 U.S.C.A. § 502(b).

Cases that cite this headnote

**[6]** **Bankruptcy**
👉 Presumptions and burden of proof

**Bankruptcy**
👉 Weight and sufficiency

If an objector successfully refutes the claimant's prima facie claims, the burden of proof shifts back to the claimant to prove the validity of its claims by a preponderance of the evidence. 11 U.S.C.A. § 502(b).

Cases that cite this headnote

**[7]** **Bankruptcy**
👉 Claims allowable;what constitutes 'claim.'

**Common Interest Communities**
👉 Power and duty to assess or levy;validity

Condominium association was not permitted to impose late charges against Chapter 13 debtor-unit owner, and so its claim for prepetition late charges would be disallowed; while Pennsylvania's Uniform Condominium Act (UCA) unambiguously empowered association to impose and enforce late charges, there was no provision in either association's declaration or bylaws which explicitly permitted the imposition of late charges, and though, under a generous reading of two sections of the declaration, it was possible that association could have levied a special assessment against debtor in the form of a late charge for failure to timely pay his monthly condominium assessment, or that its board could have adopted a resolution in order to impose monthly late charges against delinquent members such as debtor, no evidence was presented that association either levied a special assessment or adopted a resolution in order to impose late charges against debtor. 11 U.S.C.A. § 502; 68 Pa. Cons. Stat. Ann. §§ 3302(a)(11), 3315(a).

Cases that cite this headnote

**[8]** **Common Interest Communities**
👉 Power and duty to assess or levy;validity

Under Pennsylvania's Uniform Condominium Act (UCA), late charges may not be automatically imposed against condominium owners; rather, the terms of the imposition of any late charge must necessarily be set forth in a condominium association's declaration or other governing document. 68 Pa. Cons. Stat. Ann. §§ 3302(a)(11), 3315(a).

Cases that cite this headnote

**[9]** **Damages**
👉 Nature as compensation for actual damage

Under Pennsylvania law, "liquidated damages" are the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable if the breach occurs.

Cases that cite this headnote

**[10]** **Damages**
👉 Proportion of Sum Stipulated to Actual Debt or Damage

Under Pennsylvania law, in contrast to liquidated damages, a "penalty" provision is not designed as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.

Cases that cite this headnote

**[11]** **Damages**
👉 Proportion of Sum Stipulated to Actual Debt or Damage

Under Pennsylvania law, if the amount of damages assessed is subsequently adjudged unreasonable in the light of either anticipated or actual harm, the contractual provision will

be voided as a penalty, as opposed to being deemed permissible liquidated damages.

Cases that cite this headnote

**[12]** **Bankruptcy**
👉 Claims allowable;what constitutes 'claim.'

**Common Interest Communities**
👉 Power and duty to assess or levy;validity

Under Pennsylvania law, late charges sought to be imposed by condominium association against Chapter 13 debtor-unit owner constituted unenforceable penalties, not liquidated damages, and so association's claim for prepetition late charges, even if otherwise authorized by association's governing documents, would be disallowed; association provided no evidence that the charges represented a good faith estimate of the administrative expense that it would incur if an owner was delinquent but, rather, it admitted that the late charges were "penalties" imposed in order to deter owners from not timely paying their assessments. 11 U.S.C.A. § 502.

Cases that cite this headnote

**[13]** **Bankruptcy**
👉 Grounds and Circumstances

Governing documents of Chapter 13 debtor-unit owner's condominium association permitted it to recover prepetition attorney fees and costs, including interest and charges, even if such fees and costs were not incurred in connection with actions and proceedings filed by association against debtor; association had liens on debtor's unit for delinquent assessments, association's declaration plainly obligated debtor to pay any amounts that association expended to protect such liens, which included attorney fees and costs, and, in contrast to amounts allowed elsewhere in the documents, such amounts were not limited to those expended in actions or proceedings filed by association directly against debtor. 11 U.S.C.A. § 502.

Cases that cite this headnote

**[14]** **Bankruptcy**
👉 Grounds and Circumstances

Whether prepetition attorney fees and costs incurred by a claimant are reasonable, such that they will be allowed as part of its proof of claim, is determined according to applicable nonbankruptcy law. 11 U.S.C.A. § 502.

Cases that cite this headnote

**[15]** **Attorney and Client**
👉 Value of Services

Under Pennsylvania law, the following factors apply in determining whether attorney fees and costs are reasonable: the amount of work performed, the character of the services rendered, the difficulty of the problems involved, the importance of the litigation, the amount of money or value of the property in question, the degree of responsibility incurred, whether the fund involved was "created" by the attorney, the professional skill and standing of the attorney in his profession, the results he was able to obtain, the ability of the client to pay a reasonable fee for the services rendered, and, very importantly, the amount of money or the value of the property in question.

Cases that cite this headnote

**[16]** **Bankruptcy**
👉 Grounds and Circumstances

Under Pennsylvania law, Chapter 13 debtor-unit owner's condominium association held a total allowed prepetition claim for attorney fees and costs equal to $6,819.27, after adjustment for mathematical errors and unreasonable or unauthorized charges totaling $538.14; fees and costs incurred by association in monitoring foreclosure action brought by debtor's first mortgagee were reasonably incurred to protect association's liens, and fees and costs incurred in monitoring debtor's first bankruptcy were

reasonably incurred to protect association's liens and to ensure that debtor did not discharge its claims for delinquent assessments and postpetition arrears. 11 U.S.C.A. § 502.

Cases that cite this headnote

**[17]    Bankruptcy**
👈 Amount;reasonableness thereof
**Bankruptcy**
👈 Interest

Bankruptcy Code allows oversecured creditors to add reasonable postpetition, pre-confirmation attorney fees, interest, and costs to the amount of their secured claim, to the extent of the value of the underlying collateral. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[18]    Bankruptcy**
👈 Amount;reasonableness thereof
**Bankruptcy**
👈 Professional services;attorney fees

Even though an oversecured creditor's claims for postpetition attorney fees do not qualify as administrative expenses, they may be allowed to the extent of the value of the underlying collateral, subject to the court's determination that such fees are reasonable. 11 U.S.C.A. §§ 503(b), 506(b).

Cases that cite this headnote

**[19]    Bankruptcy**
👈 Amount;reasonableness thereof

Oversecured creditor's ability to add reasonable postpetition attorney fees to its secured claim is capped by the value of such creditor's underlying collateral, and, to the extent that an oversecured creditor's reasonable postpetition attorney fees exceed the value of its collateral, such excess portion is disallowed in its entirety. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[20]    Bankruptcy**
👈 Amount;reasonableness thereof

Condominium association, as an oversecured creditor, was entitled to reasonable postpetition attorney fees and costs to the extent of equity cushion in unit owned by Chapter 13 debtor; uncontested appraisal submitted by association listed value of the unit as $263,000.00, total secured claims against the unit, including first mortgage of $217,084.35 and association's allowed secured claim of $15,193.91, equaled $232,278.26, leaving equity cushion of $30,721.74, and association incurred reasonable postpetition fees and costs of at least that amount to protect its lien against the unit in, for example, preparing and filing its proof of claim, filing motion to compel payment of postpetition fees and assessments, defending debtor's adversary proceeding, objecting to confirmation of eight of debtor's ten proposed bankruptcy plans, and responding to debtor's voluntary motion to dismiss, such that those fees and costs were authorized under its declaration and bylaws. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[21]    Bankruptcy**
👈 Oversecurity

When the value of creditor's collateral exceeds the amount of its claim, the creditor is "oversecured." 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**[22]    Bankruptcy**
👈 Fees, Costs, or Charges;Attorney Fees

Oversecured creditor's postpetition attorney fees may be allowed if three elements are satisfied: (1) the claim is an oversecured, allowed secured claim, (2) the fees are reasonable, and (3) the fees are provided for under the agreement between the parties or by statute. 11 U.S.C.A. § 506(b).

In re Wilborn, 457 B.R. 575 (2011)

Cases that cite this headnote

[23]    **Bankruptcy**

👉 Grounds and Circumstances

**Bankruptcy**

👉 Amount;reasonableness thereof

Unlike prepetition fees and costs, whether postpetition fees and costs are reasonable is determined according to federal standards. 11 U.S.C.A. §§ 502, 506(b).

Cases that cite this headnote

[24]    **Bankruptcy**

👉 Reasonableness, necessity or utility of services

Under federal law, the lodestar approach controls whether postpetition attorney fees and costs are reasonably incurred. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

[25]    **Bankruptcy**

👉 Reasonableness, necessity or utility of services

Under the lodestar approach used in determining whether postpetition attorney fees and costs are reasonable, the bankruptcy court will inquire into the hours spent by the attorneys. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

[26]    **Bankruptcy**

👉 Amount;reasonableness thereof

Under the lodestar approach used in determining whether postpetition attorney fees and costs are reasonable, the bankruptcy court ordinarily fixes a reasonable hourly rate for the services provided by the attorneys, considering their legal reputation and status. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

[27]    **Bankruptcy**

👉 Reasonableness, necessity or utility of services

Under the lodestar approach used in determining whether postpetition attorney fees and costs are reasonable, the bankruptcy court need not examine the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney, as long as it can determine the hours devoted to various general activities, such as pretrial discovery, settlement negotiations, and the like. 11 U.S.C.A. § 506(b).

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*380** David A. Scholl, Law Office of David A. Scholl, Philadelphia, PA, for Debtor.

<u>OPINION</u>

Ashely M. Chan, United States Bankruptcy Judge

**I. INTRODUCTION**

The Debtor in this proceeding purchased a condominium unit fourteen years ago and, for the past eight years, failed to consistently and timely pay monthly condominium assessments and related charges required under the condominium's governing documents. By his own admission, the Debtor also filed patently unconfirmable plans and made material misstatements regarding the Debtor's delinquency to the condominium association in this bankruptcy proceeding. In order to protect its lien on the condominium unit, the condominium association was forced to take various legal actions against the Debtor.

The Debtor now objects, *inter alia*, to the condominium's pre- and post-petition late charges and the majority of its pre- and post-petition attorneys' fees and costs. As discussed below, the Court ultimately has concluded that the condominium association was not permitted under its governing documents to impose late charges against the

In re Milbourne, 557 B.R. 377 (2016)

Debtor, but did have a claim for the majority of its pre- and post-petition attorneys' fees and costs, although the Court has limited the amount of allowed reasonable post-petition attorneys' fees and costs to the equity in the Unit as required under § 506(b).

**\*381 II. FACTS AND PROCEDURAL HISTORY**
On May 29, 2002, the Debtor purchased Unit 17 of Williamsburg Commons ("Unit"), a condominium located at 533 Williamsburg Way in King of Prussia, Pennsylvania. Hr'g on Obj. to Claim No. 6 ("Hr'g on Obj."), Claimant's Ex. 1B ("Deed"), at 1, Nov. 17, 2015. As the owner of a Williamsburg Commons unit, the Debtor belongs to the Unit Owners Association, which is known as the Williamsburg Commons Condominium Association ("WCCA"), a Pennsylvania non-profit corporation. Hr'g on Obj., Claimant's Ex. 1 ("Declaration"), § 2.2.a. The Debtor is therefore subject to the Uniform Condominium Act, 68 Pa. Stat. and Cons. Stat. Ann. §§ 3101–414 (West 2016) ("UCA"), the Declaration of Condominium for Williamsburg Commons ("Declaration"), and the Bylaws of Williamsburg Commons Condominium Association ("Bylaws").

**A. Pre-Petition Activity**
On or about June 2, 2003, the Debtor executed a note and mortgage against the Unit in favor of Irwin Mortgage Corp. ("Irwin") in the amount of $193,450 ("First Mortgage"). Mot. of CitiMortgage, Inc. for Relief ("CitiMortgage Mot.") Ex. B, ECF No. 95. On December 12, 2011, Irwin assigned the First Mortgage to CitiMortgage, Inc. ("CitiMortgage"). *Id.*

The Debtor executed a second note and mortgage against the Unit in favor of Wachovia Bank, N.A. ("Wachovia"), in the amount of $92,516 ("Second Mortgage") on July 28, 2005. Debtor's Second Suppl. Mem. Supp. Objs. to Claims ("Debtor's Second Suppl. Mem.") Ex. B, ECF No. 109. Wells Fargo Bank, N.A. ("Wells Fargo"), later became the successor by merger with Wachovia to the Second Mortgage. WCCA's Second Suppl. Mem. Opp'n Objs. ("WCCA's Second Suppl. Mem.") Ex. A, ECF No. 113.

In March 2008, the Debtor allegedly stopped regularly paying monthly and special assessments that he owed to WCCA as required by the Declaration.[1] *Id.* at 2. It also

appears that, by October 2009, the Debtor also allegedly stopped regularly paying the monthly installments due on the loan secured by the Second Mortgage. Claim 7-1, Claims Register, Bankr. No. 10-31122-bif.

At some point thereafter, foreclosure proceedings were initiated against the Unit in connection with the Second Mortgage and a sheriff's sale was ultimately scheduled. Hr'g on Obj. Claimant's Ex. 4. WCCA, through its outside general counsel, Gilbert E. Toll ("Mr. Toll"), began monitoring the foreclosure proceedings and the sheriff's sale, which was continued on multiple occasions. *Id.*

Before the sheriff's sale was conducted, the Debtor and his wife, Cynthia Milbourne, jointly filed a Chapter 13 Voluntary Petition, ECF No. 1, Bankr. No. 10-31122-bif, on December 29, 2010. William C. Miller was appointed as the Chapter 13 Trustee ("Trustee") in that case ("2010 Bankruptcy"). On January 25, 2011, Wells Fargo filed a proof of claim, which it later amended twice, for the loan secured by the Second Mortgage. Claim 7-1, Claims Register, Bankr No. 10-31122-bif. WCCA also filed a proof of claim for the delinquent **\*382** monthly and special assessments, which were secured by a lien against the Debtor's Unit as established by UCA and the Declaration, on February 10, 2011.[2] Claim 8-1, Claims Register, Bankr. No. 10-31122-bif.

On July 14, 2011, Wells Fargo filed a Motion for Relief from Automatic Stay Under § 362(a) ("Wells Fargo Motion"), ECF No. 61, Bankr. No. 10-31122-bif, to, *inter alia*, resume the foreclosure proceedings on the Second Mortgage and the sheriff's sale of the Debtor's Unit. Wells Fargo alleged in the motion that the Debtor owed post-petition arrears of $3,316.81 under the Second Mortgage and, as a result, failed to adequately protect Wells Fargo's interest in the Unit. Wells Fargo Mot. ¶¶ 6, 8. Wells Fargo and the Debtor subsequently filed a Settlement Stipulation, ECF No. 83, Bankr. No. 10-31122-bif, on September 21, 2011.[3] An Order Granting Settlement Stipulation, ECF No. 87, Bankr. No. 10-31122-bif, was entered on September 26, 2011. However, the Debtor and his wife subsequently defaulted under the Settlement Stipulation and, on November 3, 2011, the Court entered another Order, ECF No. 93, Bankr No. 10-31122-bif, which granted the Wells Fargo Motion.

On November 4, 2011, Glenn A. Manochi ("Mr. Manochi") entered his appearance in the 2010 Bankruptcy

and filed Objections to Debtors' Second Amended Chapter 13 Plan, ECF No. 95, Bankr No. 10-31122-bif, on behalf of WCCA. [4] Mr. Manochi alleged therein that the Debtor and his wife owed $2,904.36 in post-petition arrears to WCCA for unpaid monthly and special assessments. *Id.* ¶ 6. Among the listed objections were, *inter alia*, the plan's failure to specify the monthly amount that the Debtor would pay to satisfy the pre-petition arrears that he owed to WCCA; to pay in full, pre-confirmation, the post-petition arrears that the Debtor owed to WCCA; and to provide superior treatment to WCCA, a senior lienholder, relative to Wells Fargo, a junior lienholder. [5] *Id.* ¶¶ 7–8, 13.

Also on November 4, 2011, Mr. Manochi filed a motion on behalf of WCCA to join **\*383** in the Trustee's motion to dismiss the Debtor's 2010 Bankruptcy based, in part, on the Debtor's failure to pay post-petition arrears to WCCA. Joinder in the Mot. to Dismiss ¶ 1, ECF No. 96, Bankr. No. 10-31122-bif. On November 15, 2011, the court held hearings on the confirmation of the plan and the Trustee's motion to dismiss and decided to deny confirmation of the plan and permit the Trustee to withdraw the motion to dismiss without prejudice. However, the Trustee filed another motion to dismiss the 2010 Bankruptcy on December 23, 2011, which the court ultimately granted on January 17, 2012.

In either April or May 2012, WCCA, through Mr. Toll, filed a complaint against the Debtor to collect the delinquent assessments that the Debtor owed to WCCA. Hr'g on Obj. Claimant's Ex. 4. Shortly thereafter, WCCA filed a motion for default judgment against the Debtor. *Id.* Although WCCA and the Debtor agreed to a payment plan on July 23, 2012, the Debtor apparently fell out of compliance with the plan by October 16, 2012. *Id.*

Subsequently, CitiMortgage and Wells Fargo separately maintained foreclosure proceedings on their respective mortgages on the Debtor's Unit. Mr. Toll monitored each of the foreclosure proceedings on behalf of WCCA. *Id.* On January 3, 2013, the Debtor finally satisfied the Second Mortgage. WCCA's Second Suppl. Mem. Ex. A. As evidence thereof, Wells Fargo recorded a Satisfaction of Mortgage in the Recorder of Deeds Office in Montgomery County. *Id.*

**B. Post-Petition Activity**

On August 8, 2014 ("Petition Date"), the Debtor filed a Chapter 13 Voluntary Petition, ECF No. 1, and commenced this bankruptcy case. William C. Miller was again appointed as the Chapter 13 Trustee. David A. Scholl entered his appearance on behalf of the Debtor on September 9, 2014, and filed a Chapter 13 Plan of the Debtor ("Chapter 13 Plan"), ECF No. 19, on September 16, 2014.

Mr. Manochi entered his appearance on behalf of WCCA on October 24, 2014, and filed a proof of claim against the Debtor for $16,112.05 ("Proof of Claim") on November 26, 2014. Claim 6-1, Claims Register. WCCA's Proof of Claim reflected WCCA's pre-petition claims described above which included: $7,389.00 of monthly assessments, $950.00 of special assessments, $380.00 of late fees, $35.64 of other fees, and $7,357.41 of attorneys' fees and costs billed by Mr. Toll and Mr. Manochi. Hr'g on Obj. Claimant's Ex. 4.

On January 8, 2015, Mr. Manochi filed objections to the Debtor's Chapter 13 Plan on behalf of WCCA. Objs. to Debtor's Chapter 13 Plan ("Objs. to Plan"), ECF No. 37. Among the listed objections were, *inter alia*, the plan's failure to: pay the pre- and post-petition arrears owed to WCCA; prioritize the payment of the most recent six months of fees and assessments over the payment of the First Mortgage pursuant to UCA § 3315(b)(2)(i); prioritize the payment of all other months' fees and assessments over the payment of all liens and encumbrances other than first mortgages and liens for governmental assessments pursuant to § 3315(b)(2)(ii); and provide liens of corresponding priority on the Debtor's Unit to WCCA. [6] *Id.* ¶¶ 8, 10–14.

On February 6, 2015, the Debtor filed a complaint against WCCA under Bankruptcy Code § 506(a) **\*384** "to avoid [its] totally unsecured lien" on the Debtor's Unit ("Adversary Complaint"). Compl. ¶¶ 1, 8, ECF No. 1, Bankr. No. 14-16411, Adv. No. 15-00045. The Debtor asserted that the First Mortgage exceeded the Unit's alleged value of $200,000.00, according to the Debtor, such that the Unit retained no equity to secure WCCA's Proof of Claim. [7] *Id.* ¶¶ 5–8. Mr. Manochi filed an answer on behalf of WCCA in which it asserted that the Unit's value was "much greater than $200,000.00 and exceeds the value of all liens against it," on March 11, 2015. Answer ¶ 6, ECF No. 4, Bankr. No. 14-16411, Adv. No. 15-00045. The deadline to submit expert appraisal reports of the

In re Manochi, 557 B.R. 071 (2016)

value of the Debtor's Unit in the Adversary Complaint proceeding ("Adversary Proceeding") was June 15, 2015. Pretrial Order ¶ 6(b), ECF No. 5, Bankr. No. 14-16411, Adv. No. 15-00045.

Also on February 6, 2015, the Debtor filed an Amended Chapter 13 Plan ("Amended Plan"), ECF No. 39. The Debtor, however, allegedly had not paid any post-petition assessments or fees that he owed to WCCA. Mot. for Payment of Post-Petition Fees ("Mot. for Payment") ¶ 8, ECF No. 44. Mr. Manochi therefore filed a motion on behalf of WCCA to, *inter alia*, compel "the immediate payment" by the Debtor of all such post-petition fees and assessments "prior to the confirmation of the Debtor's plan," on March 12, 2015. *Id.* ¶ 10. He argued that such assessments and fees were "administrative expenses" under Bankruptcy Code § 503(b), which the Debtor was required to pay pre-confirmation under § 1326(b)(1). *Id.* ¶¶ 5–6. On March 20, 2015, Mr. Manochi filed objections to the Amended Plan on behalf of WCCA that also alleged, *inter alia*, that the Debtor had not paid any post-petition assessments or fees. Objs. to Debtor's Am. Plan ¶ 6, ECF No. 46.

On March 24, 2015, the Debtor filed an answer to WCCA's motion and indicated that he was "ready, willing, and able" to pay the delinquent post-petition assessments and fees "and thereafter make regular payments." Answer to Mot. for Payment of Post-Petition Fees ¶ 3, ECF No. 47. The Debtor then filed a Second Amended Chapter 13 Plan, ECF No. 48, on March 27, 2015. Although WCCA withdrew its motion on May 7, 2015, Mr. Manochi filed objections to the Second Amended Plan on its behalf on May 13, 2015, in which it again alleged that, *inter alia*, the Debtor had not paid any post-petition assessments or fees. Objs. to Debtor's Second Am. Plan ¶ 6, ECF No. 59.

The Debtor filed a Third Amended Chapter 13 Plan ("Third Amended Plan"), ECF No. 60, on May 17, 2015, and Mr. Manochi filed Objections to Debtor's Third Amended Plan, ECF No. 64, on August 4, 2015, on behalf of WCCA. The Debtor  **\*385**  alleged in the Third Amended Plan that he had "paid all post-petition fees" that he owed to WCCA, but WCCA maintained that the Debtor had failed to pay "$9,860.44 in post-petition assessments." Third Am. Plan ¶ 3.D; Objs. to Debtor's Third Am. Plan ¶ 6. The Debtor filed a Fourth Amended Chapter 13 Plan ("Fourth Amended Plan"), ECF No. 65, on August 8, 2015, in which he reaffirmed that no amount

of post-petition fees remained due to WCCA. Fourth Am. Plan ¶ 3.D. However, at a confirmation hearing held on August 11, 2015, the Debtor later admitted that his representations in the Third Amended Plan and Fourth Amended Plan were false. Objs. to Debtor's Sixth Am. Plan ¶ 31, ECF No. 85.

In each of the Debtor's first five Chapter 13 plans, the Debtor maintained that if he successfully avoided the liens that allegedly secured WCCA's pre-petition claims against the Unit in the Adversary Proceeding, then the claims would be discharged as unsecured. *E.g.*, Fourth Am. Plan ¶ 3.D. However, WCCA submitted an expert appraisal report on July 24, 2015 ("Appraisal"), which valued the Debtor's Unit at $263,000 as of the Petition Date. [8] Def.'s Resp. to Pl.'s Voluntary Dismiss Mot. ("Def.'s Resp.") ¶¶ 3–4, ECF No. 17, Bankr. No. 14-16411, Adv. No. 15-00045. WCCA argued that the Appraisal proved that the Unit retained sufficient equity to pay all of WCCA's pre-petition claims and therefore supported WCCA's priority liens against the Unit. Objs. to Debtor's Fifth Am. Plan ¶ 21, ECF No. 76; Objs. to Debtor's Sixth Am. Plan ¶ 27, ECF No. 85.

On August 18, 2015, seemingly in response to the Appraisal, the Debtor filed the instant Objections to Proof of Claim ("Objections"), ECF No. 71, in which he argued that the amounts claimed by WCCA were "grossly inflated by unreasonable late charges and ... exorbitant and unnecessary legal fees." Objs. ¶ 5. The Debtor asserted that, as a result, he only owed the pre- and post-petition monthly assessment arrears to WCCA, which amounted to $7,356 and $820, respectively. *Id.* ¶¶ 3–4.

The Debtor also filed a Fifth Amended Chapter 13 Plan ("Fifth Amended Plan"), ECF No. 73, on August 22, 2015, and a Sixth Amended Chapter 13 Plan ("Sixth Amended Plan"), ECF No. 80, on October 3, 2015. In each, the Debtor acknowledged that the Adversary Proceeding was going to be dismissed in light of the Appraisal. Fifth Am. Plan ¶ 3.D; Sixth Am. Plan ¶ 3.D. Mr. Manochi filed objections to the Fifth Amended Plan and Sixth Amended Plan on behalf of WCCA on September 22, 2015, and November 10, 2015, respectively.

Although the Debtor twice requested that WCCA agree to proposed stipulations to voluntarily dismiss the Adversary Complaint, WCCA took the position that it would only consent to the dismissal if, "for the purposes

of Debtor's bankruptcy proceeding, the parties agree the value of the Debtor's Unit is $263,000." Pl.'s Mot. to Voluntarily Dismiss Proceeding ("Pl.'s Mot. to Dismiss") ¶ 6, ECF No. 15, Bankr. No. 14-16411, Adv. No. 15-00045; Def.'s Resp. ¶ 9. The Debtor refused. Def.'s Resp. ¶ 10.

On October 19, 2015, the Debtor filed a motion to voluntarily dismiss the Adversary Complaint, in which he again admitted that "he could not successfully maintain" the Adversary Proceeding in light of the Appraisal. Pl.'s Mot. to Dismiss ¶ 4. On **\*386** November 6, 2015, Mr. Manochi filed a response on behalf of WCCA in which it requested that, if the Court granted the motion, it also determine that the Unit's value is $263,000. Def.'s Resp. ¶ 14. The Court granted the Debtor's motion on November 17, 2015, but, under the circumstances, declined to determine the Unit's value. Order Granting Pl.'s Mot. to Dismiss, ECF No. 19, Bankr. No. 14-16411, Adv. No. 15-00045.

On November 17, 2015, the Court also held a hearing on the Debtor's Objections. At the hearing, Mr. Manochi presented various exhibits on behalf of WCCA, including pre-petition bills as well as post-petition bills through November 11, 2015, and a statement of the Debtor's account as of November 11, 2015. Through the exhibits, Mr. Manochi sought to substantiate WCCA's Proof of Claim and also the post-petition claims described above, which included $1,085.00 of monthly assessments, $375.00 of late fees, $50.00 of other fees, and $21,134.77 of attorneys' fees and costs billed by Mr. Toll and Mr. Manochi. Hr'g on Obj. Claimant's Ex. 5.

The Debtor filed a Memorandum in Support of Debtor's Objections ("Debtor's Memorandum"), ECF No. 91, on December 6, 2015, and Mr. Manochi filed a Memorandum in Opposition to Debtor's Objections ("WCCA's Memorandum"), ECF No. 92, on December 7, 2015, on behalf of WCCA. The Debtor argued that only the pre-petition monthly assessments and $618.19 of WCCA's pre-petition attorneys' fees and costs—those related to WCCA's state court action against the Debtor —were due and compensable. [9] Debtor's Mem. 7–8. The Debtor conceded no special assessments, late fees, other fees, or post-petition amounts that WCCA claimed at the prior hearing. Id. at 3–7.

The Debtor also alleged that he needed to resolve WCCA's pre-petition security interests in the Unit because it was "the principal impediment" to a loan modification that he was negotiating. Id. at 2. "For this reason," the Debtor had proposed on multiple occasions to pay a "lump sum" to WCCA to resolve its pre-petition claims. Id. WCCA, however, had rejected all such offers and had proposed no counteroffers. Id.

On December 8, 2015, the Court continued the hearing again to February 9, 2015, and ordered the Debtor and WCCA to submit supplemental and responsive briefing on the issues of late fees and attorneys' fees and costs. The Debtor filed a Supplemental **\*387** Memorandum ("Debtor's Supplemental Memorandum"), ECF No. 94, on December 17, 2015; Mr. Manochi filed a Supplemental Memorandum ("WCCA's Supplemental Memorandum"), ECF No. 97, on January 8, 2016, on behalf of WCCA; and the Debtor filed a Memorandum in Reply ("Debtor's Reply Memorandum"), ECF No. 102, on January 15, 2016. [10]

On February 9, 2016, the Court concluded its hearing on the Debtor's Objections. At the hearing, Mr. Manochi presented additional exhibits on behalf of WCCA, including post-petition bills incurred after the first day of the hearing on November 17, 2015, and a statement of the Debtor's account as of February 4, 2016. Through the additional exhibits, Mr. Manochi sought to substantiate the remaining post-petition claims described above, which included $75.00 of late fees and $13,450.73 of attorneys' fees and costs billed by Mr. Toll and Mr. Manochi. Hr'g on Obj. Claimant's Exs. 10–11. "The Debtor opposed any attempt to reopen the record on the Objections at that juncture," but the Court permitted Mr. Manochi to submit the additional exhibits. Debtor's Second Suppl. Mem. 3.

The Court then ordered the Debtor to submit any line item objections to WCCA's claims by March 1, 2016, and WCCA to submit any responses by March 15, 2016. After the final round of supplemental briefing, the Debtor largely maintained his previous positions, but conceded the pre-petition special assessments and other fees to WCCA that he previously denied were due. Id. at 11. The Debtor therefore requested that the Court reduce WCCA's Proof of Claim to the sum of the pre-petition monthly assessments, special assessments, other fees, and

attorneys' fees and costs related to WCCA's state court action against the Debtor: $8,993.33.[11] *Id.*

WCCA, however, maintained that it was due the full amount of its pre-petition Proof of Claim. WCCA's Second Suppl. Mem. 13. WCCA also requested that the Court "set [its] post-petition claim at $35,585.50 as of February 4, 2016."[12] *Id.* The total requested by WCCA is $51,796.55.[13] *Id.* at 2. WCCA finally requested that the Court award it "15% interest on its post-petition attorneys' fees and costs," pursuant to Declaration § 13.12. *Id.* at 12–13.

**\*388** Meanwhile, the Debtor filed a Seventh Amended Chapter 13 Plan, ECF No. 98, on January 10, 2016, and an Eighth Amended Chapter 13 Plan, ECF No. 104, on January 24, 2016. The Debtor thus filed a total of nine Chapter 13 plans as of the filing of WCCA's final memorandum on this matter, and a tenth thereafter. WCCA asserts that none of the plans proposed to timely pay the full pre- and post-petition amounts due, or to provide liens of corresponding priority, to WCCA. WCCA's Second Suppl. Mem. 8. The issues raised by the Debtor and by WCCA with respect to the Debtor's Objections to WCCA's Proof of Claim are now ripe to be decided.

### III. DISCUSSION

As explained above, the Debtor has already conceded that the following pre-petition amounts should be allowed: $7,389 in monthly assessments, $950 in special assessments, and $35.64 in other fees. The Debtor also concedes that WCCA is entitled to $618.69 in pre-petition attorneys' fees and costs related to WCCA's state court action against the Debtor, but disputes that WCCA is entitled to the remaining $6,738.72 in pre-petition attorneys' fees and costs, any portion of its post-petition attorneys' fees and costs, interest on its post-petition attorneys' fees and costs, or any of the pre-petition or post-petition late charges. The Debtor's Objections to WCCA's Proof of Claim therefore raise two primary issues: to what extent should the Court allow WCCA's (A) pre-petition claims for late charges and attorneys' fees and costs; and (B) post-petition claims for late charges, attorneys' fees and costs, and interest on such attorneys' fees and costs. The Court will address these issues in turn.

### A. Pre-Petition Claims Under § 502(b)

**[1]** **[2]** A proof of claim "is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). "If properly filed, a proof of claim is *prima facie* evidence of the validity and amount of the claim, even if an objection is filed." *In re Wells*, 463 B.R. 320, 326 (Bankr.E.D.Pa.2011) (emphasis added) (citations omitted) (citing Fed. R. Bankr. P. 3001(f)). A *prima facie* proof of claim "satisfies the claimant's initial obligation to go forward." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992).

**[3]** **[4]** **[5]** **[6]** If a party in interest objects to a proof of claim, the Court "shall determine the amount of such claim ... as of the date of the filing of the petition, and shall allow such claim in such amount," subject to several exceptions. 11 U.S.C. § 502(b). Upon the filing of an objection to a properly filed proof of claim, "[t]he burden of going forward then shifts [from the claimant] to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *Allegheny Int'l*, 954 F.2d at 173. "[I]f such objection to a claim is made, the court ... shall allow such claim ... except to the extent that ... (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b); *see also Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000)) (stating that a proof of claim shall be allowed only to the extent that a claimant is entitled to such claim based upon "the underlying substantive law creating the debtor's obligation"). Furthermore, with regard to any objection to a proof of claim, "any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers*, 549 U.S. at 450, 127 S.Ct. 1199 (citing 4 *Collier on Bank* **\*389** *ruptcy* ¶ 502.03[2][b] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006)). "[T]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Allegheny Int'l*, 954 F.2d at 173–74. Finally, if the objector successfully refutes the claimant's *prima facie* claims, the burden of proof shifts back to the claimant to "prove the validity of [its] claim[s] by a preponderance of the evidence." *Id.* at 174 (citing *In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D.Mass.1983)).

Here, WCCA properly filed its Proof of Claim under § 501 and it is *prima facie* evidence of the claims therein. Upon the filing of the Debtor's Objections, the burden of proof

*In re Wilborn*, 607 B.R. 379 (2018)

shifted to the Debtor to produce evidence sufficient to negate the *prima facie* validity of the Proof of Claim. The Debtor will satisfy his burden of proof to the extent that he can demonstrate that WCCA's pre-petition claims for late charges and attorneys' fees and costs are unenforceable under an agreement between himself and WCCA or under applicable state law. If the Debtor successfully refutes WCCA's *prima facie* claims, then WCCA must prove the validity of its claim by a preponderance of the evidence. Mindful of these shifting burdens of proof, the Court must now determine the extent to which the Proof of Claim will be allowed.

### 1. Late Charges

WCCA attached a Financial Transaction sheet dated as of October 23, 2014 ("Sheet"), to its Proof of Claim which sets forth, *inter alia,* a list of the pre-petition late charges charged to the Debtor from October 17, 2006, to October 14, 2014. Claim 6-1, Claims Register. Thus, WCCA set forth a *prima facie* claim for such pre-petition late charges in the total amount of $380.

The Debtor objects to the pre-petition late charges because (a) he is under "no contractual obligation" to pay the late charges; (b) the late charges are so excessive as to "constitute[ ] an unenforceable penalty clause"; and (c) the late charges are the product of a procedurally unconscionable adhesion contract. Debtor's Mem. 4–5 (quoting *In re Jordan*, 91 B.R. 673, 680 (Bankr.E.D.Pa.1988)); Debtor's Reply Mem. 2–3. For the reasons explained below, the Court will sustain the Debtor's Objections to the pre-petition late charges because WCCA failed to prove that the Debtor was contractually obligated to pay late charges to WCCA. In addition, by WCCA's own admission, the Court concludes that the late charges sought to be imposed by WCCA against the Debtor constitute unenforceable penalties.

### a. The Imposition of Late Charges

[7] At the outset, the Debtor denies that he is contractually obligated to pay the pre-petition late charges because, pursuant to *In re Jordan*, 91 B.R. 673 (Bankr.E.D.Pa.1988)), WCCA must have "express" and "unambiguous[ ]" contractual authorization to collect the

late charges. Debtor's Suppl. Mem. 3 (quoting *Jordan*, 91 B.R. at 678).

In response, WCCA argues that "the imposition of late charges by the Association is a matter of statute and not contract" because it is authorized to impose such fees pursuant to UCA §§ 3302(a)(11) and 3315(a). WCCA's Suppl. Mem. 2–3. Under the former, WCCA may, "[s]ubject to the provisions of the declaration ... (11) Impose charges for late payment of assessments." UCA § 3302(a). Under the latter, "[u]nless the declaration otherwise provides, fees, charges, late charges, fines and interest charged pursuant to section 3302(a)(10), (11) and (12) ... are enforceable as assessments under this section." *Id.* § 3315(a).

[8]  **\*390**  It appears that WCCA is arguing that the UCA is self-executing and that late charges may be automatically imposed against condominium owners under UCA §§ 3302(a)(11) and 3315(a). To the extent that WCCA makes this argument, the Court disagrees because WCCA's interpretation of §§ 3302(a)(11) and 3315(a) contradicts their plain meaning. *See Com v. Packer*, 568 Pa. 481, 798 A.2d 192, 196 (2002) (citing 1 Pa. Cons. Stat. § 1921(b); *LTV Steel Co. v. Workers' Comp. Appeal Bd. ( Mozena)*, 562 Pa. 205, 754 A.2d 666, 674 (1997)) (stating that "where the intent of the legislature is clear from the plain meaning of the statute, courts need not pursue statutory interpretation").

The language of §§ 3302(a)(11) and 3315(a) unambiguously empowers a condominium association to impose and enforce late charges. However, it is clear from the face of these provisions that the terms of the imposition of any late charge must necessarily be set forth in a condominium association's declaration or other governing document. Thus, under the clear language of the UCA, WCCA may not impose late charges unless its Declaration or other governing document affirmatively sets forth the terms of the imposition of such charges.

With regard to WCCA's Declaration, the Debtor argues that "there is no provision in any contract ... between the parties providing for late charges." Debtor's Mem. 5. WCCA argues that a monthly late charge of $10 was automatically assessed to any member of WCCA whose account became delinquent in excess of $20.01 pursuant to the Board's Administrative Resolution # 1 on March 17, 1997 ("Resolution"). WCCA's Second Suppl. Mem. 11–

12; Hr'g on Obj. Claimant's Ex. 1A. In addition, WCCA argues that it subsequently increased the late charge to $25 when the monthly condominium assessment increased to $195, as evidenced in the minutes of an October 16, 2013, WCCA Board meeting. WCCA's Second Suppl. Mem. 11–12; Hr'g on Obj. Claimant's Ex. 4.

There is no provision in either WCCA's Declaration and Bylaws which explicitly permits the imposition of late charges. The burden of proof therefore shifts to WCCA to demonstrate that it is permitted to impose late charges under the Declaration or related governing documents.

The only reference to late charges in the Declaration is found in § 13.2 which states that "[a]ny fees, charges, late charges, fines and interest which may be levied by the Executive Board pursuant to 3302(a)(10), (11) and (12) of the [UCA], shall be subordinate to the lien of a Permitted Mortgage on a Unit." Declaration § 13.2. This section, alone, however, is insufficient to support WCCA's imposition of late charges against the Debtor since it fails to set forth that a late charge will actually be imposed or the terms of such late charge; it merely contemplates that, to the extent a late charge is imposed, it will be subordinate to the liens of permitted mortgagees.

The only provisions in the Declaration which could remotely support the imposition of late charges are §§ 13.5 and 14.1(b). Section 13.5 provides that "a special assessment may be levied against the Unit Owner ... for violations of the terms and provisions of this Declaration or the Rules and Regulations promulgated by the Executive Board from time to time." *Id.* § 13.5. Thus, under a generous reading of this provision, it is possible that WCCA could have levied a special assessment against the Debtor in the form of a late charge for failure to timely pay his monthly condominium assessment. However, no evidence was presented that WCCA levied a special assessment against the Debtor in order to impose late charges.

**\*391** In addition, § 14.1(b) of the Declaration, which permits WCCA's Board to adopt or amend rules and regulations in order to remedy violations of the Declaration through appropriate resolutions duly approved by WCCA's Board, provides:

> The Board shall have the power to adopt, amend and enforce ... procedures and penalties for

violations of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto which the Board shall deem appropriate. Any rules and regulations shall be adopted or amended, from time to time, by means of appropriate resolutions duly approved by the Board in accordance with the By-Laws. A copy of the rules and regulations and copies of any amendments thereto shall be delivered or mailed to each Owner and occupant of a Dwelling promptly after the adoption thereof and shall become binding upon all Owners, their successors in title and assigns, and occupants of Dwellings.

*Id.* § 14.1(b).

Although it is possible that WCCA's Board may have adopted the Resolution in order to impose a monthly late charge of $10 against delinquent members pursuant to this provision, WCCA has not provided this Court with any evidence that the Resolution was served on the Debtor, as required by § 14.1(b) of the Declaration. In the absence of such notice, it is clear that the Debtor could not possibly be bound by the Resolution. In addition, the Court finds that the imposition of increased late charges of $25 is also insufficient since the Board apparently did not even adopt a resolution in connection with such late charges and, again, WCCA failed to produce any evidence that the Debtor was notified of any resolution adopting increased late charges.

#### b. Unenforceable Penalty Provisions

The Court's disallowance of WCCA's pre-petition late charges is further buttressed by this Court's determination that the late charges constitute unenforceable penalties, which WCCA admitted. In opposing the late charges, the Debtor argued that they "are so excessive" that they cannot constitute liquidated damages and instead must be disallowed as "unenforceable penalt [ies]." Debtor's Suppl. Mem. 4. In response, WCCA argued that it "must provide penalties which require unit owners to timely pay assessments" because, otherwise, "unit owners will have

no incentive to timely pay their assessments." WCCA's Suppl. Mem. 4.

**[9]** **[10]** **[11]** This issue turns on whether the late charges constitute permissible liquidated damages or unenforceable penalties under Pennsylvania law. Liquidated damages are "the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is legally recoverable ... if the breach occurs." *Pantuso Motors, Inc. v. CoreStates Bank*, 568 Pa. 601, 798 A.2d 1277, 1282 (2002) (quoting *In re Plywood Co. of Pa.*, 425 F.2d 151, 154 (3d Cir.1970)). In contrast, a penalty provision is not designed "as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach." *Id.* (quoting *Westmount Country Club v. Kameny*, 82 N.J.Super. 200, 197 A.2d 379, 382 (N.J.Super.Ct.App.Div.1964)). "If the amount of damages assessed is subsequently adjudged unreasonable in the light of either anticipated or actual harm, the contractual provision will be voided as a penalty." *Finkle v. Gulf & W. Mfg. Co.*, 744 F.2d 1015, 1021 (3d Cir.1984) (quoting **\*392** *Unit Vending Corp. v. Tobin Enters.*, 194 Pa.Super. 470, 168 A.2d 750, 751 (1961)).

**[12]** In determining whether the late charges are reasonable liquidated damages assessments or unenforceable penalties, WCCA has failed to provide any evidence that they represent a good faith estimate of the administrative expense that it would incur if an owner was delinquent. Rather, WCCA admits that the late charges are "penalties" imposed in order to deter owners from not timely paying their assessments. WCCA's Suppl. Mem. 4. By its own description, therefore, each late charge is "a punishment, the threat of which is designed to prevent the breach," and thus, by definition, an unenforceable penalty. *Pantuso Motors*, 798 A.2d at 1282.

Based upon the foregoing, the Court will not allow WCCA's pre-petition late charges against the Debtor. Neither the Declaration nor Bylaws permit the imposition of late charges and such charges constitute unreasonable penalties. Accordingly, the Court will sustain the Debtor's Objections with regard to the pre-petition late charges.

2. Attorneys' Fees and Costs

WCCA sets forth a *prima facie* claim for pre-petition attorneys' fees and costs in the amount of $7,357.41, as evidenced in the Sheet attached to WCCA's Proof of Claim. Claim 6-1, Claims Register. As explained above, the Debtor has already conceded $618.69 of such fees and costs incurred in WCCA's state court action against him. However, the Debtor objects to the remaining $6,738.72 of such fees and costs incurred largely to monitor the foreclosure proceedings on the Second Mortgage, and the sheriff's sale scheduled thereafter, prior to the 2010 Bankruptcy; to monitor the 2010 Bankruptcy; to prepare and file a proof of claim, objection to confirmation, and joinder motion therein; to appear at the confirmation/dismissal hearing therein; to monitor the subsequent foreclosure proceedings and both mortgages on the Debtor's Unit; and to collect unpaid assessments from the Debtor.

The Debtor objects to the foregoing because (a) WCCA did not incur the fees and costs as a prevailing party in an action against the Debtor; and (b) the fees and costs are unreasonable. Debtor's Second Suppl. Mem. 5–10. For the reasons explained below, the Court will deny in part and grant in part the Debtor's Objections as to the pre-petition attorneys' fees and costs.

*a. The Declaration and Bylaws*

**[13]** The Debtor cites three provisions in the Declaration and Bylaws, which "address the circumstances under which WCCA is entitled to recover reimbursement of its attorneys fees and costs." Debtor's Second Suppl. Mem. 4–5. First, he cites Declaration § 13.12, titled "Remedies," which states, in pertinent part:

> In the event of any violation of the provisions of the Act, this Declaration, the ByLaws or the Rules and Regulations of the Association by any Unit Owner ... the Association ... or the Executive Board ... shall have each and all of the rights and remedies that may be provided for in the [UCA], the Declaration, the ByLaws or said Rules and Regulations, or that may be available at law or in equity, and *may prosecute an action or other*

*proceedings against such defaulting Unit Owner ....* All expenses of the Executive Board *in connection with any such actions or proceedings*, including court costs and attorneys fees ... together with interest thereon at the rate of fifteen percent (15%) per annum until paid, shall be charged to and assessed against such defaulting Unit Owner ....

**\*393**  Declaration § 13.12 (emphasis added). The Debtor argues that this provision "clearly limits reimbursement for attorneys fees and costs from unit owners to those in connection with actions and proceedings against a unit owner." Debtor's Second Suppl. Mem. 5. The Debtor also cites Declaration § 14.1(c)(ii), titled "Costs and Attorneys' Fees," which states:

In any proceeding arising because of an alleged failure of an Owner to comply with the terms of this Declaration, the By-Laws and any rules and regulations adopted pursuant thereto, *the prevailing party* shall be entitled to recover the costs of the proceeding and reasonable attorneys' fees; provided, however, that no costs or attorneys' fees may be recovered against the Board in any action unless the court shall first expressly find that the Board acted in bad faith.

Declaration § 14.1(c)(ii) (emphasis added). The Debtor argues this provision imposes the same limits as § 13.12 and adds "the requirement that the party entitled to be reimbursed must be 'prevailing.' " Debtor's Second Suppl. Mem. 5.

In addition, he cites Bylaws § 10.1.2, also titled "Costs and Attorney's Fees," which states: "In any proceedings arising out of any alleged default by an Owner, the prevailing party shall be entitled to recover the costs of such proceeding and such reasonable attorney's fees as may be determined by the court." Bylaws § 10.1.2. He argues that § 10.1.2 adds a final requirement: "that the entitlement to reimbursement be 'determined' by a court." Debtor's Second Suppl. Mem. 5.

The Debtor alleges that the foregoing provisions "were drafted solely by WCCA" and therefore "must be construed strictly against [it]." *Id.* at 7. The Debtor argues that the provisions should restrict recoverable attorneys' fees and costs "to those determined by a trial court to be due to WCCA [for] services performed in connection with actions and proceedings initiated by WCCA in which it has been judicially determined to have been the prevailing party." *Id.* at 6; *see also id.* at 7 (stating that "WCCA was empowered to draft these documents more broadly and expressly include the services for which it seeks fee-reversal ... and chose not to do so"). The Debtor therefore requests that the Court disallow the remaining pre-petition attorneys' fees and costs because WCCA was never "determined by any court to be entitled to costs and attorneys fees as a prevailing party in any action brought against the Debtor." *Id.* at 6.

In response, WCCA argues that, in addition to the attorneys' fees and costs described by the Debtor, it is also entitled to the amounts set forth in Declaration § 13.8, titled "Interest and Charges," which states, in pertinent part:

Any delinquent owner shall also be obligated to pay (i) all expenses of the Executive Board, including reasonable attorney's fees incurred in the collection of the delinquent assessment by legal proceedings or otherwise, and (ii) *any amounts paid by the Executive Board* for taxes or on account of superior liens *or otherwise to protect its lien*, which expenses and amounts, together with accrued interest, shall be deemed to constitute part of the delinquent assessment and shall be collectible as such ....

Declaration § 13.8 (emphasis added). WCCA argues that § 13.8 "plainly sets forth Debtor's obligation to pay the Association's expenses to protect its lien" and that the remaining pre-petition attorneys' fees and costs may be allowed thereunder. WCCA's Second Suppl. Mem. 6.

The Court concludes that WCCA correctly interprets § 13.8. As explained above, WCCA has liens on the Debtor's Unit for the delinquent assessments pursuant **\*394**  to UCA § 3315(a) and Declaration § 13.12. Section 13.8

plainly obligates the Debtor to pay any amounts that WCCA expends to protect such liens, which would include attorneys' fees and costs. Such amounts are not limited thereunder to those expended in actions or proceedings filed by WCCA directly against the Debtor, and therefore are distinguishable from the amounts allowed under §§ 13.12 and 14.1(c)(ii) of the Declaration and § 10.1.2 of the Bylaws. *See* Declaration § 13.12 (stating that WCCA and the Board "shall have each and all of the rights and remedies that may be provided for in the [UCA], the Declaration, the By-Laws or said Rules and Regulations, or that may be available at law or in equity, *and* may prosecute an action or other proceedings against such defaulting Unit Owner") (emphasis added); *id.* § 14.1(c) (stating that WCCA is entitled "to the remedies provided in this Declaration, and also to the following relief, *none of which shall be exclusive of any other remedies* ") (emphasis added); Bylaws § 10.1 (stating that "*[i]n addition to the remedies provided in the [UCA] and the Declaration*, a default by an Owner shall entitle the Association, acting through its Executive Board to the following relief") (emphasis added).

### b. Reasonable Attorneys' Fees and Costs

**[14]** **[15]** If WCCA's remaining pre-petition fees and costs are reasonable, they will be allowed as part of its Proof of Claim. Whether pre-petition attorneys' fees and costs are reasonable is determined according to applicable nonbankruptcy law. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000)) (stating that bankruptcy courts should "consult state law in determining the validity of most claims" under § 501(b)(1)). The Pennsylvania Supreme Court has instructed that the following factors apply:

> the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the

> attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*In re LaRocca's Tr. Estate*, 431 Pa. 542,246 A.2d 337, 339 (1968). [14]

**[16]** The Debtor's only line item objections to the pre-petition fees and costs were set forth in his first memorandum. Therein, he asserted that Mr. Manochi committed a mathematical error when he calculated the fees and costs listed in Invoice 2989. Although the Debtor asserted that the error inflated the pre-petition fees and costs by $60.50, Mr. Manochi conceded that the error inflated the fees and costs by $78.00. Debtor's Suppl. Mem. Ex. A; Debtor's Mem. 7. The Debtor asserted that Mr. Manochi committed additional **\*395** mathematical errors, which, including the aforementioned concession, inflated the pre-petition fees and costs by a total of $468.75. Debtor's Suppl. Mem. Ex. A; Debtor's Mem. 7. However, Mr. Manochi did not concede, and the Court's calculations do not reveal, such errors. The Court will therefore reduce WCCA's Proof of Claim in the amount of Mr. Manochi's concession of $78.00.

In addition, the Court's calculations revealed an error not asserted by the Debtor with respect to Invoice 3203. As reflected in the Sheet, the portion of that invoice that was charged to the Debtor on August 6, 2012, was in the amount of $869.64. However, as reflected in the pre-petition bills, that portion of the invoice was billed to WCCA in the amount of $526.50, which is $343.14 less than the amount charged to the Debtor. Hr'g on Obj. Claimant's Ex. 4. The Court will therefore reduce WCCA's Proof of Claim by an additional $343.14.

As stated above, the Court ordered the Debtor to submit additional line item objections following the conclusion of the hearing on his Objections. Although the Debtor purported to comply with the Court's order, he asserted only *general* objections to WCCA's attorneys' fees and costs, not *line item* objections. Moreover, his objections were confined to a single paragraph in which he concluded that "[a] further line-by-line analysis could be undertaken, but only with considerable time-expenditures, which

In re Milbourne, 557 B.R. 575 (2015)

should be unnecessary because the entire sum of amounts allowed to WCCA are likely to be ultimately classified as unsecured and hence payable in very small part, or disallowed entirely." Debtor's Second Suppl. Mem. 9–10. Accordingly, the Debtor asserted only two further objections to the remaining pre-petition fees and costs.

First, the Debtor denied that "most of Mr. Toll's services for monitoring the foreclosure action brought by the Debtor's first mortgagee ... were necessary." *Id.* at 9. As explained above, CitiMortgage holds the First Mortgage on the Debtor's Unit and maintained foreclosure proceedings thereupon after the Debtor's 2010 Bankruptcy. If CitiMortgage had obtained a foreclosure judgment and conducted a sheriff's sale, then WCCA would have risked the complete divestment of its liens for unpaid assessments due more than six months before the sale. UCA § 3315(b)(2). Therefore, these services were reasonably incurred to protect WCCA's liens under Declaration § 13.8.

Second, the Debtor denied that "Mr. Manochi's services for monitoring the Debtor's first bankruptcy were necessary." Debtor's Second Suppl. Mem. 9. As explained above, the 2010 Bankruptcy commenced on December 29, 2010. Therein, WCCA filed a proof of claim for delinquent assessments; objections to confirmation to compel priority payment of pre- and post-petition arrears; and a motion to join the Trustee's motion to dismiss the bankruptcy because of the nonpayment of post-petition arrears. Mr. Toll prepared the proof of claim and Mr. Manochi prepared the objections and joinder motion. Such services were reasonably incurred to protect WCCA's liens in the Unit and to ensure that the Debtor did not discharge WCCA's claims in the 2010 Bankruptcy under Declaration §§ 13.12 and 14.1(c)(ii) and Bylaws § 6.1.2.

The Debtor's additional general objections to the remaining pre-petition attorneys' fees and costs therefore did not reveal any unreasonable or unauthorized fees or costs. The Court's line-by-line analysis of the pre-petition bills, however, did discover one unauthorized charge. There is a single entry in Invoice 3203 on January 20, 2012, that does not appear to pertain to services incurred in pursuit of this or related **\*396** matters. It reads: "Telephone with Cathy P. (fr) w/ question re access to Milbourne to check water—see file memo dictated; question re getting needed proxies for approval

of Declaration—I will review & advise." Hr'g on Obj. Claimant's Ex. 4. The Court will therefore reduce WCCA's Proof of Claim in the amount of such charge: $117.00.

The sum of the foregoing reductions for mathematical errors and unreasonable or unauthorized charges is $538.14. After subtracting this amount from WCCA's request for prepetition attorneys' fees and costs of $7,357.41, the Court concludes that WCCA holds a total allowed pre-petition claim for attorneys' fees and costs equal to $6,819.27.

This amount is eminently reasonable in light of the fact that it represents less than twenty-eight hours of legal services provided over more than four years to recover the Debtor's delinquent assessments and protect WCCA's liens arising therefrom. Through those services, Mr. Toll and Mr. Manochi monitored multiple foreclosure proceedings, preserved their client's claims in bankruptcy, and managed the collection of the Debtor's account. Moreover, the vast majority of the pre-petition fees and costs were billed by Mr. Toll, whose testimony was particularly credible and whose rate was more than reasonable, especially in light of his vast experience and credentials, which the Debtor did not challenge. Finally, the Debtor could have prevented the incursion of all or most of such fees and costs had he timely paid the delinquent assessments, or cured the delinquencies in a reasonable timeframe, rather than allow them to accumulate over the four years preceding this bankruptcy.

Based upon the foregoing, the Court concludes that WCCA holds an allowed pre-petition secured claim in the amount of $15,193.91, which represents the following allowed pre-petition amounts: $7,389 in monthly assessments, $950 in special assessments, $35.64 in fees, and $6,819.27 in attorneys' fees and costs.

### B. Post-Petition Claims Under § 506(b)

[17]   [18]   As just discussed, WCCA holds an allowed pre-petition secured claim equal to $15,193.91 ("Secured Claim") under § 502. WCCA has also requested an award for post-petition late charges, interest and attorneys' fees. [15] In order to determine whether WCCA is entitled to add post-petition claims to its Secured Claim, the Court looks to § 506(b) which provides:

> To the extent that an allowed secured claim is secured by property

the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). Section 506(b) therefore "allows oversecured creditors to add reasonable post-petition, pre-confirmation attorney fees, interest, and costs to the amount of their secured claim" to the extent of the value of the underlying collateral.[16] **\*397** *In re Joubert*, 411 F.3d 452, 454 (3d Cir.2005); *see also In re Nunez*, 317 B.R. 666, 670 (Bankr.E.D.Pa.2004) (stating that "section 506(b) applies only to post-petition interest, fees and costs sought in a secured creditor's proof of claim" and that "[t]he 'allowability' of pre-petition claims is governed by section 502 and not by section 506(b)"); 4 *Collier on Bankruptcy* ¶ 506.04 [1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (stating that "[t]he allowability of ... prepetition amounts as part of the secured creditor's 'claim' is not determined by section 506, but is governed by section 502 in conjunction with other provisions of the Code").

**[19]** By the terms of § 506(b), however, the oversecured creditor's ability to add reasonable post-petition attorney fees to its secured claim is capped by the value of such creditor's underlying collateral. To the extent that an oversecured creditor's reasonable post-petition attorney fees exceed the value of its collateral, such excess portion is disallowed in its entirety. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (addressing the right to recover post-petition interest under § 506(b) and holding that § 506(b) has the "substantive effect of denying undersecured creditors postpetition interest on their claims—just as it denies over secured creditors postpetition interest to the extent that such interest, when added to the principal amount of the claim, will exceed the value of the collateral").[17]

### C. Calculation of WCCA's Post-Petition Claims Under § 506(b)

**[20]** **[21]** The Court has determined that the Unit has a value of $263,000.00.[18] The **\*398** Court has also calculated that the total secured claims against the Unit

equal $232,278.26.[19] Based upon the foregoing, the Court concludes that there is an equity cushion in the Unit equal to $30,721.74 ("Equity Cushion") and, therefore, that WCCA is an oversecured creditor.[20] At the outset, the Court will focus on WCCA's request for post-petition attorneys' fees and costs. Accordingly, the Court will add WCCA's reasonable post-petition attorneys' fees and costs, if any, to WCCA's Secured Claim to the extent of the Equity Cushion. If the Court determines that WCCA's reasonable post-petition attorneys' fees and costs exceed the Equity Cushion, the Court will disallow such excess portion in its entirety and will not consider WCCA's request for interest on the post-petition attorneys' fees and costs.

**[22]** **[23]** Under § 506(b), post-petition attorney's fees may be allowed "if three elements are satisfied: (1) the claim is an oversecured, allowed secured claim; (2) the fees are reasonable; and (3) the fees are provided for under the agreement between the parties or by statute." *In re Gordon–Brown*, 340 B.R. 751, 757 (Bankr.E.D.Pa.2006); *accord In re Nunez*, 317 B.R. at 668 (stating the same); *Collier*, *supra*, ¶ 506.04[3] (stating the same). However, unlike pre-petition fees and costs, whether post-petition fees and costs are reasonable under § 506(b) is determined according to "federal standards." *Collier*, *supra*, ¶ 506.04[3][d]; *see also In re Ryker*, No. 06–1872, 2007 WL 2138590, at \*4 (3d Cir. July 27, 2007) (citing *In re A & P Diversified Techs. Realty, Inc.*, 467 F.3d 337, 341 (3d Cir.2006)) (stating that § 506(b) "governs the reasonableness of ... attorneys' fees, irrespective of conflicting state law" and "preempts conflicting state law regarding attorneys' fees")).

**[24]** **[25]** **[26]** **[27]** Under federal law, the lodestar approach controls whether post-petition attorneys' fees and costs are reasonably incurred. *See Gordon–Brown*, 340 B.R. at 757. Pursuant to the lodestar approach, the Court will inquire "into the hours spent by the attorneys." *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir.1973).[21] The Court need **\*399** not examine "the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney" as long as it can determine "the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations," etc. *Id.*

Accordingly, WCCA's post-petition fees and costs will be allowed to the extent that they were reasonably incurred and authorized under the Declaration and the Bylaws. WCCA has incurred post-petition attorneys' fees and costs totaling at least $34,585.50. Hr'g on Obj. Claimant's Exs. 5, 10–11. WCCA incurred such fees and costs largely to prepare and file its Proof of Claim, motion to compel the payment of its post-petition fees and assessments, praecipe to withdraw the same, memorandums in opposition to the Debtor's Objections, and objections to the confirmation of eight of the Debtor's ten Chapter 13 plans in this bankruptcy; to prepare and file an answer, expert appraisal report, and response to the Debtor's voluntary motion to dismiss, in the Adversary Proceeding; and to collect unpaid assessments from the Debtor and respond to his lump sum payment proposals.

Just like with WCCA's pre-petition attorneys' fees and costs, the Debtor argues that these fees and costs are not authorized under the Declaration and Bylaws. However, these arguments fail for the same reasons discussed above—namely, Declaration § 13.8 permits WCCA to incur attorneys' fees and costs to protect its lien against the Unit.

The Debtor also lists several "specific services" that he believes were unreasonably billed to him.[22] Debtor's Second Suppl. Mem. 9. However, the Debtor's arguments as to these services fail, as explained below.

*Excessive Consultations*

First, the Debtor denies that "the numerous consultations between Mr. Toll and Mr. Manochi" were necessary. *Id.* at 10. As a general principle, however, the Court finds that it was necessary for Mr. Toll and Mr. Manochi to occasionally consult each other in order to competently represent WCCA. The Court will therefore reduce WCCA's post-petition claims only if, and to the extent that, a line-by-line analysis of its post-petition bills reveals that its attorneys excessively consulted with each other.

*Defending the Adversary Proceeding*

Second, the Debtor denies that it was necessary to defend against his Adversary Proceeding if Mr. Manochi knew of, but failed to disclose, Wells Fargo's Second Mortgage on the Debtor's unit. *Id.* at 9–10. **\*400** The Debtor argues that, under such circumstances, Mr. Manochi "should have gracefully conceded that the claim of WCCA was in fact totally unsecured and stipulated to the relief sought." *Id.* at 10. As explained above, however, the Second Mortgage was satisfied on January 3, 2013. WCCA's Second Suppl. Mem. Ex. A. It was therefore entirely reasonable to defend against the Adversary Proceeding because, if it did not, WCCA might have lost "all of its security interest in Debtor's Property and quite possibly [its] right to collect any pre- or post-petition amounts due from Debtor." *Id.* at 7–8.

*Dismissing the Adversary Proceeding*

Third, the Debtor denies that WCCA's opposition to his "attempts to voluntarily dismiss the initial adversary proceeding" was necessary and asserts that WCCA should have executed a "Stipulation of Dismissal." Debtor's Second Suppl. Mem. 10. However, WCCA reasonably devoted "significant time and expense" to prepare its Appraisal of the Debtor's Unit in the Adversary Proceeding. Def.'s Resp. ¶ 13. And the Debtor tacitly endorsed WCCA's Appraisal when he admitted that the primary reason that he moved to dismiss the Adversary Proceeding was his "subsequent review of ... evidence of the value of the residence." Pl.'s Mot. to Dismiss ¶ 4. WCCA did not act unreasonably, therefore, when it incurred time trying to obtain the Debtor's consent to the value of the Unit since WCCA was trying to avoid the "additional time and expense" necessary to re-litigate the Unit's value in the lead bankruptcy case. Def.'s Resp. ¶ 13. Thus, WCCA reasonably opposed dismissal of the Adversary Proceeding in an attempt to secure the full value of its efforts to determine the value of the Unit therein.

*Objections to Confirmation*

Fourth, the Debtor denies that WCCA's "voluminous" objections to the confirmation of the Debtor's Chapter 13 plans were necessary because the plans "could not have been confirmed." Debtor's Second Suppl. Mem. 10. According to the Debtor, confirmation of his Chapter 13 plans would have been denied, even if WCCA did not object, because of "[t]he presence of other, larger creditors

*In re Millbourne, 557 B.R. 377 (2016)*

of the Debtor whose claims were not totally satisfactorily treated." Debtor's Mem. 1.

The foregoing argument is absurd. In the event of a unit owner's failure to timely pay assessments, WCCA and the Board are plainly entitled to "each and all of the rights and remedies that may be provided for in the [UCA], the Declaration, the By-Laws or said Rules and Regulations, or that may be available at law or in equity." Declaration § 13.12. WCCA was not obligated, and it would not have been wise for WCCA, to entrust the protection of its rights and remedies to the Debtor's other creditors, the Trustee, or the Court merely to consolidate the objections filed in this bankruptcy:

> In none of the plans did Debtor agree to pay the amounts Debtor owed as set forth in WCCA's proof of claim or the post-petition amounts due WCCA at the time of confirmation. In none of these plans did Debtor acknowledge WCCA's lien rights in these amounts or agree to pay post-confirmation Association assessments. These failures required WCCA to object to the plans. Had the Association not timely objected, and any one of the [ten] plans been confirmed, the Association and its Board members would have been subjected to possible legal claims from the paying unit owners that the Association was not properly protecting their interests.

WCCA's Second Suppl. Mem. 8. Moreover, such entrustment could have possibly exposed its counsel to punishment for violations of the rules of professional conduct. **\*401** The Court therefore will deny the Debtor's Objections.

*Unsecured Creditors and Excessive Undertakings*

The Debtor finally argues that WCCA's post-petition fees and costs as a whole are unreasonable for two reasons. According to the Debtor, (1) his "limited financial resources ... should not be exhausted by one creditor" to the detriment of his other creditors; and (2)

WCCA's "excessive undertakings ... do not exhibit the spirit of economy that might be expected from a creditor actually concerned about saving costs to its members." Debtor's Second Suppl. Mem. 8–9; Debtor's Reply Mem. 3. The Debtor therefore requests that the Court allow no more than 10% of WCCA's post-petition fees and costs. Debtor's Second Suppl. Mem. 9.

In response, WCCA argues that all of the legal actions it has taken during the Debtor's bankruptcy proceeding were necessary to ensure that the Debtor pays WCCA what it is owed. WCCA's Second Suppl. Mem. 9. WCCA alleges that if it had forfeited the amounts it was owed, then other, nondefaulting unit owners would have borne the resulting burden. WCCA's Suppl. Mem. 7–8. Such a result, WCCA concludes, "would not only be unfair to the other unit owners, it would pervert justice." *Id.* WCCA concludes that it is therefore "entitled to the full amount of its attorneys' fees and costs even if those fees and costs are disproportionate to the non-attorneys' fees assessments [it] seeks." WCCA's Second Suppl. Mem. 9–10 (citing *Arches Condo. Ass'n v. Robinson*, 131 A.3d 122 (Pa.Commw.Ct.2015); *Latch's Lane Owners Ass'n v. Bazargani*, No. 2408 C.D. 2009, 2010 WL 9516204 (Pa.Commw.Ct. Apr. 13, 2010); *Mountain View Condo. Ass'n v. Bomersbach*, 734 A.2d 468 (Pa.Commw.Ct.1999)).

The Court agrees with WCCA. First, although the Debtor has incurred attorneys' fees on account of its legal battle with WCCA in this proceeding, and although the amount that the Debtor may use to pay such fees might otherwise have been available to pay the Debtor's unsecured creditors, WCCA is clearly entitled to take reasonable action in order to enforce its liens to the full extent of its claims. Such advantages enjoyed by secured creditors are inherent in the basic structure of the Bankruptcy Code. *See* 11 U.S.C. §§ 502–03, 506–07 (setting forth the rules governing secured and unsecured claims).

Second, as WCCA observed, it is not unprecedented to award attorneys' fees and costs to condominium associations in excess of the amounts for which such fees and costs were incurred to recover. [23] Contrary to the Debtor's criticism of its "spirit of economy," such cases clarify that WCCA may "stand on princip[le]" and "pursue its legally correct position." *E.g.*, *Mountain View*, 734 A.2d at 471. As a result, WCCA was permitted to incur whatever reasonable attorneys' fees and costs were

necessary in order to protect and enforce all of its rights, and its lien against the Unit, under the Declaration and applicable state law.

 **\*402** Finally, the Debtor's actions in this bankruptcy proceeding demonstrate that he is substantially responsible for the inflated fees and costs to which he objects. The Debtor has consistently failed to file plans that proposed to grant liens to secure the delinquent pre-petition assessments, or to pay post-petition assessments, to WCCA. Instead, he filed numerous plans that he admitted "could not have been confirmed." Debtor's Second Suppl. Mem. 10. As WCCA observed, the Debtor therefore "plainly controlled the nature and length of the litigation" that produced the claims to which he now objects. WCCA Second Suppl. Mem. 9. In addition, the Debtor has acknowledged that, although he repeatedly stated in his plans that he was current on all monthly post-petition assessments to WCCA, those statements were not true. Through the Declaration and the Bylaws, the Debtor clearly was on notice of the risk posed by his refusal to pay monthly post-petition assessments and by proposing plans that he admits were patently unconfirmable and failed to protect WCCA's lien in the Unit: that he would be liable to pay the resulting attorneys' fees and costs incurred by WCCA to protect its interests. He will now be held responsible for his actions.

*The Court's Line-by-Line Analysis*

As explained above, the Debtor's objections to WCCA's post-petition claims for attorneys' fees and costs did not reveal any unreasonable or unauthorized charges. Although the Court conducted a line-by-line analysis of WCCA's post-petition bills, the Court discovered only one error not asserted by the Debtor. WCCA claimed $4,602.00 of fees and costs related to services performed

by Mr. Manochi from December 2015 to January 2016. Hr'g on Obj. Claimant's Ex. 11. However, the sum of the bills therefor is only $4,542.25. *Id.* The Court will therefore reduce WCCA's post-petition attorneys' fees and costs by the amount of such error: $59.75.

Based upon the foregoing, WCCA has incurred reasonable post-petition attorneys' fees and costs totaling $34,525.75. As explained above, however, the Court will only allow WCCA's reasonable post-petition attorneys' fees and costs to the extent of the Equity Cushion which is equal to $30,721.74. Thus, the Court will limit the award of WCCA's reasonable post-petition attorneys' fees and costs under § 506(b) to $30,721.74. Finally, WCCA's request for the remainder of its post-petition attorneys' fees and costs and interest on its post-petition attorneys' fees and costs will be disallowed because they exceed the Equity Cushion in the Unit.

### IV. CONCLUSION

For the foregoing reasons, the Debtor's Objections to WCCA's Proof of Claim will be sustained in part and denied in part. The Court concludes that WCCA holds an allowed prepetition secured claim of $15,193.91 pursuant to § 502 and that WCCA holds an additional secured claim of $30,721.74 as an oversecured creditor pursuant to § 506(b) on account of reasonable post-petition attorneys' fees and costs. The Court concludes therefore that WCCA holds a total allowed secured claim against the Debtor equal to $45,915.65.

An appropriate order follows.

**All Citations**

557 B.R. 376

### Footnotes

1    As a member of WCCA, the Debtor was required to pay "monthly assessments" for "common expenses" of Williamsburg Commons, and certain "special assessments" for "limited common expenses." Declaration §§ 2.2.c, .e, 13.1. Special assessments were set by the WCCA Executive Board ("Board") as necessary to offset annual budget shortfalls and oversights, including the non-payment of an assessment by a unit owner. *Id.* § 13.5. Monthly and special assessments were due on the first day of each month and accrued interest at a limited rate from the tenth day thereafter. *Id.* §§ 13.1, 13.8.

2    Section 3315(a) of UCA establishes that WCCA "has a lien on a unit for any assessment levied against that unit or fines imposed against its unit owner from the time the assessment or fine becomes due." UCA § 3315(a). Declaration § 13.12

In re Williams, 557 B.R. 571 (2016)

establishes that if the Debtor violates any provisions of UCA, the Declaration, the Bylaws, or any rules and regulations adopted by the Board, WCCA and the Board

> may prosecute an action or other proceedings against such defaulting Unit Owner and/or others for enforcement of any lien .... All expenses of the Executive Board in connection with any such actions or proceedings, including court costs and attorneys fees ... shall be charged to and assessed against such defaulting Unit Owner ... *and the Association shall have a lien for all of the same, as well as for nonpayment of the respective share of the Common Expenses*, upon the Unit.

Declaration § 13.12 (emphasis added).

3 Mr. Toll, who had been monitoring the Debtor's 2010 Bankruptcy, contacted Wells Fargo's counsel to request that it modify the Settlement Stipulation to "accommodate" the post-petition arrears that the Debtor owed to WCCA, on September 23, 2011. Hr'g on Obj. Claimant's Ex. 4.

4 The Debtor and his wife had filed a Chapter 13 Plan, ECF No. 21, Bankr. No. 10-31122-bif, on January 25, 2011; an Amended Chapter 13 Plan, ECF No. 86, Bankr. No. 10-31122-bif, on September 22, 2011; and a Second Amended Chapter 13 Plan, ECF No. 89, Bankr. No. 10-31122-bif, on October 18, 2011.

5 Section 3315(b)(1) of UCA provides that WCCA's lien "is prior to all other liens" except those "recorded before the recordation of the declaration"; "[m]ortgages ... securing first mortgage holders and recorded before the due date of the assessment"; "[j]udgments obtained for obligations secured by [such] mortgages"; and "[l]iens for real estate taxes and other governmental assessments or charges against the unit." UCA § 3315(b)(1).

6 Section 3315(b)(2) of UCA states that WCCA's lien is divested upon a judicial sale:

> (i) As to unpaid common expense assessments ... that come due *during the six months immediately preceding the date of a judicial sale* of a unit in an action to enforce collection of a lien against a unit by a judicial sale, *only to the extent that* the six months' unpaid assessments are paid out of the proceeds of the sale.
>
> (ii) As to unpaid common expense assessments ... *other than the six months assessment* referred to in subparagraph (i), in the full amount of these unpaid assessments, whether or not the proceeds of the judicial sale are adequate to pay these assessments. To the extent the proceeds of the sale are sufficient to pay some or all of these additional assessments ... *they shall be paid before any remaining proceeds may be paid to any other claimant*, including the prior owner of the unit.

UCA § 3315(b)(2) (emphasis added).

7 On December 10, 2014, CitiMortgage filed a proof of claim against the Debtor for $217,084.35, for the loan secured by the First Mortgage. Claim 8-1, Claims Register. The Debtor allegedly stopped regularly paying the monthly installments due on the loan secured by the First Mortgage such that thirty-five installments were past-due by August 2014. *Id.* Ex. A-1.

8 On July 15, 2015, the Court granted a stipulation between the Debtor and WCCA to extend the deadline to file expert appraisal reports in the Adversary Proceeding. Order, ECF No. 13, Bankr. No. 14-16411, Adv. No. 15-00045. The Debtor did not submit a report to refute WCCA's Appraisal. Def.'s Resp. ¶ 6.

9 The Debtor asserted that the pre-petition monthly assessments totaled $7,349.00, which was "the sum of the first five entries" of the pre-petition bills submitted by WCCA at the hearing on November 17, 2015. Debtor's Mem. 3. The Debtor also asserted that WCCA agreed to the foregoing via email on December 2, 2015, but insisted upon "special assessments and a fine, of which the Debtor is unaware and therefore cannot agree is due." *Id.* at 3–4. The Debtor submitted a copy of the above-referenced email to the Court, which substantiates the foregoing assertions. Suppl. Mem. Ex. A, ECF No. 94. The figure quoted by the Debtor as the total pre-petition assessments due, however, is less than the sum of the pre-petition assessments that WCCA listed in the pre-petition bills, which is $7,389.00, according to the Court's calculations. Hr'g on Obj. Claimant's Ex. 4. Moreover, in the email, Mr. Manochi asserted that "the non-legal pre-petition amounts due are $8,754.64," which matches the sum of the nonlegal pre-petition bills he submitted at the hearing notwithstanding the pre-petition assessments that the Debtor asserted totaled only $7,349.00. Suppl. Mem. Ex. A; Hr'g on Obj. Claimant's Ex. 4. The Court therefore rejects the Debtor's calculation of the pre-petition monthly assessments and finds that the total pre-petition monthly assessments equal $7,389.00.

> The Debtor also miscalculated the total of WCCA's attorneys' fees and costs that he listed as compensable. The correct total is $618.69. Hr'g on Obj. Claimant's Ex. 4.

10 Meanwhile, on December 29, 2015, CitiMortgage filed a motion for relief from the automatic stay to maintain foreclosure proceedings on the First Mortgage. CitiMortgage Mot. ¶ 11. The Debtor filed an Answer, ECF No. 99, on January 11, 2016, and CitiMortgage filed a Praecipe to Withdraw, ECF No. 118, on March 30, 2016.

11 The Debtor erroneously asserted that the conceded amounts totaled $8,992.85. Although the Debtor apparently corrected his previous miscalculation of the pre-petition monthly assessments, he apparently did not correct his previous

miscalculation of the conceded attorneys' fees and costs. The Debtor also apparently miscalculated the total of the special assessments and other fees that he conceded in his most recent memorandum. The correct amount of the pre-petition charges conceded by the Debtor is $8,993.33 and is broken down into $7,389.00 in monthly assessments, $950.00 in special assessments, $35.64 in other fees, and $618.69 in attorneys' fees and costs.

12    The Court believes that the correct amount of post-petition attorneys' fees and costs requested by WCCA is $34,585.50 broken down into WCCA's two prior requests of $21,134.77 and $13,450.73.

13    The Court believes that the correct amount of WCCA's total requested claims is $51,796.55 broken down into WCCA's Proof of Claim of $16,112.05, post-petition attorneys' fees and costs of $34,585.50, post-petition monthly assessments of $599.00, late charges of $450.00, and other fees of $50.00.

14    *See also* Arches Condo. Ass'n v. Robinson*, 131 A.3d 122, 131–32 (Pa.Commw.Ct.2015) (stating that the trial court should have applied such factors to determine whether the fees and costs that a condominium association's executive board incurred to collect delinquent assessments were reasonable, but that it may be sufficient to consider only "factors such as the nature and length of the litigation, the responsibilities of the parties in affecting the nature and length of the litigation, and the competitiveness of the rate and time expended").

15    As discussed below, the Debtor is only entitled to post-petition late charges under § 506(b) if a Pennsylvania statute, or an agreement between the Debtor and WCCA, authorizes such charges. Since the Court has already determined that no statute or agreement exists which permits WCCA to impose late charges, the Court will deny WCCA's request for post-petition late charges.

16    The Debtor argues that WCCA's post-petition attorney's fees and costs can only be allowed by this Court as an administrative expense under § 503(b) and that WCCA has not demonstrated that it is entitled to an administrative claim thereunder. Debtor's Second Suppl. Mem. 1. Although the Court agrees that WCCA's post-petition attorneys' claims do not qualify as administrative expenses under § 503(b), they may be allowed under § 506(b) to the extent of the value of the underlying collateral, subject to this Court's determination that such fees are reasonable.

17    *See also* Tribune Media Co.*, No. 08–13141 (KJC), 2015 WL 7307305, at *3 (Bankr.D.Del. Nov. 19, 2015) (quoting *In re Glob. Indus. Techs., Inc.*, 327 B.R. 230, 239–40 (Bankr.W.D.Pa.2005)) (stating that "post-petition interest, attorney's fees and costs are recoverable only by oversecured creditors" because (1) "unsecured creditors have no clear entitlement to postpetition attorneys' fees" in the Bankruptcy Code; (2) the United States Supreme Court "permitted only oversecured creditors to recover postpetition interest" under § 506(b) in *Timbers*; (3) claims are determined "as of the date the petition was filed" under § 502(b), and then post-petition claims are added "to the extent a creditor is oversecured" under § 506(b); and (4) "it is inequitable to allow certain unsecured creditors to recover postpetition attorney's fees at the expense of similarly situated claimants"), *mot. to certify appeal granted sub nom. In re Tribune Media Co.*, C.A. No. 15–1116–GMS, 2016 WL 1451161 (D.Del. Apr. 12, 2016); *In re Plymouth House Health Care Ctr.*, No. 03–19135, 2005 WL 2589201, at *5 (Bankr.E.D.Pa. Mar. 15, 2005) (stating that "an unsecured creditor or an undersecured creditor is not entitled to recover postpetition fees and costs arising from his claim"); *Glob. Indus. Techs.*, 327 B.R. at 239 (agreeing "with the majority of courts that unsecured creditors may not include postpetition attorneys' fees in their claims from a bankruptcy estate") (footnote omitted); *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 444 (Bankr.D.Del.2002) (stating that "post-petition fees and costs may only be recovered by creditors to the extent their claims are oversecured"). *But see Collier, supra*, ¶ 502.03[2][b] (stating that "the trend seems to be moving towards courts allowing" unsecured claims for post-petition attorneys' fees "where permitted by state law or contractual agreement").

18    The Debtor has not provided any evidence regarding the value of the Unit. WCCA submitted an Appraisal of the Unit in the Adversary Proceeding filed by the Debtor against WCCA, which listed the value as $263,000. In the absence of any evidence from the Debtor regarding the value of the Unit and for the purpose of determining whether WCCA is oversecured, the Court will adopt the value of the Unit listed in the Appraisal of $263,000. To the extent that the Debtor contests the value of the Unit, he may file a timely motion for reconsideration of the Order that will accompany this Opinion. At the hearing on the motion for reconsideration ("Hearing"), the Debtor may present testimony by the Debtor, and/or an appraiser, of the value of the Unit provided that the Debtor gives a copy of any appraisal used by the Debtor at the Hearing to WCCA at least one week before the Hearing.

19    The Court determined the total amount of secured claims against the Unit by adding the allowed secured claim of the First Mortgage in the amount of $217,084.35 to WCCA's allowed secured claim of $15,193.91. Although the Debtor has alleged that "it has recently come to light" that his Unit "has a second mortgage of approximately $100,000 against it," it is clear that Wells Fargo's Second Mortgage on the Unit was satisfied on January 3, 2013. Debtor's Second Suppl. Mem. 7; WCCA's Second Suppl. Mem. Ex. A.

20    "When the value of the collateral exceeds the amount of the claim, the creditor is 'oversecured.' " *In re Ryker*, No. 06–1872, 2007 WL 2138590, at *3 n. 6 (3d Cir. July 27, 2007).

21    Ordinarily, the Court would also "fix a reasonable hourly rate" for the services provided by the attorneys, considering their "legal reputation and status." *Lindy Bros.*, 487 F.2d at 167. However, WCCA correctly observes that the "Debtor does not challenge the skill, expertise or hourly rates charged by either Mr. Toll or [Mr. Manochi]." WCCA's Second Suppl. Mem. 7. The Court therefore will not conduct such an inquiry.

22    The Debtor further argues that "[n]o more than" $3,000 should have been billed for the post-petition legal services provided before the hearing on November 11, 2015, and that "[n]o more than" $1,000 should have been billed for the legal services provided in opposition to Debtor's voluntary dismissal of the Adversary Proceeding. Debtor's Second Suppl. Mem. 10. However, the Court cannot evaluate whether the precise figures quoted by the Debtor fairly represent the only fees and costs that should have been billed for such legal services because he has not provided line item objections thereto.

    The Debtor also argues that, to the extent that WCCA's post-petition attorneys' fees and costs are unauthorized under the parties' agreements, they may be allowed only "in extraordinary situations, such as where legally unjustifiable conduct of a party or counsel for a party is established, or where the debtor requests some extraordinary dispensation." Debtor's Mem. 6–7 (quoting *In re Nickleberry*, 76 B.R. 413, 424 (Bankr.E.D.Pa.1987)). The Debtor therefore denies that the post-petition fees and costs may be allowed because "[t]here are no such circumstances here on the part of the Debtor or his counsel." *Id.* However, as the Court will explain below, all of WCCA's post-petition fees and costs were authorized under the Declaration and the Bylaws.

23    *See Arches*, 131 A.3d at 125 (upholding a judgment of $27,355.68, including $26,206.68 of attorneys' fees and costs to collect unpaid fees and assessments); *Latch's Lane*, 2010 WL 9516204, at *4–5 (upholding a judgment of $18,000, including $17,297.71 of attorneys' fees and costs to collect unpaid late fees); *Mountain View*, 734 A.2d at 469 (upholding a judgment of $46,548.64 of attorneys' fees and costs to collect prior fees and costs for unpaid assessments). Although federal law controls the reasonableness of attorneys' fees under § 506, the policies articulated in these cases are pervasive.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.